1   James J. Ison, Esq. (SBN 209116)
2   **THE ISON LAW FIRM, PC**
    333 University Avenue, Suite 200
3   Sacramento, California 95825
    Telephone: (916) 565-7677
4   Facsimile: (916) 929-0448
    james@jisonlaw.com
5
6   Attorneys for Plaintiffs James J. Ison and
    The Ison Law Firm, PC
7

8               **UNITED STATES DISTRICT COURT**

9               **EASTERN DISTRICT OF CALIFORNIA**

10  JAMES J. ISON AND THE ISON LAW          Case No.
    FIRM, PC
11                                          **PLAINTIFFS' COMPLAINT:**
            Plaintiffs,
12                                          1) **Fourteenth Amendment to United**
            v.                                 **States Constitution - Federal Due**
13                                             **Process Clause**
    SUPERIOR COURT OF CALIFORNIA,
14  COUNTY OF SAN FRANCISCO,                2) **First Amendment to the United**
    ETHAN P. SCHULMAN,                         **States Constitution – Right to**
15  THE JUDICIAL COUNCIL OF                     **Petition**
    CALIFORNIA,
16  TANI G. CANTIL-SAKAUYE,                 3) **Declaratory Judgment Act - 28**
    MERCURY INSURANCE COMPANY,                 **U.S.C. § 2201**
17  MERCURY CASUALTY COMPANY,
    CALIFORNIA AUTOMOBILE                   4) **42 U.S.C. § 1985(c) - Civil Rights**
18  INSURANCE COMPANY,                         **Act – 42 U.S.C. § 1983**
    RANDALL R. PETRO,
19  TARA L. STRONG,                         5) **18 U.S.C. § 1961 et seq. –**
    KERN SEGAL & MURRAY,                       **Racketeer Influenced and**
20  PHILIP A. SEGAL,                           **Corrupt Organizations Act**
    BRYANA S. MCGUIRK,
21  TODD P. DRAKEFORD,
    MICHAEL S. THOMAS,                              **DEMAND FOR JURY TRIAL**
22  GRACE M. HARRIET,
    STUART D. DIAMOND,
23  STUART DIAMOND LAW &
    MEDIATION OFFICE,
24  STACEY DIAMOND-GARCIA
    AND DOES 1 TO 25
25
            Defendants.
26
27
28
                                1

## SUMMARY OF THE CASE

1.      Mercury Insurance is well known to the Insurance Commissioner of the State of California ("Commissioner") and California Department of Insurance.  In 2019, the Commissioner "imposed civil penalties against Mercury in the sum of $27,593,550 for almost 184,000 unlawful acts." (*Mercury Ins. Co. v. Lara* (2019) 35 Cal.App.5th 82, 92.)  Indeed, Mercury's "lengthy history of serious misconduct" and "contempt towards and/or abuse of its customers, the Commissioner, its competition, and the Superior Court" has "[a]mong Department staff, consumer attorneys, and consumer victims of its bad faith" earned it a well-deserved "reputation for abusing its customers and intentionally violating the law with arrogance and indifference."  (Ex. A)

2.      Mercury Insurance is a  corporation with $5.9 billion in total assets and annual net revenues of nearly $400 million: it has a lot of money to spend corrupting lawyers and judges as a means of increasing its profits.

3.      The underlying state court cases that give rise to this federal lawsuit exemplify and highlight Mercury's toxic effect on California's justice system.  What began as a relatively straightforward personal injury action exposed Mercury's corrupting influence on judges in the superior courts of San Mateo and San Francisco counties who permit Mercury to commit perjury and fabricate evidence without comment or consequence, and, as in the case of the Honorable Ethan P. Schulman, dispense with all pretense of fairness and impartiality.

4.      The genesis of this lawsuit begins in San Mateo County Superior Court where Plaintiffs James J. Ison and The Ison Law Firm (collectively "Ison" or "Plaintiffs") represent a personal injury victim who suffered debilitating injuries as a result of the negligence of Mercury's insured, The Japanese Feast, Inc.  Ison made an agreement with Mercury in which the parties agreed to engage in voluntary mediation that Mercury would pay for in return for the dismissal of one its insureds (Kenichi Kawashima).

5.      Instead of attending the mediation, Mercury paid its attorneys (Kern Segal & Murray) and the mediator (Stuart D. Diamond) to conduct a sham mediation that had Diamond going back and forth between Ison and an empty room for four hours while telling Ison that the

Mercury Insurance claims adjuster (Defendant Tara L. Strong) and Kern Segal attorney (Defendant Bryana S. McGuirk) were in the "conference room down the hall" when in fact they were not there.

6.    Ison discovered the fraud and therefore did not dismiss Kawashima.  While the perpetration of this fraudulent scheme was clearly unlawful and unethical, had Mercury and Kern Segal accepted that they had been caught and that Kawashima would not be voluntarily dismissed as a result, there would have been no derivative litigation.

7.    But Mercury and Kern Segal did not do that.  Instead, they demanded that Ison stop asking for more evidence of their attendance at the mediation and threatened to file a motion for monetary sanctions if he did not immediately dismiss Kawashima.  When Plaintiffs refused, Defendant Phillip A. Segal began libeling Ison and threatened him with disbarment implying he had powerful connections as he declared: "Mr Ison.  . . . You will likely be disbarred soon for unethical conduct.  I have never been wrong" and to this day continues defaming Ison's personal integrity and professional reputation at the behest of a $5.9 billion corporation notorious for its criminal conduct and contempt for the law.

8.    Segal's smears and threats were followed by Kern Segal filing a motion for monetary sanctions based solely on McGuirk's and Diamond's perjurious declarations as Mercury, Kern Segal and Diamond embarked on a campaign of intimidation and harassment designed to get Ison disbarred because he exposed their fraud and as a matter of professional responsibility he refused to dismiss Kawashima.  Hence, Plaintiffs were compelled to file suit against Mercury Insurance, Kern Segal and Diamond in the San Francisco County Superior Court for the State of California ("Superior Court").

9.    On May 3, 2021, Mercury and Kern Segal filed an anti-SLAPP motion pursuant to Code of Civil Procedure section 425.16.

10.    While the idea that Ison could chill Mercury's First Amendment rights is ludicrous on its face, Judge Schulman granted Mercury's motion in its entirety.  In so doing, he intentionally disobeyed the law, disregarded Plaintiffs' evidence without explanation, credited Mercury with evidence that Mercury did not produce and does not exist, refused to make the requisite findings

3

on all the key legal issues, and angrily asserted that Ison somehow unilaterally and nefariously forced Strong and McGuirk to attend a voluntary and mutually-agreed upon mediation during COVID as though he were to blame for their fraudulent conduct, while at the same time expressing outrage over the absence of Talens, the injury victim, who was not required to be present.  In so doing, Judge Schulman violated the Code of Judicial Ethics and showed himself to be a corrupt judge who was wholly unconcerned with maintaining even the appearance of fairness and impartiality in his courtroom.

11.    After the hearing, Plaintiffs discovered that as part of California's Temporary Assigned Judge Program, the Chief Justice of the California Supreme Court assigned Judge Schulman to the First Appellate District of the California Court of Appeal.  In that capacity, he participated in over 100 appellate court opinions such that he sat on and may again sit on the same appellate court that will hear Plaintiffs' appeal in this case  In so doing, Plaintiffs allege that the Chief Justice violated Plaintiffs' federal Due Process rights as well as the rights of other similarly situated persons.

12.    As detailed herein, Plaintiffs' allegations of fraud and corruption are based on Judge Schulman's written rulings, verbal statements at hearings, hostile demeanor, and failure to make even a pretense of impartiality and Due Process.  Plaintiffs' allegations of corruption are also based on the contradictions between Judge Schulman's past writings as an attorney, trial court judge and temporary appellate court justice where he correctly applied what he called the "familiar two step" anti-SLAPP analysis and his writings and words in this case where he contradicted his earlier writings and well-established principles of law so he could reach a predetermined result in Mercury's favor.

