EXHIBIT A

\

1   CALIFORNIA DEPARTMENT OF INSURANCE
    LEGAL DIVISION
2   Auto Compliance Bureau
    Jon A. Tomashoff, Bar No. 173458
3   45 Fremont Street, 21st Floor
    San Francisco, CA 94105
4   Telephone: 415-538-4119
    Facsimile:  415-904-5490
5
    Attorney for Department of Insurance
6

7                   BEFORE THE INSURANCE COMMISSIONER
                       OF THE STATE OF CALIFORNIA
8
    In the Matter of                          DEPARTMENT'S OPPOSITION TO
9                                             RESPONDENTS' MOTION IN LIMINE
        MERCURY INSURANCE COMPANY,
10                                            OAH Case No.: 2006040185
        MERCURY CASUALTY COMPANY,
11                                            CDI File No.: NC-03027545
        AND
12                                            ALJ ASSIGNED: Steven C. Owyang
        CALIFORNIA AUTOMOBILE
13      INSURANCE COMPANY,                    HEARING DATE:  March 16-20, 23-26,
                                              30-31, and April 1-3, 2009
14          Respondents.
                                              MSC DATE:  February 23, 2009
15
                                              HEARING LOCATION:  Oakland
16

17

18  I.      INTRODUCTION

19          A.      Respondents' Motion Is Vague

20          On February 6, Respondents filed a "Motion-In-Limine Requesting That All Evidence of

21  Conduct Beyond The Scope Of The Allegations Be Excluded" ("Motion").  Other than referring

22  to a "FRUB" report,[1] Respondents' do not mention any particular witness or document they seek

23  to exclude as being "beyond the scope of the allegations."  Without knowing which specific

24  witnesses or other documents Respondents seek to exclude, and how their arguments for

25  exclusion apply to that particular witness or document, it is difficult for the Department to

26  respond to their motion.

---

[1] A FRUB report is a written report issued by the Department's Field Rating and Underwriting Bureau reciting the
nature, timing, impetus, scope and results of an examination into an insurer's rating and underwriting practices.

1         B.      Respondents' Motion Is Premature; A Similar, New Motion Should Be Precluded

2         The Department respectfully suggests that Respondents' entire motion is premature;

3 Respondents could have waited until the exchange of exhibit and witness lists without any

4 prejudice.  They then could have argued with respect to specific items of evidence, and the

5 Department could have responded accordingly.  If the pending motion is denied, Respondents

6 will no doubt wish to file a new motion in limine before the hearing, thus creating double work

7 for O.A.H. and the Department.  The Department suggests that Respondents be admonished for

8 their premature filing, and advised that no additional written motion in limine based on the same

9 arguments will be entertained.  Respondents had their "at-bat," swung too soon, and struck out.

10 They should not receive another chance at the plate.  The admissibility of the Department's

11 evidence could and should be determined at hearing upon oral motions.

12         C.      Respondents' Authority Is Non-Applicable and Ignores the A.P.A. Rule

13         Respondents base their motion on the Evidence Code and cases applying the Evidence

14 Code.  They ignore the provision of Government Code section 11513(c) that: "The hearing need

15 not be conducted according to technical rules relating to evidence and witnesses, except as

16 hereafter provided.  Any relevant evidence shall be admitted if it is the sort of evidence on which

17 responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the

18 existence of any common law or statutory rule which might make improper the admission of the

19 evidence over objection in civil actions."  As discussed below, Respondents fail to even argue, let

20 along carry their burden to prove, that the Department's evidence to which they object should be

21 excluded under the standard recited in the second sentence of section 11513(c).

22

23 II.     THE EVIDENCE THE DEPARTMENT MAY PRESENT WILL NOT BE BEYOND THE SCOPE OF THE

24        ALLEGATIONS, WILL BE RELEVANT AND NECESSARY TO DETERMINE THE PROPER PENALTY,

25        AND WILL BE ADMISSIBLE UNDER THE EVIDENCE CODE AND A.P.A.

26

A.    The Department's Evidence Will Not Be Outside the Scope of the Pleading; It Will Relate to Allegations Expressly Contained in the Pleading

1.    <u>The evidence will prove that Respondents' violations were willful.</u>

Respondents assert that evidence of Mercury's past conduct that is outside the pleading must be excluded.  However, past conduct Respondents consider to be "outside the pleading" may be relevant to allegations within the pleading.

Throughout the Pleading, the Department alleges that Respondents' conduct and violations were willful.[2]  Any "past conduct and attitude" evidence the Department might present would be probative that Respondents intended to commit the acts that violated the Code, and knew the acts violated the Code.  Consequently, such evidence would not be "outside the scope of the pleading," but instead probative of allegations expressly recited in the pleading.