13.    "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."  (*Code of Judicial Ethics*, canon 2A.)  Hence, a "judge who commits legal error which, in addition, clearly and  convincingly reflects bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law, or any purpose other than the faithful discharge of judicial duty is

subject to investigation and discipline." (*Rules of Com. on Jud. Performance*, rule 111.4; *Oberholzer v. Commission on Judicial Performance* (1999) 20 Cal.4th 371, 398.) It follows that a judge who intentionally commits error to arrive at a predetermined result that benefits one party at the opposing party's expense is biased and corrupt such that he or she should not be afforded the presumption of honesty and integrity normally afforded those serving as adjudicators.

14.     Judge Schulman refuses to disqualify himself from this case, and his assignment to the First Appellate District has compromised its impartiality; hence, Plaintiffs cannot get a fair and impartial hearing in the California courts in a manner that satisfied Due Process. Therefore, based on the facts and evidence set forth below, Plaintiffs ask for the injunctive and monetary relief requested below.

## THE PARTIES

### Plaintiffs

15.     James J. Ison ("Ison").

16.     The Ison Law Firm, PC.

17.     Plaintiffs are collectively referred to herein as "Plaintiffs".

### The Superior Court Defendants

18.     The Superior Court of California, County of San Francisco, referred to herein as the "Superior Court".

19.     The Honorable Ethan P. Schulman, a Judge of the Superior Court of California, County of San Francisco, who is alternatively referred to herein as "Attorney Schulman", "Judge Schulman" or "Justice Schulman".

20.     The Superior Court and Defendant Schulman are collectively referred to herein as the "Superior Court Defendants"

### The Judicial Council Defendants

21.     Judicial Council of California ("Judicial Council").

22.     The Honorable Tani G. Cantil-Sakauye, the Chief Justice of the California Supreme Court, who is referred to herein as the "Chief Justice".

23.     The Chief Justice and Judicial Council are referred to herein as the "Judicial Council Defendants."

**The Mercury Defendants**

24.     Mercury Insurance Company.

25.     Mercury Casualty Company.

26.     California Automobile Insurance Company.

27.     Randall R. Petro ("Petro"), Mercury's Vice President of Claims.

28.     Tara L. Strong ("Strong"), claims adjuster employed by Mercury.

29.     The defendants identified in the previous five paragraphs are collectively referred to herein as the "Mercury Defendants" or "Mercury".

**The Kern Segal Defendants**

30.     Kern Segal & Murray ("Kern Segal").

31.     Phillip A. Segal ("Segal").

32.     Bryana S. McGuirk ("McGuirk").

33.     Todd P. Drakeford.

34.     Michael S. Thomas.

35.     Grace M. Harriet.

**The Diamond Defendants**

36.     Stuart D. Diamond ("Diamond").

37.     Stuart D. Diamond Law & Mediation Office ("SDD").

38.     Stacey Diamond-Garcia ("Diamond-Garcia").

39.     The attorneys referenced in the previous three paragraphs are collectively referred to herein as the "Diamond" or the "Diamond Defendants".

40.     Plaintiffs are ignorant of the true names and capacities of defendants sued in this complaint as DOES 1 to 25, inclusive, and therefore sues these defendants by these fictitious names.  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.  Plaintiffs are informed and believe and thereon allege that each of the fictitiously

named defendants is responsible in some manner for the occurrences herein alleged and that Plaintiffs' damages were proximately caused by such defendants.

## JURISDICTION AND VENUE

41.     This Court has jurisdiction in this case because it arises under federal law, including the Due Process clauses to the Fourteenth Amendment to the United State Constitution, 28 U.S.C. section 1331, 28 U.S.C. section 1367, 42 U.S.C. section 1983 and 18 U.S.C. section 1961 et seq. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiffs' state law claims because they are related to his federal claims and arise out of a common nucleus of operative facts.

42.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant Tara L. Strong and the Judicial Council of California reside in the County of Sacramento, State of California.

## FACTUAL ALLEGATIONS

### Attorney Ethan P. Schulman

43.     Attorney Schulman was admitted to the State Bar of California in 1984.  For the next 29 years, he practiced law at three high-powered corporate law firms: Howard Rice Nemerovski Canady Robertson & Falk, PC, Folger Levin & Kahn LLP, and Crowell & Moring LLP.

44.     In that time, he became a certified appellate specialist through the State Bar's Board of Legal Specialization, a member of the California Academy of Appellate Lawyers, and Vice-Chair of the San Francisco Bar Association's Appellate Practice Program, while serving as volunteer mediator with the First Appellate District to the California Court of Appeal ("First Appellate District").  (Ex. B)

45.     Whether it be to help big tobacco companies sell cigarettes or a telecommunications giant recover damages caused by a worldwide **civil conspiracy** to fix the price of crystal display panels, Attorney Schulman filed dozens of appellate and amicus curie briefs in the service of large corporations like R.J. Reynolds Tobacco, Inc., AT& T, Charles Schwab Co., Inc., and Health Net,

Inc.

### Attorney Schulman Pushes Frivolous $84 Million Conspiracy Theory

46.     On August 5, 2011, Attorney Schulman filed an $84 million dollar lawsuit on behalf of Basic Your Best Buy, Inc. ("Basic") against DirecTV alleging "a single cause of action for **conspiracy** in restraint of trade in violation of the Cartwright Act." (Ex. C)  DirecTV filed an anti-SLAPP motion arguing that Attorney Schulman's complaint was "based on DirecTV's petitioning activity" and therefore "protected by the litigation privilege. (*Civ. Code*, § 47, subd. (b).)"  (Ex. C, pp. 8-9.)  "The trial court denied the motion on the rationale that the alleged conspiracy which formed the basis of Basic's complaint was not a communication in furtherance of DirecTV's right of petition." (Ex. C.)

47.     DirecTV appealed the trial court's denial of its anti-SLAPP motion.  On May 29, 2012, Attorney Schulman with the help of three other attorneys filed the Respondent's Brief ("Brief") on behalf of Basic. (Ex. D)  It provides a well-reasoned and cogent analysis of how the anti-SLAPP statute and litigation privilege interact and should be applied in the context of the "conspiracy theory" advanced by Attorney Schulman.  He opened his brief by asserting that "Basic failed to meet its burden to show that the action arose from protected activity, the first prong of the anti-SLAPP test" because "Basic sued DirecTV for damages caused by its illegal conspiracy to restrict competition. **The complaint therefore does not arise from any protected activity, as the gravamen or principal thrust of Basic's claim is that DIRECTV entered into an anticompetitive conspiracy in violation of the Cartwright Act**." (Ex. D [emphasis added].)  He concluded by stating:

> The distinction between communicative and noncommunicative conduct hinges on the gravamen of the action. That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was  communicative in its 'essential nature." [¶] Here, as shown above, the gravamen of Basic's claim is not based on DIRECTV's prelitigation communications, but rather on its unlawful conduct in violation of the antitrust laws. Accordingly, the litigation privilege cannot provide DIRECTV with a defense to that claim  (Ex. D)

48.     The Court of Appeal affirmed the trial court's ruling.

49.     As discussed further below, Attorney Schulman made the exact same arguments

made by Plaintiffs in the underlying case only for Judge Schulman to derisively label it as a "conspiracy theory" while skipping over the "gravamen" analysis altogether before finding that Mercury met is burden on the first prong of its anti-SLAPP motion.

50.   DirecTV subsequently filed a motion for summary judgment, which was granted by the same trial court that denied the anti-SLAPP motion.  When Judge Schulman's former partners at Crowell appealed, the Court of Appeal affirmed, noting that "Basic's [conspiracy] theory . . . is clearly without merit." (Ex. E)  Therefore, even though Attorney Schulman's $84 million claim was frivolous, the trial court had kept an open mind and allowed the case to move forward because the gravamen of Attorney Schulman's claim pertained to a fraudulent course of conduct rather than protected speech and it was possible that if allowed to conduct discovery Attorney Schulman might find evidence supporting his claims.