2.    <u>The evidence is necessary to justify the penalty.</u>

At issue at the hearing will not only be the existence of Mercury's violations, but the appropriate penalty for those violations.  The Code sections that recite the possible monetary penalties for Mercury's rating and advertising violations prescribe that the fine not exceed $5,000 per act, or $10,000 if the act was willful.  (See sections 790.035 and 1858.07(a).)  The A.L.J. and Commissioner must have an evidentiary record to justify whatever penalty they impose.  Absent

---

[2] "Respondents *willfully* permitted their insurance agents to charge "broker fees" to Respondents' policyholders." (P. 2, L 20)

"Respondents *willfully* permitted the rate discrimination to occur." (P. 3, L. 6)

"The facts alleged in paragraphs 1 – 4 establish that Respondents *willfully* used a rate, rating plan or rating system in violation of Chapter…." (P. 3, L. 8)

"Respondents *willfully* failed to disclose that broker fees might be charged in addition to the premium.  By not mentioning the broker fees in the advertisements, Respondents *willfully* misrepresented the actual price insurance consumers could expect to pay…." (P. 3, L. 20)

"By not mentioning the broker fees in the advertisements, Respondents have *willfully* misrepresented the actual price insurance consumers could expect to pay for insurance from Respondents, and thus deceived and misled consumers." (P. 4, L. 10)

"The facts alleged in paragraphs 6 and 7 establish that Respondents *willfully* engaged in unfair or deceptive acts or practices defined in sections 790.03, and constitute grounds to impose a civil penalty of $10,000 for each act." (P. 4, L. 18)

Department's Opposition to Respondents' Motion in Limine

3

1  such a record, any penalty levied by the Commissioner will be vulnerable to a challenge that it is

2  arbitrary. Mercury's lengthy history of serious misconduct, and its attitude - contempt towards

3  and/or abuse of its customers, the Commissioner, its competition, and the Superior Court - are all

4  relevant to determining the penalty needed to best ensure the protection of the public from future

5  violations and wrongdoing.

6       B.   The Department Does Not Seek To Introduce Mere Allegations.

7       Mercury attempts to limit evidence that is "unproven" and "unadjudicated." (Motion: P.

8  6, L. 19)  Since the Department does not know what specific evidence Mercury is referring to, it

9  cannot properly argue its relevance and admissibility.

10      Among Department staff, consumer attorneys, and consumer victims of its bad faith,

11 Mercury has a deserved reputation for abusing its customers and intentionally violating the law

12 with arrogance and indifference. Opinion and reputation testimony regarding Mercury's past

13 conduct, and the foundation for that opinion and reputation, is relevant to intent, knowledge,

14 absence of mistake, and penalty, and admissible under Ev. Code sections 1100 and 1101(b).

15

16      C.   Previously Settled Matters May be Admissible.

17      Respondents seek blanket exclusion of all evidence of prior settlements by Mercury as

18 being *per se* prejudicial, confusing and irrelevant. The Department trusts that the A.L.J. in this

19 matter is highly unlikely to be prejudiced or confused by evidence of a settlement, and will not

20 admit evidence of a specific settlement when the consumption of hearing time needed for its

21 discussion outweighs its relevance. Ev. Code section 352.

22

23      D.   The Department Does Not Seek to Introduce Inadmissible Character Evidence.

24      Mercury seeks to exclude all character evidence that falls within Ev. Code section

25 1101(a). The Department does not intend to introduce such evidence.

26

E.    Respondents' Objection To The FRUB Report Is Premature.

Mercury asserts that the FRUB report is inadmissible hearsay. This objection, as is the rest of the Motion, is premature. The Department has not yet preferred the document, attempted to provide its foundation, nor explained its intended use. It may or may not be offered to prove the truth of the matters stated therein, and if it is, it may be subject to various exceptions to the hearsay rule. Even if not subject to an exception, it may be considered as administrative hearsay per Government Code section 11513(d).

III.    RESPONDENTS' OBJECTION BASED ON EV. CODE SECTION 352 IS PREMATURE.

Mercury seeks a blanket prohibition of "evidence beyond the scope of the allegations" under Ev. Code section 352. As discussed above, Respondents have an erroneously narrow view of the "scope of the allegations." Respondents have failed to allege, let alone carry their burden of proving, which specific Department evidence falls within section 352, or how the evidence falls within that section.