**The Honorable Judge Ethan P. Schulman**

51.   In 2013, Governor Edmund Brown appointed Attorney Schulman to the Superior Court for the County of San Francisco, State of California ("Superior Court")

52.   Judge Schulman adjudicated numerous anti-SLAPP motions, including *Dorit v. Noe*, Case No. CGC-19-572638.  (Ex. F)

53.   On April 9, 2019, Judge Schulman denied the Defendant Jack Noe's anti-SLAPP motion after finding that the first prong of the analysis had been met, but not the second.  As stated in his Order Denying Defendant Jack Noe's Special Motion to Strike:

> To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the [plaintiff] is credited.' [Citations.] For purposes of this inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' [Citations.] In making this assessment it is **'the court's responsibility. . . to accept as true the evidence favorable to the plaintiff** . . [Citation.] "The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Ca1.4th 260, 291.) (Ex. F, p. 2:14-26)

**Justice Schulman**

54.     Pursuant to article VI, section 6 of the California Constitution, "[t]he Chief Justice may provide for the assignment of any judge to another court but only with the judge's consent if the court is of lower jurisdiction."  The Constitutional corollary to this provision provides that "[o]n stipulation of the parties litigant the court may order a cause to be tried by a temporary judge who is a member of the State Bar, sworn and empowered to act until final determination of the cause." (Cal. Const. article VI, § 21.)

55.     In 1996, the Judicial Council established the Judicial Assignments Unit which administers Assigned Judges Program ("AJP").

56.     The Chief Justice and Judicial Council maintain that article VI, section 6 gives them "plenary power to determine the eligibility of judges for assignment and to assign them to the courts statewide."  Based on that interpretation of the California Constitution, the Chief Justice and Judicial Council assigned trial court judges of inferior jurisdiction to appellate courts of superior jurisdiction.  As a consequence, a trial court judge who has been temporarily assigned to the appellate court becomes a member of both courts and is therefore wittingly or unwittingly put in a position to influence the outcome of any appeal of his own orders as the appellate court he is temporarily assigned to will be reviewing the orders he has made as a trial court judge,

57.     Pursuant to article VI, section 6, and as part of the AJP, the Chief Justice assigned Judge Schulman to the First Appellate District of the California Court of Appeal, which hears appeals arising from actions venued in, among others, the Superior Courts of San Francisco County and San Mateo County.  In that capacity, Justice Schulman authored or participated in over 100 appellate court opinions, including the decisions discussed below.

***Winslett v. 1811 27th Ave., LLC* (2018) 26 Cal.App.5th 239**

58.     On August 15, 2018, the First District filed an opinion pertaining to anti-SLAPP motions that is now binding precedent in California.  In that case, the plaintiff filed a complaint asserting various claims against her former landlord and his company after he filed an unlawful detainer action against her.  (*Winslett v. 1811 27th Ave., LLC* (2018) 26 Cal.App.5th 239, 242.)

Her landlord responded by filing an anti-SLAPP motion to strike three of her claims.  (Id.) The trial court granted the motion.  (*Id*.)

59.     On appeal, "Plaintiff asserted that the court erred by ruling that (1) the litigation privilege bars her retaliation and retaliatory eviction claims under section 1942.5, and (2) her claim for violation of the Just Cause Ordinance was based on protected activity under the anti-SLAPP statute."  (*Id*.)  As stated by the unanimous three justice panel that included Justice Schulman: "We agree on both counts and shall therefore reverse."  (*Id*.)  In so doing, the Court provided the following framework:

> Anti-SLAPP analysis under Code of Civil Procedure section 425.16 proceeds in **two familiar steps**.  In the first step, the defendant must make" "**a threshold showing that the challenged cause of action is one 'arising from' protected activity.**" ' " (*Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321 . . . (Barry); *Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 . . . (*Navellier*).) In this context, the term " "protected activity" ' " refers to speech or petitioning activities. (*Barry, supra*, 2 Cal.5th at p. 321 . . .) If the court finds the defendant succeeds at the first step, then the burden shifts to the plaintiff to " ' "demonstrate[ ] a probability of prevailing on the claim." ' " ( Ibid. )

> A claim arises from protected activity when that activity underlies or forms the basis for the claim. We look to whether " 'the defendant's act underlying the plaintiff's cause of action [was] itself ... an act in furtherance of the right of petition or free speech.'" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063 . . . "[T]he focus is on determining what 'the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.'" (Ibid.) . . . .

> At the second step, "'[w]e . . . evaluate the defendants' evidence only to determine if it defeats that submitted by the plaintiff as a matter of law.' [Citation.] '[I]n order to establish the requisite probability of prevailing [citation], the plaintiff need only have " 'stated and substantiated a legally sufficient claim.' " [Citation.] "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " ' [Citation.] ... That burden [is] not particularly high[.]" (*Area 51 Productions, Inc. v. City of Alameda* (2018) 20 Cal.App.5th 581, 602.) (*Winslett, supra*, 26 Cal.App.5th 239, 245-46, 255 [emphasis added])

60.     Justice Schulman's panel further stated that the courts must "**look at the pleadings and declarations, accepting as true the evidence that favors the plaintiff**", while adding that the "litigation privilege is 'not without limit,' as the *Action Apartment* court took pains to point

1   out." (*Id.* at p. 246 [emphasis added].)

2   ### *Singer v. Alice Tse* (Apr. 10, 2018, A145599)

3   61.   On April 10, 2018, Justice Schulman authored an unpublished opinion arising from

4   the trial court's denial of an anti-SLAPP motion entitled *Singer v. Alice Tse*. (Ex. G)  In that case,

5   the Singers alleged in their third cause of action that Tse falsely represented to others that they

6   owned and controlled property said to be in 'abhorrent' condition.  Tse moved to strike that cause

7   of action, "arguing her statements were 'protected activity' under Code of Civil Procedure section

8   425.16."  (Ex. G)  The trial court ruled that Tse did not carry her burden of proving that her

9   statements were acts in furtherance of her "'right of . . . free speech' as defined in section 425.16,

10  subdivision (e)" and First Appellate District affirmed.  (Ex. G)  In so doing, Justice Schulman

11  made the following statements regarding how anti-SLAPP statute should be applied in that case:

12  
13  The contention that the trial court must focus on Tse's version of the facts rather
     than on the allegations of the complaint is feckless. . . . . Tse "cannot meet [her]
     threshold showing in step one by pointing to the lack of evidence that the statements
14   were made . . . ." (*City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214
     Cal.App.4th 358, 372.) "The question is what is pled—not what is proven."
15   (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 942.) . . . . [¶] **As Singer correctly**
     **argues, the first step in the analysis of an anti-SLAPP motion looks only at the**
16   **conduct alleged as the basis for plaintiff's cause of action, viz., "the act or acts**
     **of which the plaintiff complains" to determine whether it is protected activity.**
17   (*Equilon Enterprises, supra*, 29 Cal.4th at p. 67; and see *Martinez v. Metabolife*
     *Internat., Inc.* (2003) 113 Cal.App.4th 181, 188, citing *City of Cotati v. Cashman*
18   (2002) 29 Cal.4th 69, 79 [**whether anti-SLAPP statute applies is determined by**
     **the 'principal thrust or gravamen of the plaintiff's cause of action**']; *Park v.*
19   *Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062 ["A
     claim arises from protected activity when that activity underlies or forms the basis
20   for the claim"].)(Ex. G)

21  ### *Magana v. Superior Court* (2018) 22 Cal.App.5th 840
22
23  62.   In that opinion, Judge Schulman expresses his dismay over an African American

24  man's attempt to disqualify a San Mateo County Superior Court judge for cause based on his

25  allegation that the judge harbored "racial animus" towards him because of his race.  While

26  summarily dismissing the African American man's allegation, he expressed further dismay over a

27  party trying to disqualify a judge.  As stated by Judge Schulman:

28  A motion to recuse a trial judge is inherently offensive to the sitting judge because

12

it requires the moving party to allege and substantiate bias and prejudice - traits contrary to the impartiality expected from a mortal cloaked in judicial robe.  Yet the fair administration of justice requires that lawyers challenge a judge's purported impartiality when facts arise which suggest the judge has exhibited bias or prejudice.  The appropriate mechanism for such a challenge is a motion to recuse.' [citation]  (*Id*. at pp. 865-66 [emphasis added].)