IV.    RESPONDENTS' HAVE FAILED TO MEET THEIR BURDEN UNDER GOVERNMENT CODE SECTION 11513(C).

A.    Respondents Have Failed To Meet Their Burden With Respect To The FRUB Report.

Pursuant to C.G.C. § 11513(c), Respondents must establish that the Department's proffered evidence is not "the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs." Respondents provided no argument in this regard. With respect to the FRUB report, a formal government report prepared by an examiner in accordance with detailed, time-tested, protocols, which report was carefully reviewed and approved by a supervisor and that supervisor's supervisor and addressed to the government agency's highest official, is precisely the kind of evidence on which responsible people rely. It is hard to imagine a better example of what the Legislature might have been contemplating in drafting subdivision (c).

EXHIBIT B

  
ATTORNEYS AT LAW

# FOLGER LEVIN & KAHN LLP

Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, California 94111
Telephone 415.986.2800
Facsimile 415.986.2827

Los Angeles Office:
1900 Avenue of the Stars, 28th Floor
Los Angeles, California 90067
Telephone 310.556.3700
Facsimile 310.556.3770

www.flk.com



**Ethan P. Schulman**
415.986.2800
eschulman@flk.com

**Practice Areas:**
Appellate
Legal Profession
Complex Litigation
Class Action
Educational
Organizations

**Education:**
Boalt Hall School of
Law, University of
California, Berkeley
(J.D., 1983, Order of
the Coif)

Princeton University
(A.B. cum laude in
Politics and
Economics, 1978;
Certificate in Russian
Studies)

Fulbright-Hays
Scholar, Tchaikovsky
State Conservatory of
Music, Moscow, USSR
(1978-1979)

Ethan P. Schulman is a partner in the San Francisco office, and co-chair of FLK's appellate practice and legal profession groups. Mr. Schulman's practice involves appeals, representation of public entities, representation of attorneys and law firms, and complex commercial litigation.

Mr. Schulman joined FLK in 2008 after practicing for many years as a litigation partner in a prominent San Francisco law firm. He is AV Peer Review Rated and has been selected as a Northern California Super Lawyer each year since 2004.

**Representative Matters**

- Successfully representing prominent law firm in case resulting in California Supreme Court decision that plaintiffs in legal malpractice action could not recover punitive damages they allegedly lost due to the negligence of their attorneys in the underlying litigation. *Ferguson v. Lieff, Cabraser, Heimann & Bernstein, LLP*, 30 Cal. 4th 1037 (2003).

- Successfully representing law firm and individual lawyers in trial court and on appeal in $8.1 million legal malpractice action. Court of Appeal affirmed summary judgment for clients.

- Successfully representing law firm and partners on appeal from $690,000 award of attorneys' fees and costs to prevailing lessor in lease dispute. Court of Appeal reversed fee award in its entirety.

- Successfully representing twelve court-appointed class counsel in litigation arising out of objections to $1.55

FOLGER LEVIN & KAHN LLP

Ethan P. Schulman
Page 3

## Presentations

- "Is the Freedom to Associate A Freedom to Discriminate?," St. John's University Law Review 3rd Annual Constitutional Law Panel Discussion, New York (March 2009)

- "Appellate Law for Trial Lawyers," Bridgeport Continuing Education, San Francisco (January 2008) and Los Angeles (April 2008)

- "Recent Developments in California Law on Conflicts and Privilege," CLE International, San Francisco (2007)

- "Do Student Organizations Have A Constitutional Right to Discriminate? Attacks by Religious Student Groups on University Nondiscrimination Policies," National Association of College and University Attorneys (NACUA), Washington, D.C. (April 2006) and Orlando, Florida (June 2005)

## Memberships

- Member, American Bar Association

- Member, State Bar of California and admitted to practice in federal courts throughout California including U.S. Court of Appeals for the Ninth Circuit

- Member, Bar Association of San Francisco, Appellate Practice Section

## Certificates and Honors

- Certified appellate specialist, State Bar of California, Board of Legal Specialization, 2003 to present

- Member, California Academy of Appellate Lawyers

- Vice Chair, Bar Association of San Francisco, Appellate Practice Section

FOLGER LEVIN & KAHN LLP

Ethan P. Schulman
Page 4

### Community Service

- Member and former chair, Legal Committee of the American Civil Liberties Union of Northern California, 1996 to present

- Volunteer mediator for the California Court of Appeal, First Appellate District, 2002 to present

EXHIBIT C

# Basic Your Best Buy, Inc. v. DirecTV, Inc.

COURT OF APPEAL OF THE STATE OF CALIFORNIA SECOND APPELLATE DISTRICT DIVISION THREE    Oct 5, 2012

B236383 (Cal. Ct. App. Oct. 5, 2012)

B236383

10-05-2012

BASIC YOUR BEST BUY , INC., Plaintiff and Respondent, v. DIRECTV, INC., Defendant and Appellant.