63.     Because he deemed these accusations to be a "**willful misrepresentation**" by the defendant's African American attorney, Judge Schulman claimed to have "no alternative but to refer him to the State Bar for investigation and possible disciplinary action."  (*Id.* at p. 866 [emphasis added].)

### TALENS V. THE JAPANESE FEAST, INC.
### (The "San Mateo Action" – Case No. 19-CV-05403)

64.     On March 5, 2018, a van operated by The Japanese Feast, Inc. ("JFI") driven by Samuel Hernandez rear ended Ms. Brenda Talens because he was talking to his boss, Kenichi Kawashima, on his cell phone.  The collision totaled both vehicles and caused debilitating injuries to Talens that have thus far required a discectomy at two levels of her cervical spine and rotator cuff surgery on both shoulders.

65.     Talens filed suit on September 13, 2019, against JFI, Kawashima and Hernandez in San Mateo County Superior Court.

66.     JFI was insured by Mercury Insurance.

67.     Mercury retained Kern Segal to represent the defendants, which assigned Segal and McGuirk to the file.

68.     Mercury's claims adjuster in that case was at all relevant times Defendant Tara Strong.

### Mercury Agrees to Voluntary Mediation

69.     Mercury voluntarily agreed to personally attend and pay for a mediation if Plaintiff dismissed Kawashima without prejudice.

70.     The parties agreed to use Defendant Stuart D. Diamond as the mediator ("Diamond").  Diamond's office is located at 1000 4th Street in San Rafael, California.

71.     Before the mediation, McGuirk and Strong represented that they would be

13

attending the mediation in person on behalf of Mercury and Kern Segal.

72.     Instead of attending the mediation to secure Kawashima's dismissal, Strong, Segal, McGuirk, and Diamond conspired amongst themselves and decided to just have Diamond put on an act and deceive Plaintiffs into believing that Strong and McGuirk were present at the mediation so they would not have to attend and still obtain Kawashima's dismissal based on their fraudulent scheme.

73.     To effectuate this scheme, Mercury paid Stuart Diamond to conduct a sham mediation where for nearly four hours Diamond went back and forth between Ison and an empty room pretending that Strong and McGuirk were in the conference room down the hall before abruptly ending the charade at 2:00 p.m. telling Ison that the mediation is over and that Strong and McGuirk had already left the building without Ison seeing either one of them while he was in Diamond's office.

## Mercury Demands Kawashima's Dismissal

74.     On December 17, 2020, Kern Segal demanded Kawashima's immediate dismissal pursuant to Mercury's agreement with Plaintiffs.

75.     Plaintiffs refused to dismiss Kawashima unless Strong and McGuirk provided easily accessible documentary evidence that would have been created had they been there, e.g., debit card charges or credit card statements showing that they paid for four hours of parking at the Garage where they claim to have parked.

76.     Mercury, Kern Segal and Diamond claimed that Strong and McGuirk parked at the 3rd and A Street Garage in San Rafael ("Garage") at 9:35 a.m. and 9:50 a.m., respectively.  (Ex. H)

77.     The Garage is operated by the City of San Rafael.

78.     To park in the Garage, the City of San Rafael charges $.50 for every half hour of parking. (Ex. S )

79.     In sworn declarations filed with the California Superior Courts of San Mateo and San Francisco County and in correspondence coming from Kern Segal, McGuirk, Diamond and

Diamond-Garcia stated under oath that Strong and McGuirk arrived at Diamond's office at about 10:00 a.m. and left his office at 1:30 p.m.; it follows that the City of San Rafael would have charged them $4.00 for parking at the Garage.  (Ex. H)

80.     To prove that Strong was at Diamond's office on December 16, 2020, for four hours, Kern Segal produced the following documents:

- Strong's Golden 1 debit card charge showing that she was charged $.50 by the City of San Rafael for parking at one of its parking facilities on December 17, 2020 – *the day after the mediation and for no more than 30 minutes of parking*.  (Ex. I)

- McGuirk's Citibank credit card statement showing that she was charged for $1.00 of parking by the City of San Rafael for parking at one of its facilities on December 16, 2020, **for** *one hour*.  (Ex. J)

- An email from McGuirk to Ison depicting text messages purportedly exchanged between Strong and McGuirk when they arrived at the Garage on the morning of December 16, 2020. (Ex. K)

81.     Mercury and Kern Segal produced no other records purporting to prove that Strong and McGuirk were parked in the Garage for four hours as McGuirk and Diamond testified in their sworn declarations.

82.     Despite multiple requests, Mercury and Kern Segal refused to explain the irreconcilable differences between their claim of what the debit charge and credit card statement prove and what they actually show: 1) that Strong parked at a parking facility operated by the City of San Rafael the **day after the mediation for 30 minutes** or less and 2) that McGuirk parked at a parking facility operated by the City of San Rafael for one hour or less on December 16, 2020, such that even if she had arrived at the Garage at 9:35 a.m. and went to Diamond's office, she left no later than 10:30 a.m. and was therefore not there for four hours as she claims.

83.     As to the alleged text messages, Kern Segal refused to provide Plaintiffs with the text messages themselves. With current technology, text messages can be easily fabricated.

84.     Plaintiffs are informed and believe that the physical location of a person sending an authentic text message can be traced such that if Strong did send the text message that McGuirk claims she sent upon her arrival at the Garage at 9:50 a.m. on December 16, 2020, its location or

origin can be established to confirm whether she sent the message from the garage or from Sacramento where she resides.

85.     The evidence presented in this complaint proves beyond a reasonable doubt that Strong was not in Diamond's office for a four-hour mediation on December 16, 2020, and that Mercury, Kern Segal and Diamond had perpetrated a fraud on Plaintiffs that was cosigned by Judge Schulman when he granted Mercury's motion.

86.     If Plaintiffs were allowed to conduct discovery, or this Court or some other investigatory body such as the State Bar of California or District Attorney were to use its authority to compel Strong and McGuirk to produce internal records, bank and credit card records, cell phone provider records, and records maintained by the City of San Rafael, they would be able to easily establish exactly where Strong was on December 16, 2020.  However, Judge Schulman summarily denied Plaintiffs' request to conduct discovery.

87.     When Plaintiffs refused to dismiss Kawashima because Strong and McGuirk did not attend the mediation, Mercury and Kern Segal became increasingly belligerent in its communications, culminating in Segal libeling Ison and threatening him with disbarment as he declared in an email: "Mr Ison. This has gone far enough. . . .. You will likely be disbarred soon for unethical conduct. I have never been wrong."  (Ex. L)

**Mercury Asks Judge Fineman to Impose Monetary Sanctions on Plaintiffs Because Ison Refuses to Dismiss Kawashima**

88.     If Mercury, Kern Segal and Diamond had accepted the fact that their fraudulent scheme had failed and Kawashima would not be voluntarily dismissed because they did not fulfill their end of the agreement, there would have been no derivative litigation.  However, when Segal began libeling Plaintiffs and embarked on a campaign of harassment and intimidation, Plaintiffs were compelled to file suit against the Kern Segal and Mercury Defendants based on the defamation, but would not have sued for damages caused by their fraudulent conduct.

89.     However, Mercury and Kern Segal did not only continue to falsely defaming Plaintiffs, but they also doubled down on their fraud by filing a "Motion For § 128.5 Sanction For Bad Faith Participation In Scheduled Mediation" seeking $4,160.00 in monetary sanctions against

16

Plaintiffs because of their refusal to dismiss Kawashima and in so doing sought to make Judge Fineman an accomplice to their fraudulent scheme.