Quinn Emanuel Urquhart & Sullivan, Michael E. Williams, B. Dylan Proctor and Valerie A. Lozano for Defendant and Appellant. Crowell & Moring, Ethan P. Schulman, Gregory D. Call, Daniel A. Sasse and Jasmine M. Velazquez for Plaintiff and Respondent.

CROSKEY

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

(Los Angeles County

Super. Ct. No. BC467034)

APPEAL from an order of the Superior Court of Los Angeles County, Richard E. Rico, Judge. Affirmed.

Quinn Emanuel Urquhart & Sullivan, Michael E. Williams, B. Dylan Proctor and Valerie A. Lozano for Defendant and Appellant.

Crowell & Moring, Ethan P. Schulman, Gregory D. Call, Daniel A. Sasse and Jasmine M.
2   Velazquez for Plaintiff and Respondent. *2

Defendant and appellant DirecTV, Inc. appeals from the trial court's order denying its anti-SLAPP (Code Civ. Proc., § 425.16) motion to strike the complaint of plaintiff and respondent Basic Your Best Buy , Inc. (Basic), in this action for conspiracy in restraint of trade. DirecTV argued that all of its alleged acts in restraint of trade were, in fact, protected acts in furtherance of its right of petition. The trial court denied the motion on the rationale that the alleged conspiracy which formed the basis of Basic's complaint was not a communication in furtherance of DirecTV's right of petition. We agree and therefore affirm.

also marketed its services through a number of authorized dealers. Pursuant to their agreements with DirecTV, authorized dealers would be paid a certain amount for each of their customers who ultimately became a DirecTV subscriber.

Basic was a successful authorized dealer of DirecTV. Pursuant to its agreement, it was paid a flat rate for every subscriber, and also earned residuals and additional payments for additional services sold to its customers. On average, Basic earned $300 per subscriber.

While some of DirecTV's authorized dealers were local small businesses, Basic worked nationwide, and was considered one of DirecTV's national sales partners. A great deal of Basic's success was attributable to its Yellow Pages advertising *3 campaign. According to Basic, its approach to Yellow Pages advertising was "sophisticated and cutting-edge." Basic tailored its Yellow Pages advertising to each market, and considered its approach to Yellow Pages advertising to be proprietary information. In March 2007, DirecTV prohibited all of its authorized dealers *except* Basic from using Yellow Pages advertising.[1] Basic was, at this time, considered to be DirecTV's one national sales partner in Yellow Pages advertising.

> [1] One other authorized dealer was also exempted, but not on the same scale. Limited local exemptions would also be considered on a case by case basis by DirecTV.

In 2008, Basic's advertising generated nearly 800,000 calls to its national call center. This resulted in between 3000 and 5000 new DirecTV subscribers per month. At an average of $300 per customer, and an average of 4000 new subscribers per month, this resulted in approximately $14.4 million in revenue from DirecTV for the year.

Pursuant to Basic's contract with DirecTV, DirecTV could terminate its agreement with Basic without cause on 30 days' notice. According to Basic, DirecTV chose to internalize sales and terminate many of its national sales partners; DirecTV wanted to increase its own share of sales from 5% to 55%. Thus, on October 29, 2008, DirecTV indicated that it would terminate Basic's contract. A termination letter was sent, effective December 4, 2008.

Marketers are typically required to purchase Yellow Pages advertising 12-15 months in advance. As such, by November 2008, Basic was under contract to spend an additional $3.2 million on Yellow Pages advertising into 2009 and 2010. This advertising, as well as Basic's existing 2008 advertising, was expected to generate over *4 one million customer calls. Basic estimated that its advertising would generate 779,628 calls in 2009; 429,581 calls in 2010; 185,269 calls in 2011; and 98,636 calls in 2012. The question arose as to who would take those calls and convert the callers into subscribers.[2]

> [2] It should be clear that these calls were generated by a combination of: (1) DirecTV's name and logo appearing in the Yellow Pages advertisements; and (2) Basic's marketing scheme in deciding which advertisements to place in which directories (and in which categories). Both parties treat the calls as the product of their intellectual property; to some degree, both are correct.

According to Basic, there was an existing market for sales calls; the industry average value for such calls at the time was between $20 and $24 per call. As its existing (and contracted) advertising would generate nearly 1.5 million calls, Basic valued its incoming calls at over $30 million. At the time of Basic's termination, DirecTV immediately opened negotiations

as its "entire marketing program, including intellectual property, toll-free numbers, or [internet website addresses] owned . . . , as well as sales calls that [its] marketing program continued to generate post-termination." As the negotiations between the parties referred to various prices per call, we use "calls" to describe the assets at issue.