90.     In support of their motion, Mercury submitted McGuirk's declaration in which she claims under oath that she and Strong were present at the mediation for four hours on December 16, 2020.  (Ex M)

91.     **Strong did not submit a declaration supporting Mercury's motion**.

92.     Mercury did not produce any documents or records showing that McGuirk and Strong were present: not even Strong's debit charge and McGuirk's credit card statement that Mercury told Plaintiffs were proof of their presence in Diamond's office for four hours on December 16, 2020.

93.     In Opposition to Mercury's motion for sanctions, Plaintiffs accused McGuirk of perjury, moral turpitude, and fabricating evidence – criminal offenses for which disbarment and jail time are within the range of punishments under the State Bar Act.  (See e.g., Bus. & Prof. Code, §§ 6106 and 6128.)

94.     Mercury did not file a reply brief in response to these allegations or provide any evidence disproving them.

95.     On April 27, 2021, the Civil Commissioner opined at an Informal Discovery Conference that as long as Mercury's sanctions motion against Plaintiffs remained on calendar he believed that Plaintiffs had a right to depose Tara Strong.  Mercury quickly withdrew its motion to avoid the risk of Strong's deposition being compelled by the court.

### ISON V. MERCURY INSURANCE, ET AL
### (The "San Fransico Action" - 20-CGC-589080)

96.     Due to Mercury's escalating campaign of harassment, intimidation and unlawful conduct, Plaintiffs filed suit against Mercury, Strong, Petro, Segal, Diamond and McGuirk in San Francisco County Superior Court.

97.     On March 17, 2021, Plaintiffs filed their First Amended Complaint in San Francisco County Superior Court.  (To correct an error with the original filing, the FAC was refiled on June 11, 2021.)

17

**Mercury Files an Anti-SLAPP Motion**

98.    On May 3, 2021, Mercury filed a special motion to strike (anti-SLAPP) pursuant to Code of Civil Procedure § 425.16.  As with Mercury's sanctions motion in the San Mateo action, it did not produce any records showing that Strong and McGuirk were at Diamond's office on December 16, 2020.  The only admissible evidence Mercury produced were the declarations of McGuirk and Diamond claiming that Strong and McGuirk were present.

99.    **Conspicuously absent from  Mercury's production was a declaration from Tara Strong**.

100.    Mercury's principal argument was that everything Segal, McGuirk, Diamond and Strong did was immunized from suit by the litigation privilege, i.e., that Mercury and Kern Segal can conspire with a mediator to defraud Ison, libel Ison and threaten him with disbarment when he called them out for it, and file motions seeking monetary sanctions based on perjurious declarations.

**The Anti-SLAPP Analysis Proceeds in
What Judge Schulman Calls "Two Familiar Steps"**

101.    Under California law, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Civ. Proc. Code*, § 425.16(b)(1).)

102.    As stated by Justice Schulman in a case that remains binding precedent in California, the "Anti-SLAPP analysis under Code of Civil Procedure section 425.16 proceeds in *two familiar steps*." (*Winslett, supra*, at 26 Cal.App.5th 239, 245 [emphasis added].) "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88.) "[I]f the defendant does not meet its burden on the first step, the court should deny the motion and need not address the second step." (*Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 266.)

103.    "If the court finds that such a showing has been made, it must then determine

18

whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Navellier, supra,* at 88.)  "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute — i.e., that arises from protected speech or petitioning *and* lacks even minimal merit — is a SLAPP, subject to being stricken under the statute." (*Navallier*, at 89 [italics in original].  "It bears emphasis that a **plaintiff's burden at the second anti-SLAPP step is a low one, requiring only a showing that a cause of action has at least 'minimal merit within the meaning of the anti-SLAPP statute**.'" (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 793 [emphasis added].)

104.   The "court considers the pleadings and evidence submitted by both sides but does not weigh credibility or compare the weight of the evidence.  Rather, **the court's responsibility is to accept as true the evidence favorable to the plaintiff** . . . and evaluate the defendant's evidence only to determine if it has defeated arguments submitted by the plaintiff as a matter of law. [citations] The trial court merely determines whether a prima facie showing has been made that would warrant the claim going forward." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.)

**Judge Schulman Refused to Let Plaintiffs Conduct Discovery**

105.   Per Code of Civil Procedure § 425.16(g), Plaintiffs prepared a motion asserting that there exists "good cause" for them to depose Mercury's Tara L. Strong and filed an ex parte application asking Judge Schulman to hear the motion on shortened time before ruling on Mercury's motion.

106.   At the hearing on Plaintiffs' application, Judge Schulman admitted that he had not read Plaintiffs' motion, but denied it anyway without making any written findings explaining why he denied it. Instead, he advised Plaintiffs to make the request again with their opposition papers and that he would revisit the issue at the hearing.

**Plaintiffs File Their Opposition**

107.   On May 27, 2021, Plaintiffs filed their Opposition to Mercury's Motion and demurrer.  In so doing, they argued that, as Justice Schulman's panel noted in *Winslett*, that litigation privilege "Does Not Provide Blanket Immunity for Every Type of Litigation Misconduct

– It Has Limits."  (Ex. N)  Plaintiffs further stated: "Civil Code section 47(b)(2) codifies the litigation privilege.  'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action.'  (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.)  Mercury cannot satisfy the first, third and fourth elements of the privilege."

108.    Plaintiffs further argued and continue to argue that what took place in Diamond's office on December 16, 2020, was not a mediation within the meaning of the California Evidence Code statutes that codify "Mediation Confidentiality" because Diamond participated in the fraud with Mercury and Kern Segal; therefore, he was obviously not neutral.  As to the second prong of the analysis, Plaintiffs produced Strong's $.50 debit card parking charge, McGuirk's $1.00 credit card charge, and a list of other items of evidence proving beyond doubt that Strong and McGuirk did not attend the mediation.

## JUDGE SCHULMAN IS BIASED IN MERCURY'S FAVOR

### Judge Schulman Grants Mercury's Motion

109.    On July 9, 2021, Judge Schulman issued his Tentative Ruling ("Ruling") granting Mercury's motion in its entirety.  (Ex. O)[1]

110.    Plaintiffs requested a hearing.

111.    On July 11, 2021, Plaintiffs submitted a Request for a Statement of Decision that was filed with the Superior Court before the hearing on July 12, 2021.

112.    Judge Schulman is a highly credentialed judge with nearly four decades of legal experience.  He knows the law and knows it well.  His ruling departed so markedly from well-

[1] On July 7, 2021, Ison deposed Mr. Kenichi Kawashima and discovered that Kawashima was "presigning" verifications to discovery responses and letting Kern Segal supply the answers: "a clear and serious violation" of Business & Professions Code sections 6106, 6128 and 6068, as well as other statutes and rules. (*Drociak v. State Bar* (1991) 52 Cal.3d 1085, 1090.)  Plaintiffs also discovered from Kawashima that Kern Segal was suppressing critical documents such as Kawashima's call log which Kern Segal had answered "did not exist" on verified responses and counseling Hernandez to pretend that he needs an interpreter to testify at deposition and trial when he is fluent in English.  Plaintiffs filed an ex parte application the next day asking Judge Schulman to continue the hearing so the Court could review the new evidence. Judge Schulman refused and denied the application.

established law and rudimentary legal principles that a minimally competent judge would apply, it was immediately apparent to Ison that Judge Schulman had intentionally committed legal error to reach a predetermined result.  As discussed further below, he failed to apply controlling law, skipped over the "gravamen" analysis entirely, disregarded without comment or explanation highly probative admissible evidence, credited Mercury for evidence that does not exist, and adopted irrelevant arguments and positions advanced by Mercury inside and outside this proceeding indicating that he had coordinated his ruling with Mercury and Kern Segal.