Unable to reach an agreement with DirecTV,[4] Basic sought to sell its calls to one or more authorized DirecTV dealers. Basic alleges that although multiple authorized DirecTV dealers were interested in purchasing its incoming calls, they were unable to do so because DirecTV refused to allow any authorized DirecTV dealer to bid against it for Basic's calls. According to Basic, it was known throughout the authorized dealer community that no authorized dealer could purchase the assets of a terminated dealer without DirecTV's permission, without risking losing its own authorized dealer status. DirecTV allegedly denied permission to any authorized dealer interested in purchasing Basic's calls.

[4] Basic also alleged that DirecTV stopped compensating it for commissions as of October 29, 2008, although Basic's termination was not effective until December 4, 2008, and it was ultimately requested by DirecTV to continue fielding calls until January 5, 2009. Basic alleges that, by withholding these commissions, DirecTV drove it to the brink of bankruptcy.

On November 13, 2008, with no agreement on the horizon, Basic sent an e-mail to DirecTV offering three alternative proposals: (1) a cash sale to DirecTV for $11.5 million; (2) a sale of its calls to DirecTV for $12.50 per call for 36 months; or (3) Basic would change its call center system so that when customers called, they would be given the option to choose whether they wanted DirecTV, Dish Network, or cable television.[5] Basic offered DirecTV "the right of first refusal" on any of these proposals. It stated, "If DirecTV corporate is not
6   interested we will be more than happy to work *6 with any approve[d] DirecTV dealer or dealers." The e-mail indicated a deadline of November 17, 2008.

[5] The amount which DirecTV would reimburse Basic per call depended on whether Basic was the first, second, or third option on the interactive phone system.

Since Basic's Yellow Pages advertisements used DirecTV's logo and "DirecTV-affiliated 800 numbers," DirecTV interpreted Basic's third option as a threat that Basic would use DirecTV's trademarks to sell its competitors' products and services. DirecTV contacted counsel, Attorney Michael E. Williams, who concluded that DirecTV "had a legally viable claim for trademark infringement and injunctive relief if Basic sought to use the D[irec]TV-Affiliated 800 numbers to sell competing products and services." As such, on November 18, 2008, Attorney Williams sent Basic a cease and desist letter.

The cease and desist letter indicated counsel's understanding that "unless D[irec]TV is willing to pay substantial amounts of money for these D[irec]TV-related numbers, [Basic] intends to either use these toll-free telephone numbers associated with D[irec]TV's trademarks to promote and sell the products and services of a competitor to D[irec]TV, or sell these numbers to a competitor so that they can use them to promote and sell their competing products."[6] As such, "[t]his letter places [Basic] on notice that (1) if at any point [Basic] uses the D[irec]TV-related numbers to sell products and services other than those provided by D[irec]TV; or (2) sells the D[irec]TV-related numbers to a third-party,


The letter makes no mention of Basic's stated willingness to sell the calls to a DirecTV authorized seller who would not sell competing products.

[7]   At this point, the letter had a footnote, which stated, "To the extent [Basic] intends to sell the D[irec]TV related numbers to a third party, this action violates Federal Communications Commission rules, specifically 47 C.F.R. § 52.107, which prohibits the 'selling of a toll free number by a private entity for a fee.'" The merits of this, or any, legal theory are not before us at this time. We note, however, that: (1) Basic never stated it would sell the 800 numbers, it only stated it would sell/redirect the calls; and (2) at least one court has found the language of the cited regulation, which was intended to proscribe number "hoarding," to be ambiguous, suggesting that a sale of a number to preserve a business's goodwill may be a "normal and lawful" transaction. *(Jahn v. 1-800-Flowers.com, Inc.* (7th Cir. 2002) 284 F.3d 807, 809-810.) Indeed, to the extent DirecTV takes the position that the sale of Basic's calls to another DirecTV authorized dealer would have run afoul of this regulation, it is unclear how the ultimate sale of the calls to DirecTV itself would not have also been in violation.

[8]   DirecTV notes that its cease and desist letter demanded confirmation that Basic would cease its unlawful conduct, and Basic subsequently confirmed in writing that it would. Basic's counsel had simply replied, "Rest assured that [Basic] will comply with all of its contractual and statutory obligations and we trust that D[irec]TV will do the same."

As DirecTV allegedly refused to grant any authorized dealer permission to bid on Basic's calls, Basic was forced to sell its calls to DirecTV at what it believes was a below-market rate. Basic agreed to transition the calls to DirecTV, and DirecTV agreed to pay Basic $157.50 for every new subscriber obtained from Basic's numbers from December 16, 2008

8   through November 30, 2010.[9] *8

[9]   DirecTV notes that it paid Basic over $3 million pursuant to this agreement. Basic believes it could have sold the calls on the competitive market for over $30 million, and that it would have earned over $20 million had it simply been permitted to "earn out its calls" after termination.