### Judge Schulman Refuses to Permit Plaintiffs to Depose Tara Strong, and Then Falsely Asserts that She Submitted a Declaration in Support of Mercury's Motion

113.    Plaintiffs accused Tara Strong of fraud numerous times in papers filed in this Court and in San Mateo County.  As a matter of common sense and legal necessity, any attorney who wishes to persuade a fair and impartial judge that Strong did not commit the fraudulent acts of which she is accused would have provided her declaration and records proving she attended the mediation on December 16, 2020, when filing a dispositive motion.  Indeed, as stated by the California Supreme Court, if "a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply . . . and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt." (*People v. Preston* (1973) 9 Cal.3d 308, 313-314.)

114.    However, if Judge Schulman is corrupt and conspiring with Mercury to deprive the Plaintiffs of their Due Process rights in return for some personal benefit, then Mercury could safely refuse to produce that evidence knowing Judge Schulman would rule in its favor irrespective of whatever evidence it did or did not produce.

115.    **Tara L. Strong did not provide a declaration supporting Mercury's anti-SLAPP motion just as she did not provide a declaration supporting Mercury's motion for sanctions in the underlying action.**

116.    Yet, at the hearing, Judge Schulman stated that the "evidence I have before me on that subject . . . is sworn declarations from the Defendant's representative" which is of course

**Mercury's Tara Strong who to this day has remained silent on the issue which in a court of law is admissible evidence of her guilt.** (Ex. P)

117. In so doing, Judge Schulman disregarded a well-established and time-honored principle of evidence cited above by the California Supreme Court: silence in the face of accusations of criminal conduct an innocent person would deny constitutes an admission of guilt, then falsely claimed that he had before him a declaration submitted by Tara Strong in support of Mercury's anti-SLAPP motion thereby buttressing Mercury's motion with critical evidence that does not exist.

118. Contrary to Judge Schulman's ruling, there is nothing "speculative" about Tara Strong paying $.50 for 30 minutes of parking in San Rafael the day ***after the mediation*** or Mercury's inability to provide any records or proof showing she was there – ***not even her own declaration***.

119. Plaintiffs' direct and circumstantial evidence is probative, persuasive, and, most importantly for the purposes of Mercury's motion, admissible at trial based on the well-established and time-honored evidentiary principles found in California's Evidence Code, Civil Jury Instructions, and thousands of cases in state and federal courts. Judge Schulman's failure to apply these principles to Plaintiffs' evidence and his attempt to distort the record by citing to a nonexistent Tara Strong declaration and nonexistent settlement negotiations reveals his extreme bias in Mercury's favor and that he granted Mercury's motion for reasons that had nothing to do with the facts, evidence or law.

**Judge Schulman Finds that Mercury Satisfied the First Prong of Anti-SLAPP Analysis Based on Evidence of "Settlement Negotiations" That Does Not Exist**

120. It is fundamental to anti-SLAPP law that Mercury had the burden of proving that the wrongful conduct of which they are accused constitutes protected speech. Judge Schulman ruled that Mercury met the first prong of the anti-SLAPP analysis because "[t]here can be no question that settlement negotiations and agreements are made 'in connection with' litigation for purposes of the anti-SLAPP statute." However, Mercury did not produce any evidence showing that Plaintiffs' claim arises from "settlement negotiations" or "agreements" and Plaintiffs' FAC

22

and opposition never mention any.  Hence, as he did with Strong's declaration, Judge Schulman conjured up the evidence of non-existent settlement negotiations as he was intent on granting Mercury's motion the moment it crossed his desk.

**Attorney Schulman Had Made the Exact Same Arguments Made by Plaintiffs, But Judge Schulman Failed to Apply the Same Principles and Analysis to Their Case**

121.    It is fundamental to anti-SLAPP law that the trial court's "inquiry regarding the **first prong** of the analysis concerns the principal thrust or gravamen of the cause of action - the allegedly wrongful and injury-producing conduct that provides the foundation for the claims." (*Gotterba v. Travolta* (2014) 228 Cal.App.4th 35, 41 [emphasis added]) Hence, once a court decides whether or not the "gravamen" of a plaintiff's claim constitutes protected speech subject to an anti-SLAPP motion, "gravamen" analysis becomes wholly irrelevant as it has nothing to do with determining whether the plaintiff's evidence shows the "minimal merit" necessary to defeat an anti-SLAPP motion.   From an analytical standpoint, Plaintiffs and Attorney Schulman approached this issue in the exact same way and correctly so as that basic analytical framework appears in hundreds of appellate opinions, including *Winslett,* where Justice Schulman was a member of the panel.

122.    In arguing that Mercury's conduct was not immunized by the litigation privilege, Plaintiffs' Opposition stated the following:

> The litigation privilege immunizes litigants from suit arising from their statements and publications; it does not immunize them for their conduct, i.e., noncommunicative acts.  "A threshold issue in determining if the litigation privilege applies is whether the alleged injury arises from a communicative act or noncommunicative conduct."  (*Action, supra,* 41 Cal.4th at 1248.)  Where the complaint "is not based on a communicative act", it follows that "the conduct alleged is not protected by the litigation privilege."  (*Booker v. Rountree* (2007) 155 Cal.App.4th 1366, 1373.)  In assessing Mercury's Motion, this Court must "draw a careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and ***one based upon an underlying course of conduct evidenced by the communication***."  (*White v. Western Title Ins. Co.* (1985) 40 Cal.3d 870, 888 [emphasis added].)  (Ex. N)

123.    When Attorney Schulman argued that DirecTV's conduct was NOT immunized by the litigation privilege, he spent many pages of his brief arguing that the DirecTV's conduct - not

23

speech - was the gravamen of his conspiracy claim and that DirecTV's conduct were noncommunicative acts unprotected by the litigation privilege. As stated therein:

> DIRECTV contends that the litigation privilege provides it with an absolute defense to Basic's Cartwright Act claim. [citation omitted] However, the litigation privilege applies only to communicative acts, not to tortious or illegal courses of conduct. [citations omitted] **The distinction between communicative and noncommunicative conduct hinges on the gravamen of the action. That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an act that was communicative in its 'essential nature.''** (citation omitted) (emphasis added) [¶ Here, as shown above, the gravamen of Basic's claim is not based on DIRECTV's prelitigation communications, but rather on its unlawful conduct in violation of the antitrust laws. Accordingly, the litigation privilege cannot provide DIRECTV with a defense to that claim. (Ex. D)

124.    Plaintiffs made the exact same arguments that Attorney Schulman made to the appellate court when advancing his frivolous $84 million "conspiracy theory" against DirecTV: that the defendants' conduct and speech made in connection with their illegal conspiratorial activities and objectives was not protected speech.

125.    Judge Schulman, on the other hand, skipped that analysis altogether in this case and ruled that Mercury satisfied its burden in establishing that Plaintiffs' suit was based on protected speech without analysis or reference to what was the gravamen of Plaintiffs' claims or whether the fraudulent conduct complained of constitutes protected speech or unprotected noncommunicative conduct. If Judge Schulman had applied the law and reasoning put forth by Attorney Schulman he would have denied Mercury's Motion. Indeed, his failure to analyze the gravamen of Plaintiffs' claims as part of his first prong analysis is a clear and obvious legal error and Judge Schulman knows it.

### Judge Schulman Refers in Passing to the Gravamen of Plaintiffs' Claims in the Second Prong of the "Familiar Two Step" Analysis Where it was Irrelevant

126.    Judge Schulman's Ruling refers to the gravamen of Plaintiffs' claims and noncommunicative conduct after he already ruled that Mercury met the first prong of what he in other cases called the "familiar" two step analysis and only in connection with Plaintiffs' abuse of process claim in the second prong of the anti-SLAPP analysis where it is wholly irrelevant.

24

127.   Judge Schulman knows the law and knows it well.  This was not unintentional error. It was a purposeful and deliberate misapplication of the law because he knew that he could not credibly assert that Mercury satisfied the first prong unless he summarily reached that conclusion without analyzing the gravamen of Plaintiffs' claims.