### 2. *Basic's Complaint*

On August 5, 2011, Basic brought suit against DirecTV, alleging a single cause of action for conspiracy in restraint of trade in violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.). Basic alleged that DirecTV conspired in restraint of trade to restrict competition in bidding for, and purchasing, sales calls from terminated dealers. Basic alleged that DirecTV "told its [authorized dealers] that they could not bid for another [authorized dealer's] assets without first receiving express permission from DirecTV." Basic alleged that DirecTV directly and indirectly informed its dealers that they would be terminated if they bid for such assets when not approved by DirecTV. Basic further alleged that the authorized dealers "knew that they should not bid for other [dealers'] assets if DirecTV was bidding for those same assets." As a result, Basic alleged, competition for the assets of terminated dealers, like Basic, was improperly restricted. Basic alleged that, but for this conspiracy, Basic would have sold its calls to another authorized dealer for substantially more than it received for the calls from DirecTV.

### 3. *DirecTV's Anti-SLAPP Motion*

9    connection with anticipated litigation (i.e., the threatened *9 trademark violation action
against Basic). DirecTV therefore argued that the anti-SLAPP statute was triggered and that
Basic must establish a reasonable probability of prevailing. DirecTV argued that Basic
could not do so, as its statements were protected by the litigation privilege. (Civ. Code, §
47, subd. (b).)

DirecTV supported its motion with, among other things, a declaration of Attorney Williams
which explained the genesis of the cease and desist letter. Attorney Williams testified that
he was contacted by DirecTV, "after it . . . had received threats from Basic to use
D[irec]TV-Affiliated 800 numbers in connection with the sale of competing products and
services." While Attorney Williams testified that he concluded DirecTV had a legally viable
claim for trademark infringement if Basic used those numbers to sell competing products
and services, Attorney Williams did *not* testify that he believed DirecTV had a legally
viable claim against Basic if it sold its calls to another DirecTV authorized dealer.

4. *Basic's Opposition*

Basic opposed the motion, arguing that its complaint was not based on privileged
communications, but instead on the coerced agreement for other DirecTV authorized
dealers not to bid on its assets. Basic specifically argued that its complaint for conspiracy in
restraint of trade was in no way based on the cease and desist letter from DirecTV's
10   counsel. *10

Basic supported its opposition with, among other things, a declaration of Patrick J.
Hudgin,[10] the president of Expert Satellite, Inc., a former authorized national sales partner
of DirecTV.[11] Hudgin declared that, "To limit competition with its [authorized dealers],
DirecTV started to make it clear, and it was generally understood, that [authorized dealers]
were required to check with DirecTV prior to purchasing assets from a terminated dealer."
Hudgin stated that this was communicated directly by DirecTV, "as well as [by] action
taken against [authorized dealers] who did not comply with the scheme. This scheme was in
place in late 2008." Hudgin further stated that he was interested in purchasing Basic's assets
when it was terminated. However, he did not bid for those assets because it was common
knowledge that his dealership would be terminated if he did not obtain DirecTV's approval
before bidding, and, when he inquired, DirecTV told him to " 'stay away' " from Basic's
assets. Hudgin declared that DirecTV never stated that the reason he could not bid on
11   Basic's assets related to DirecTV protecting its trademarks.[12] *11

10  DirecTV objected to much of Hudgin's declaration. No rulings were obtained on the
objections. DirecTV does not argue, on appeal, that its objections should be sustained by this
court in our evaluation of whether Basic's claim is subject to the anti-SLAPP statute. Indeed, in
discussing the basis of Basic's claim, DirecTV relies on language in the Hudgin declaration to
which it had objected.

11  Expert Satellite Inc. was terminated in 2009.

12  The parties dispute whether a sale of Basic's calls to another DirecTV authorized dealer would
have violated DirecTV's trademarks. The issue is irrelevant to our resolution of this appeal.

5. *Reply*

casetext    CARA A.I.    "best buy" and crowell and slapp    JX    §    JI    ?    ✓

Results                    Basic Your Best Buy, Inc. v. DirecTV, Inc.    Copy Cite

    ···Read    Analyses 0    Briefs 0    Citing Cases 1

6. *Ruling and Appeal*

After a hearing, the trial court denied the motion. The trial court stated, "the [c]omplaint is not based on DirecTV's threats to sue Basic if Basic used the 800 numbers to sell competing products or services, it is based on DirecTV's alleged conspiracy with other businesses that were authorized DirecTV retailers to restrict competition in bidding for Basic's 800 numbers."