### Judge Schulman Refused to Consider Plaintiffs' Evidence or Make Findings on its Admissibility

128.   At the hearing, Judge Schulman stated: "What I have from you is no admissible evidence to the contrary. I have got a bunch of speculation. I have got a bunch of inferences that you want me to draw from dubious circumstantial evidence.  You are basically asking me to accept what I think anybody would characterize as a conspiracy theory here based on virtually nothing." (Ex. P)

129.   When Plaintiffs raised Tara Strong's debit card receipt showing that she parked at the Garage for less than 30 minutes the day **after** the mediation, Judge Schulman became hostile and petulant, stating "I'm not here to explain anything!" refusing to answer any questions regarding his failure to fulfill what in other cases he himself called his "responsibility" to "accept as true" Plaintiffs' evidence and shutting down further discussion.

130.   Contrary to Judge Schulman's biased characterization of the evidence, antagonistic posture and apparent belief that he could make Plaintiffs' evidence disappear by judicial fiat, Plaintiffs are confident that they will easily prevail in a jury trial based on the following evidence submitted by Plaintiffs in their First Amended Complaint ("FAC") and in opposition to Mercury's motion:

- Tara Strong has refused to testify under oath as to where she was on December 16, 2020, and to this day has failed to refute Plaintiffs' allegations of criminal conduct that an innocent person would naturally deny without prompting.

- Mercury failed to produce any verifiable records that would have been created by normal business processes if Strong had attended the mediation in San Rafael on December 16, 2020.

- The evidence Mercury provided is a $.50 charge to Strong's Golden 1 debit card on December 17, 2020, for parking at a garage that charges $.50 for every half hour.

- Mercury could not produce similar parking records to show that Strong was parked in San Rafael for four hours on December 16, 2020.

- Mercury could not explain how the parking charge for less than 30 minutes the day after the mediation is proof that she attended the four-hour mediation.

- Mercury's own evidence shows that instead of December 16, 2020, Strong was in San Rafael on December 17, 2020, the day after the mediation and was there for just enough time to sign the Mediation Confidentiality Agreement ("MCA") as she was not there to sign it the previous day.

- The evidence McGuirk produced to prove her own attendance is a $1.00 parking charge to her credit card by the City of San Rafael on December 16, 2020, at a garage that charges $.50 for every half hour.

- Based on the $1.00 parking charge, McGuirk, if she had arrived early at the garage as she claimed, could not have been at Stuart Diamond's office for more than 30 minutes.

- Both McGuirk and Diamond therefore lied under oath to this Court when they claimed in their declarations that Strong and McGuirk were in Diamond's office for four hours for the mediation.

- Ison was 25 minutes late, yet was the first to sign the MCA.  The natural thing for Diamond to do would have been to meet with Strong and McGuirk first and get their signatures while waiting for Ison.

- On the morning of December 17, 2020 – after purportedly spending four hours with Strong and McGuirk the previous day and just 20 hours after they left Diamond's office – Diamond when asked could not remember the name of the Kern Segal attorney who attended (McGuirk) and repeatedly referred to Mercury's adjuster as "Ms. Powers". He made no mention at all of the name Tara Strong.

- Diamond took 27 hours to send the signed Mediation Confidentiality PDF to Ison because he was waiting for Strong and McGuirk's signatures and he was later proven to have lied when he said his inability to use the scanner was excuse for the delay. It should have only taken only minutes if it had been signed the day before.

- Mercury produced an email showing purported text messages exchanged between Strong and McGuirk when they arrived at the Garage, but not the text messages themselves.  When Plaintiffs accused Mercury of fabricating this evidence, Mercury did not refute this allegation.

- Mercury did not submit the alleged text messages as evidence of Strong's and McGuirk's attendance at the mediation.

- Mercury's privilege log identified "Strong's Reimbursement request to Mercury for travel on 12/16/2020" as a document that proves Strong's presence at mediation,

26

but Mercury refused to produce it.

- In opposition to Mercury's sanctions motion, Plaintiffs filed briefs that accused Mercury of perjury, fabricating evidence, and conspiring to defraud Plaintiffs and this Court – conduct that warrants jail time and disbarment.  Mercury did not file a reply brief or otherwise refute these allegations of criminal conduct.

131.   Judge Schulman brushed away all this evidence and the legal bases cited by Plaintiffs for their admissibility with no explanation whatsoever other than to angrily say: "I'm not here to explain anything!"  (Ex. P)

**Judge Schulman Grants Mercury's Motion Based Solely on McGuirk's
and Diamond's Declarations When They Have an Obvious Motive to Lie**

132.   Mercury produced no admissible evidence other than the declarations of Diamond and McGuirk attesting to Tara Strong's presence at the mediation.  For Judge Schulman to rule in Mercury's favor on a dispositive motion with nothing but the word of two persons who have an obvious motive to lie and crediting Mercury with evidence that does not exist (i.e., Strong's declaration and "settlement negotiations") reveals his lack of impartiality and clear bias in Mercury's favor.

**Judge Schulman Refused to "Accept as True" Plaintiffs' Evidence and
Omitted this Basic Tenet of Anti-SLAPP Law from His Ruling and Order**

133.   In their opposition papers and at the hearing, Plaintiffs cited *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, for a rudimentary principle of anti-SLAPP law: the trial court "considers the pleadings and evidence submitted by both sides but does not weigh credibility or compare the weight of the evidence.  Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff . . . and evaluate the defendant's evidence only to determine if it has defeated arguments submitted by the plaintiff as a matter of law. [citations] The trial court merely determines whether a prima facie showing has been made that would warrant the claim going forward."

134.   Judge Schulman had a "responsibility . . . to accept as true" Plaintiffs' evidence when determining whether their case had "minimal merit" – a principle that Attorney Schulman cited in his Best Buy Brief, Judge Schulman cited in *Dorit v. Noe*, Case No. CGC-19-572638, and

Justice Schulman cited in *Winslett*.  (Ex. E)   However, Judge Shulman omitted this well-established principle of law from his Ruling and Order when the language used in *HMS Capital* was not only cited in Plaintiffs' Opposition and Request for a Statement of Decision, but it was also read into the record at the hearing, such that Judge Schulman cannot credibly claim he somehow forgot about it.

**Judge Schulman Refuses to Issue A Statement of Decision**

135.    After reviewing Judge Schulman's tentative ruling, it was clear that he was not impartial and purposely failed to make findings on critical issues so that his silence would be presumed correct by the appellate court pursuant to the doctrine of implied findings.  (See *Fladeboe v. America Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)

136.    On July 11, 2021, Plaintiffs requested a Statement of Decision pursuant to Code of Civil Procedure sections 632 and 634 in their effort to compel Judge Schulman to make the requisite factual findings conspicuously absent from his tentative ruling and go on record as to how he reached the legal conclusions that he did. (Ex. Q)

137.    Instead of making the requested findings, the only revisions Judge Schulman made to his final order was to deny the Request, overrule Plaintiffs' objections, deny his request for judicial notice as it pertained to the Department of Insurance's brief highlighting Mercury's corrupt practices, and add citations intended to buttress the absence of evidentiary findings with case law not cited in the Tentative Ruling.  The Court mailed the Court's final order the same day.  (Ex. R)

138.    Moreover, while his Ruling did not mention Plaintiffs' request for permission to conduct discovery and he had previously avoided making a written finding as to whether or not Plaintiffs had demonstrated "good cause" for discovery, in his final order he added: "Plaintiff failed to show good cause for discovery" (Ex. R, p.  3: 7) as though Plaintiffs' request had been given due consideration when in reality Judge Schulman summarily dismissed it without reading the motion.

139.    By refusing to make the requisite factual findings, Judge Schulman sought to sabotage Plaintiffs' appeal and crafted his ruling to serve that purpose.