An order denying an anti-SLAPP motion is immediately appealable. (Code Civ. Proc., § 425.16, subd. (i).) DirecTV filed a timely notice of appeal.

## ISSUE ON APPEAL

The issue on appeal is whether the trial court erred in concluding Basic's complaint was not based on conduct or communications in furtherance of DirecTV's right of petition. As we conclude the trial court did not err, we need not consider whether Basic established a
12   probability of prevailing. *12

## DISCUSSION

1. *Standard and Scope of Review*

The Legislature enacted the anti-SLAPP law in order to address the "disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (Code Civ. Proc., § 425.16, subd. (a).) To that end, the statute provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." *(Id., §* 425.16(b)(1).)

Thus, there is a two-step process for evaluating an anti-SLAPP motion. " 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant's right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute. [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" *(Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 669.) "On appeal, we review the trial court's decision de novo, engaging in the same two-step process to
13   determine, as a matter of *13 law, whether the defendant met its initial burden of showing the action is a SLAPP , and if so, whether the plaintiff met its evidentiary burden on the second step." *(Tuszynska v. Cunningham* (2011) 199 Cal.App.4th 257, 266-267.)

We are here concerned with the first step. "In the first step of the anti-SLAPP analysis, the court decides only whether the claims arise from protected activity. The court reviews the parties' pleadings, declarations and other supporting documents to determine what conduct

casetext   CARA A.I.   "best buy" and crowell and slapp   JX

Results   Basic Your Best Buy, Inc. v. DirecTV, Inc.   Copy Cite

···Read   Analyses 0   Briefs 0   Citing Cases 1

Our Supreme Court has recognized the anti-SLAPP statute should be broadly construed [citation] and that a plaintiff cannot avoid operation of the anti-SLAPP statute by attempting, through artifices of pleading, to characterize an action as a garden variety tort or contract claim when in fact the claim is predicated on protected speech or petitioning activity. [Citation.]' " *(Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at p. 267.) At the same time, "a defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant." *(Martinez v. Metabolife Internal, Inc.* (2003) 113 Cal.App.4th 181, 188.) Determining whether a cause of action arises from protected speech or petitioning activity requires a focus on the *principal thrust* or *gravamen* of the cause of

14   action. If the allegations of protected *14 activity are merely incidental to a cause of action based essentially on non-protected activity, the allegations will not transform the non-protected cause of action into an action subject to the anti-SLAPP law. *(Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at p. 257; *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 653.) The focus on the gravamen of the action does not implicate "some philosophical thrust or legal essence of the cause of action." *(Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1190.) Instead, courts are to focus on the acts on which liability is alleged to be based. *(Ibid.)*

Moreover, courts must be careful to distinguish allegations of conduct on which liability is to be based from allegations of motives for such conduct. "[C]auses of action do not arise from motives; they arise from acts." *(Wallace v. McCubbin, supra,* 196 Cal.App.4th at p. 1186.) "The statute applies to claims 'based on' or 'arising from' statements or writings made in connection with protected speech or petitioning activities, regardless of any motive the defendant may have had in undertaking its activities, or the motive the plaintiff may be ascribing to the defendant's activities." *(Tuszynska v. Cunningham, supra,* 199 Cal.App.4th at p. 269.) Similarly, a court ruling on an anti-SLAPP motion must distinguish between allegedly wrongful acts and evidence of those acts. "Where the defendant's protected activity will only be used as evidence in the plaintiff's case, and none of the claims are based on it, the protected activity is only incidental to the claims," and will therefore not support an anti-SLAPP motion. *(Coretronic Corp. v. Cozen O'Connor, supra,* 192

15   Cal.App.4th at pp. 1388-1389.) *15

*2. DirecTV Has Failed to Sustain its Burden on the Anti-SLAPP Motion*

Code of Civil Procedure section 425.16, subdivision (e) sets forth four types of communications or conduct which are considered acts in furtherance of a person's right of speech or petition. At issue in this case is subdivision (e)(2), which describes as an act in furtherance of petition "any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body . . . ." Although this statutory language refers to litigation then pending, it has been interpreted to apply to pre-litigation statements. Communications preparatory to, or in anticipation of, bringing an action are within the protection of the anti-SLAPP statute. *(Bailey v. Brewer* (2011) 197 Cal.App.4th 781, 789.) If a prelitigation statement concerns the subject of the dispute and is made in anticipation of litigation contemplated in good faith and under serious consideration, it falls within the scope of Code of Civil Procedure section 425.16. *(Bailey v. Brewer, supra,* 197 Cal.App.4th at pp. 789-790.)