**Judge Schulman's Hypocrisy**

140.   As noted above, Justice Schulman stated in his *Magana* opinion that what he deemed to be a "**willful misrepresentation**" by the defendant's African American attorney left him "no alternative but to refer him to the State Bar for investigation and possible disciplinary action." (*Id.* at p. 866 [emphasis added].)

141.   Stuart D. Diamond submitted a declaration in support of Mercury's motion in which he perjured himself by falsely claiming under oath that Strong and McGuirk were at his office for four hours on December 16, 2020.

142.   Bryana S. McGuirk submitted a declaration in support of Mercury's motion in which she perjured herself by falsely claiming under oath that she and Strong were at Diamond's office for four hours on December 16, 2020.

143.   Unlike what he did to the African American attorney in *Magana*, Judge Schulman had no such compulsion to report Diamond's and McGuirk's perjury to the State Bar.  In fact, he used those perjurious declarations to rule in Mercury's favor.

**Conclusion**

144.   Judge Schulman knows the law and knows it well.  The legal principles discussed above are not obscure and esoteric points of law on which reasonable minds can differ: they are the most fundamental and rudimentary principles of evidence and anti-SLAPP motions routinely applied by California courts.  In light of his credentials, experience and, most of all, his own writings as an attorney, trial court  judge and appellate court justice, his failure to apply the law in this case cannot be chalked up to mere ignorance of the law: it was a willful and deliberate attempt to fix this case in Mercury's favor.

**FIRST CLAIM**
**U.S. Const., Fourteenth Amendment, Section 1 - Federal Due Process Clause**
**(Against the Superior Court Defendants)**

145.   The allegations set forth above in paragraphs 1 through 144 inclusive, are incorporated into this claim by reference as though set forth in full.

146.   The Fourteenth Amendment, Section 1 of the United States Constitution provides,

in part, that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor to deny to any person within its jurisdiction the equal protection of the law."

147.   This Fourteenth Amendment is intended to prevent state actors from employing their power in an abusive or oppressive manner.

148.   The First Amendment to the United States Constitution, through the Fourteenth Amendment, prohibits state governments from diminishing a citizen's right to petition the government for the redress of grievances and is "among the most precious of the liberties safeguarded by the Bill of Rights."  (See *United Mine Workers v. Illinois State Bar Ass'n* (1967) 389 U.S. 217, 222).

149.   In granting Mercury's motion in its entirety, Judge Schulman intentionally erred because he was intent on ruling in Mercury's favor irrespective of the law, evidence, facts and Code of Judicial Ethics and in so doing deprived Plaintiffs of their Constitutional rights.

150.   Unless Judge Schulman and Superior Court are restrained and enjoined from continuing to unlawfully violate Plaintiffs' civil rights secured by the federal constitution and the Civil Rights Act of 1871, the Superior Court Defendants will continue to do so for the foreseeable future.

151.   Plaintiffs have no plain, speedy, adequate remedy at law; therefore, injunctive relief is the only means available to them to protect the rights and privileges guaranteed by the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

**SECOND CLAIM**
**U.S. Const., Fourteenth Amendment, Section 1 - Federal Due Process Clause**
**(Against the Judicial Council Defendants)**

152.   The allegations set forth above in paragraphs 1 through 151 inclusive, are incorporated into this claim by reference as though set forth in full.

153.   The Chief Justice and Judicial Council knew or should have known that assigning a currently serving superior court judge to the appellate court who will review his or her decisions

creates a conflict of interest which can result in actual bias or give the appearance of bias on the appellate courts when they review his decisions, thereby depriving Plaintiffs and other similarly situated persons of their Constitutional rights.

154.    Plaintiffs allege that assigning a currently serving superior court judge to the appellate court who will review his decisions creates a scenario or setup conducive to abuse of power and authority by the judge who may feel confident disregarding the law and the Code of Judicial Ethics as he is confident and reassured that if his decisions are appealed they will be reviewed by an appellate court friendly to the judge because he was one of them and may again be in the future.

155.    Unless the Chief Justice and the Judicial Council are restrained and enjoined from continuing to unlawfully violate Plaintiffs' civil rights secured by the United State Constitution and the Civil Rights Act of 1871, they will continue to violate Plaintiffs' civil rights and deprive them of their Due Process and other Constitutional rights guaranteed by United States Constitution.

156.    Plaintiffs have no plain, speedy, adequate remedy at law; therefore, injunctive relief is the only means available to them to protect the rights and privileges guaranteed to them by the United States Constitution.

**THIRD CLAIM**
**(28 U.S.C. § 2201 - Declaratory Judgment Act)**
**(Against the Judicial Council Defendants)**

157.    The allegations set forth above in paragraphs 1 through 156 inclusive, are incorporated into this claim by reference as though set forth in full.

158.    A real and actual controversy exists between Plaintiffs and the Judicial Council Defendants concerning the Constitutionality of their assigning trial court judges to appellate courts that will review their orders because it creates actual bias and the appearance of bias in the appellate courts thereby depriving litigants of a fair and impartial adjudication of their claims.

159.    It is within this District Court's discretion to render a declaratory judgment on the Constitutionality of the Chief Justice permitting Judge Schulman to sit and render binding judicial opinions from the same appellate court that will review his decision to grant Mercury's motion to

strike.

160.  Wherefore, Plaintiffs respectfully request that pursuant to the Declaratory Judgment Act, this District Court enter judgment declaring the following:

- By assigning Judge Schulman to the First Appellate District to the California Court of Appeal, the Chief Justice and Judicial Council violated Plaintiffs' Due Process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

**FOURTH CLAIM**
**(42 U.S.C. § 1983 – Civil Rights Act of 1871)**
**(Against the Mercury, Kern Segal and Diamond Defendants)**

161.  The allegations set forth above in paragraphs 1 through 160 inclusive, are incorporated into this claim by reference as though set forth in full

162.  The Mercury Defendants, Kern Segal Defendants and Diamond Defendants conspired with Judge Schulman to deprive Plaintiffs of the rights, privileges, and immunities secured by the Constitution and laws of the United States under the color of state law.

163.  As a direct and proximate result of above-referenced defendants' actions, Plaintiffs have been damaged and entitled to recover actual damages, costs of suit and attorney's fees.

**FIFTH CAUSE OF ACTION**
**18  U.S.C. §§ 1961 et seq. – Racketeer Influenced and Corrupt Organizations Act**
**(Against the Mercury, Kern Segal and Diamond Defendants)**

164.  Plaintiff incorporates by reference paragraphs 1 through 163 into this cause of action as though set forth herein in full.

165.  The Mercury Defendants, Kern Segal Defendants and Diamond Defendants formed an enterprise whose activities affect interstate commerce.

166.  The Mercury Defendants, Kern Segal Defendant and Diamond Defendants participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity intended to extort money from Plaintiffs.

167.  The Mercury Defendants, Kern Segal Defendants and Diamond Defendants committed acts constituting criminal offenses under 18 U.S.C. sections 1341 and 1343 in that they devised a scheme or artifice to obtain money from Plaintiffs and similarly situated persons by

sending false statements through the United States mail and wire communications for the purpose of executing their scheme or artifice.

168.    As a direct and proximate result of the Mercury Defendants, Kern Segal Defendants and Diamond Defendants racketeering activities, Plaintiffs have been damaged and entitled to recover actual damages, treble damages, costs of suit and attorney's fees.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays judgment against the defendants, and each of them, as follows:

1.    Injunctive relief against Judge Schulman and the Superior Court;

2.    Injunctive relief against the Chief Justice and Judicial Council of California;

3.    Actual damages in an amount to be proved at trial;

4.    Punitive damages;

5.    Treble damages;

6.    Statutory damages;

7.    Costs of suit and attorneys' fees; and

8.    Such other and further relief as this Court deems just and proper.


Dated: August 27, 2021                          THE ISON LAW FIRM, PC

                                                /s/ James J Ison
                                                James J. Ison
                                                Attorney for Plaintiffs James J. Ison and The
                                                Ison Law Firm, PC