casetext   CARA A.I.   "best buy" and crowell and slapp   JX

Results   Basic Your Best Buy, Inc. v. DirecTV, Inc.   Copy Cite

...Read   Analyses 0   Briefs 0   Citing Cases 1

anticipation of contemplated litigation. It is equally clear, however, that Basic's complaint was not based on the cease and desist letter. Basic alleged a single cause of action against DirecTV for conspiracy in restraint of trade. The gravamen of Basic's complaint was that

16  DirecTV coerced its authorized dealers into *16 refraining from bidding for Basic's calls. That DirecTV also threatened to sue Basic for trademark infringement if it sold its calls[13] is, at most, evidence of DirecTV's motives. As the allegations of Basic's complaint relating to the cease and desist letter were merely incidental to its cause of action for a conspiracy in restraint of trade, those allegations alone cannot render the complaint subject to the anti-SLAPP statute.

> [13]  The text of the cease and desist letter is ambiguous as to whether DirecTV threatened suit if Basic sold its calls to another authorized DirecTV dealer, as opposed to a competitor. Clearly, DirecTV's main concern was preventing the latter situation.
>
> --------

We now turn to allegations relating to DirecTV's communications with its authorized dealers, in which DirecTV allegedly told the dealers that they could not purchase Basic's calls. These communications are, in fact, the basis or gravamen of Basic's complaint. Basic's allegations of conspiracy rely on DirecTV's communications with authorized dealers who otherwise would have bid on Basic's assets. Thus, we must consider whether these communications were, as DirecTV alleges, prelitigation communications related to the trademark violation action it had threatened against Basic.

Communications to third parties can, in fact, constitute acts in furtherance of the right of petition, when the communications relate to the substantive issues in the litigation and are directed to persons having some interest in the litigation. *(Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266.) Thus, for example, when an employer was contemplating suit against a former employee for stealing its customer lists and trade secrets, the employer's letter to its customers informing them of its allegations against the employee and suggesting

17  that "to avoid potential involvement in any ensuing *17 litigation 'as a material witness, or otherwise,' the customers should not do business with" the employee, was a communication in furtherance of the employer's right of petition. (*Id.* at pp. 1259, 1267-1268.) Similarly, when a homeowners' association was required to expend additional resources on maintenance because a homeowner would not allow access over her property, the association's letter to other homeowners informing them of the additional expense and the litigation against the recalcitrant homeowner was similarly protected. *(Healy v. Tuscany Hills Landscape & Recreation Corp.* (2006) 137 Cal.App.4th 1, 5-6.)

However, the fact that a lawsuit is contemplated, or even pending, does not mean that every subsequent communication is a writing in connection with the litigation. *(McConnell v. Innovative Artists Talent & Literary Agency, Inc.* (2009) 175 Cal.App.4th 169, 177.) In *McConnell,* two talent agents had brought suit against their agency, seeking a declaration that their contracts were terminable at will. The agency responded with a letter " 'temporarily' " modifying the agents' job duties to preclude them from coming to the office, using the office e-mail system, or communicating with clients. (*Id.* at pp. 172-173.) When the agents then amended their complaint to allege that the letter constituted retaliation and

18  written 'in connection with an issue *18 under consideration' in th[at] lawsuit[], of which no mention at all was made." *(Id.* at p. 178.)

We conclude that *McConnell* dictates the result in this case. According to Basic's complaint and the evidence it submitted, DirecTV's communications with its authorized dealers telling them not to bid on Basic's calls did not, in any way, reference the trademark violation lawsuit DirecTV had threatened in its cease and desist letter, nor did the communications refer to DirecTV's trademarks at all. Indeed, Basic alleged DirecTV "made clear to its [authorized dealers] that they were prohibited from bidding against DirecTV for any other [dealer's] assets" as early as 2006. We fail to see how communications pursuant to a policy established in 2006 were communications in connection with a litigation that would not be contemplated for another two years. That DirecTV threatened litigation against Basic for trademark infringement does not render every subsequent communication by DirecTV a communication related to the proposed litigation. Here, there was no evidence that its communications directing other dealers not to bid for Basic's assets related to the

19  substantive issues of that litigation. DirecTV has therefore failed to meet its burden. *19

## *DISPOSITION*

The order denying the anti-SLAPP motion is affirmed. Basic shall recover its costs on appeal.

### *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

CROSKEY, J. WE CONCUR:

KLEIN, P. J.

ALDRICH, J.

Coverage

SmartCite

Public records

Partnerships and Resources

Law school

Bar associations

About us

Jobs

Blog

Podcast

News

Twitter

Facebook