EXHIBIT D

BASIC YOUR BEST BUY, INC., Plaintiff and Respondent,..., 2012 WL 1965929...

Case 2:21-cv-01546-JAM-KJN    Document 1-2    Filed 08/27/21    Page 2 of 16

2012 WL 1965929 (Cal.App. 2 Dist.) (Appellate Brief)
Court of Appeal, Second District, Division 3, California.

BASIC YOUR BEST BUY, INC., Plaintiff and Respondent,

v.

DIRECTV, INC., Defendant and Appellant.

No. B236383

May 29, 2012.

On Appeal From Order of the Superior Court for the County of
Los Angeles Hon. Richard E. Rico, Judge Case No. BC467034

**Respondent's Brief**

Ethan P. Schulman (SB# 112466), eschulman@crowell.com, Gregory D. Call (SB # 120483), Crowell & Moring LLP, 275 Battery Street, 23rd Floor, San Francisco, CA 94111, Telephone: (415) 986-2800, Facsimile: (415) 986-2827, Daniel A. Sasse (SB# 236234), Jasmine M. Velazquez (SB# 266300), Crowell & Moring LLP, 3 Park Plaza, 20th Floor, Irvine, California 92614-8505, Telephone: (949) 263-8400, Facsimile: (949) 263-8414, Attorneys for Plaintiff and Respondent BASIC YOUR BEST BUY, INC.

*i TABLE OF CONTENTS

| | |
|---|---|
| INTRODUCTION AND SUMMARY | 1 |
| STATEMENT OF FACTS | 4 |
| A. Basic, An Authorized DIRECTV Retailer, Invested Millions Of Dollars In National Advertising To Generate Leads For DIRECTV's Services | 4 |
| B. In 2008, Without Warning And Without Offering Any Reason, DIRECTV Terminated Basic As A Small Business Owner | 7 |
| C. DIRECTV Eliminated Competition For Basic's Sales Leads | 9 |
| D. Basic Suffered Millions Of Dollars In Damages As A Result Of DIRECTV's Illegal Conspiracy | 13 |
| PROCEDURAL HISTORY | 13 |
| STANDARD OF REVIEW | 16 |
| ARGUMENT | 16 |
| I. THE TRIAL COURT CORRECTLY APPLIED THE TWO-PRONG TEST | 18 |
| II. DIRECTV HAS NOT MET ITS BURDEN TO SHOW THAT BASIC'S CARTWRIGHT ACT CAUSE OF ACTION AROSE FROM PROTECTED ACTIVITY | 20 |
| A. The Gravamen Of Basic's Cartwright Act Claim Is That DIRECTV Entered Into An Illegal Antitrust Conspiracy, Not That It Sent Protected Communications | 21 |
| B. DIRECTV Confuses The Acts Of Alleged Misconduct With The Evidence Needed To Prove Them | 26 |
| C. The Cases Relied Upon By DIRECTV Are Inapposite | 29 |
| *ii III. BASIC ALSO ESTABLISHED A REASONABLE PROBABILITY OF PREVAILING ON THE MERITS OF ITS CLAIM | 32 |
| A. This Court Need Not Reach The Second Prong | 32 |
| B. Alternatively, This Court May Affirm On The Ground That Basic Met Its Burden On The Second Prong | 33 |
| C. Basic's Cartwright Act Claim Is Legally Sufficient And Supported By A Prima Facie Factual Showing Of A Conspiracy Among DIRECTV and Its Authorized Retailers | 34 |
| 1. Basic Made A Prima Facie Showing That An Illegal Conspiracy Was Formed | 34 |
| 2. Basic Made A Prima Facie Showing That DIRECTV's Conspiracy Unlawfully Restrained Trade | 37 |

BASIC YOUR BEST BUY, INC., Plaintiff and Respondent..., 2012 WL 1965929...

Case 2:21-cv-01546-JAM-KJN    Document 1-2    Filed 08/27/21    Page 3 of 16

| | |
|---|---|
| 3. Basic Made A Prima Facie Showing That It Suffered Damages from DIRECTV's Conspiracy | 38 |
| D. The Litigation Privilege Does Not Bar Basic's Cartwright Act Claim | 39 |
| CONCLUSION | 41 |

*iii TABLE OF AUTHORITIES

CASES

| | |
|---|---|
| *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232 (2007) | 39 |
| *Applied Bus. Software, Inc. v. Pacific Mortg. Exchange, Inc.*, 164 Cal. App. 4th 1108 (2008) | 19, 20, 32 |
| *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1 (2012) | 34 |
| *Blackburn v. Brady*, 116 Cal. App. 4th 670 (2004) | 26 |
| *Blanchard v. DIRECTV*, 123 Cal. App. 4th 903 (2003) | 31, 33 |
| *City of Alhambra v. D'Ausilio*, 193 Cal. App. 4th 1301 (2011) | 16 |
| *City of Cotati v. Cashman*, 29 Cal. 4th 69 (2002) | 20 |
| *Clark v. Mazgani*, 170 Cal. App. 4th 1281 (2009) | 26 |
| *Coretronic Corp. v. Cozen O'Connor*, 192 Cal. App. 4th 1381 (2011) | 29 |
| *Digerati Holdings, LLC v. Young Money Ent., LLC*, 194 Cal. App. 4th 873 (2011) | 39 |
| *Donovan v. Dan Murphy Found.*, 204 Cal. App. 4th 1500 (2012) | 26 |
| *Flatley v. Mauro*, 39 Cal. 4th 299 (2006) | 16 |
| *Freeman v. Schack*, 154 Cal. App. 4th 719 (2007) | 16, 19 |
| *iv *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256 (1983) | 35 |
| *Gallimore v. State Farm Fire & Casualty Ins. Co.*, 102 Cal. App. 4th 1388 (2002) | passim |
| *Graffiti Protective Coatings, Inc. v. City of Pico Rivera*, 181 Cal. App. 4th 1207 (2010) | passim |
| *Hall v. Time Warner, Inc.*, 153 Cal. App. 4th 1337 (2007) | 32 |
| *Hylton v. Frank E. Rogozienski, Inc.*, 177 Cal. App. 4th 1264 (2009) | 19 |
| *In re Episcopal Church Cases*, 45 Cal. 4th 467 (2009) | 26 |
| *In re Marriage of Ditto*, 206 Cal. App. 3d 643 (1988) | 18 |
| *Kimmel v. Goland*, 51 Cal. 3d 202 (1990) | 39 |
| *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709 (1982) | 36, 37, 38 |
| *Kunert v. Mission Fin. Servs. Corp.*, 110 Cal. App. 4th 242 (2003) | 34 |
| *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90 (2004) | 40 |
| *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App. 4th 181 (2003) | 21, 22, 23 |
| *McConnell v. Innovative Artists Talent and Literary Agency, Inc.*, 175 Cal. App. 4th 169 (2009) | 23, 24, 30 |
| *v *Navellier v. Sletten*, 29 Cal. 4th 82 (2002) | passim |
| *Neville v. Chudacoff*, 160 Cal. App 4th 1255 (2008) | 29, 30, 33 |
| *Novartis Vaccines and Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA*, 143 Cal App. 4th 1284 (2006) | 35 |
| *Premier Med. Mgmt. Sys. v. Cal. Ins. Guar. Ass'n*, 136 Cal. App. 4th 464 (2006) | 40 |
| *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) | 40 |
| *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26 (1998) | 34 |
| *R.E. Spriggs Co. v. Adolph Coors Co.*, 94 Cal. App. 3d 419 (1979) | 37 |
| *Rusheen v. Cohen*, 37 Cal. 4th 1048 (2006) | 20, 39 |
| *Santa Monica Rent Control Bd. v. Pearl St., LLC*, 109 Cal. App. 4th 1308 (2003) | 19, 25, 31 |
| *Shaw v. County of Santa Cruz*, 170 Cal. App. 4th 229 (2008) | 18 |
| *Silverado Modjeska Rec. & Park Dist. v. County of Orange*, 197 Cal. App. 4th 282 (2011) | 33 |
| *Tusynska v. Cunningham*, 199 Cal. App. 4th 257 (2011) | 32 |
| *Wang v. Wal-Mart Real Estate Business Trust*, 153 Cal. App. 4th 790 (2007) | 26, 28 |
| *vi *World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.*, 172 Cal. App. 4th 1561 (2009) | 22, 26 |

STATUTES

WESTLAW  © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2

BASIC YOUR BEST BUY, INC., Plaintiff and Respondent...., 2012 WL 1965929...

Case 2:21-cv-01546-JAM-KJN    Document 1-2    Filed 08/27/21    Page 4 of 16

Bus. & Prof. Code
§ 16720 .................................................................................... 34
Civ. Proc. Code
§ 425.16 .................................................................................... 32
§ 425.16(a) ............................................................................... 17
§ 425.16(b)(1) .......................................................................... 17, 20
OTHER AUTHORITIES
7 B. Witkin, *California Procedure* (5th ed. 2008), Judgment § 10 at 554 .......... 18

**\*1 INTRODUCTION AND SUMMARY**

This is an appeal from an order denying an anti-SLAPP motion to strike an antitrust complaint filed by Plaintiff Basic Your Best Buy, Inc. ("Basic") against Defendant DirecTV, Inc. ("DIRECTV"). Basic was an authorized DIRECTV retailer that was terminated by DIRECTV in 2008. Basic's complaint seeks damages based on DirecTV's alleged illegal conspiracy with other DIRECTV retailers to restrict competition in bidding for Basic's sales leads, in violation of the California Cartwright Act. In its anti-SLAPP motion, DIRECTV asserted that the action arose from protected communications because after it terminated Basic, it sent Basic a letter threatening to sue it for trademark infringement if it used its sales leads to sell competitors' products or services. The trial court denied DIRECTV's motion, holding that "the Complaint is not based on DirecTV's threats to sue Basic if Basic used the 800 numbers to sell competing products or services, it is based on DirecTV's alleged conspiracy with other businesses that were authorized DirecTV retailers to restrict competition in bidding for Basic's 800 numbers." Appellant's Appendix ("AA") 192. Because "the Complaint is not based on DirecTV's threats to file trademark litigation ... the Complaint's Cartwright Act claim does not arise from DirecTV's alleged petitioning activity and C.C.P. § 425.16 does not apply." *Id.* at 193.

**\*2** The trial court correctly ruled that Basic failed to meet its burden to show that the action arose from protected activity, the first prong of the anti-SLAPP test. Basic did not sue DIRECTV because it sent Basic a letter threatening litigation for trademark infringement, nor did it seek any relief based on that letter. Rather, Basic sued DIRECTV for damages caused by its illegal conspiracy to restrict competition. The complaint therefore does not arise from any protected activity, as the gravamen or principal thrust of Basic's claim is that DIRECTV entered into an anticompetitive conspiracy in violation of the Cartwright Act. *See* Part II(A), *infra*.

While Basic's complaint contains a handful of references to DIRECTV's demand letter threatening litigation over alleged trademark and to other communications with retailers, the complaint is not *based on* those communications, which at most constitute evidentiary support for Basic's antitrust claim. That is not enough to bring the complaint within the anti-SLAPP statute. "Prelitigation communications ... may provide evidentiary support for the complaint without being a basis of liability." *Graffiti Protective Coatings, Inc. v. City of Pico Rivera*, 181 Cal. App. 4th 1207, 1215 (2010); *Gallimore v. State Farm Fire & Casualty Ins. Co.*, 102 Cal. App. 4th 1388, 1399 (2002) ("This contention confuses [the defendant's] allegedly *wrongful acts* with the *evidence* that plaintiff will need to prove such misconduct"). Because the trial court correctly found that Basic's Cartwright Act cause of action was not based on protected **\*3** activity, its order denying the anti-SLAPP motion should be affirmed on that ground alone. *See* Part II(B), *infra*.

Having denied DIRECTV's motion to strike on the ground that the first step of the anti-SLAPP test was not met, the trial court did not reach the second step: whether Basic demonstrated a reasonable probability of prevailing on its claims. If this Court should disagree with the trial court as to the first step, it should remand the matter so that the trial court can make that determination in the first instance. *See* Part III(A), *infra*. If the Court chooses to address the second step, however, it should find that Basic established a reasonable probability of prevailing on its Cartwright Act claim. Basic offered evidence to support each element of that claim, including a sworn declaration by a third-party authorized retailer who would have bid on Basic's sales leads but refrained from doing so because of coercive behavior by DIRECTV. That evidence was ample to meet Basic's minimal burden under the second step of the anti-SLAPP test. *See* Part III(C), *infra*.

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Finally, DIRECTV's purported dispositive defenses to Basic's claim based on the litigation privilege and the Noerr-Pennington doctrine lack merit for the same reason that Basic's claim is outside the scope of the anti-SLAPP statute: because it is not based on protected communications. *See* Part III(D), *infra.*

**\*4 STATEMENT OF FACTS**[1]

A. Basic, An Authorized DIRECTV Retailer, Invested Millions Of Dollars In National Advertising To Generate Leads For DIRECTV's Services.

DIRECTV offers direct broadcast satellite entertainment service programming. AA 3 ¶ 12; AA 52 ¶ 3. Its business model is based on subscriptions, through which customers pay monthly fees for television programming and other services. *Id.* Its success and revenue stream are tied to its ability to sign up new subscribers and maintain its subscriber base. *Id.* DIRECTV uses two methods to build and maintain its subscriber base: (1) it authorizes numerous marketers and advertisers, known as Small Business Owners, National Sales Partners, and Local Sales Partners, to attract and sign up new subscribers, and (2) it advertises and signs up subscribers itself through its own internal direct sales force, thereby competing directly with Small Business Owners to sign up new subscribers. AA 4 15, 8 ¶ 34; AA 155 ¶ 3; Appellant's Opening Brief ("AOB") 4.

DIRECTV relied primarily on authorized sales partners to build and maintain its subscriber base, contractually authorizing thousands of companies to sign up DirecTV customers. AA 3 ¶ 12, 4 ¶¶ 15-18. Some of those DIRECTV sales partners generated sales leads on their own by **\*5** purchasing advertisements, but many sales partners purchased these leads from other sources and signed up new customers using these leads. AA 155 ¶ 3.

From 1996 through 2008, Basic was an authorized retailer of DIRECTV's satellite television programming services. AA 1-2 ¶¶ 1- 2, 5 ¶ 19; AA 155 ¶ 2. To generate sales leads for DIRECTV, Basic placed advertisements in thousands of Yellow Pages and White Pages directories across the country that included toll free telephone numbers. AA 5-6 ¶ 24; AA 155 ¶ 2. Basic would then field sales calls generated by those listings in its own independently operated call centers and convert callers into new DIRECTV subscribers. *Id.* Basic's call center exceeded industry standards for both volume of incoming sales calls and percentage of activations and installations. *Id.*

In placing advertising, Basic utilized competitive insight, expertise, and strategy that it had developed over several years to place strategic and effective advertisements. AA 6 ¶ 25. For example, Basic determined which directories and types of advertisements would be most successful in generating sales leads in a given geographic area. *Id.*

As a result of Basic's highly effective advertising strategy and call center, DIRECTV consistently recognized Basic as one of its top ten performers nationwide. AA 1 ¶ 1, 5 ¶¶ 20-21, 12 ¶ 63. As one DIRECTV executive stated, "[Basic] has become an expert on Yellow Pages media **\*6** and publishing services ... [It] has the experience and expertise on how to buy the media, what creative elements drive the best responses, and (most importantly) how to cost-effectively and efficiently convert the call to an activation." AA 6 ¶ 26.

In early 2007, Basic had several meetings with DIRECTV senior management regarding its Yellow Pages marketing and use of that marketing channel. AA 6 ¶ 27. At those meetings, DIRECTV encouraged Basic to grow its business and to invest heavily in Yellow Pages advertising. *Id.* In 2007, DIRECTV told Basic that it was going to become DIRECTV's "one national partner" in Yellow Pages advertising. AA 10 ¶ 53. At the time, Basic underwent an extensive business review with DIRECTV, which repeatedly encouraged it to purchase advertising and invest in its business. AA 11 ¶ 54.

Based on DIRECTV's repeated commitments, Basic invested millions of dollars on marketing for DIRECTV. AA 11 ¶ 59. It spent more than $20 million in 2007 and 2008 on placing Yellow Pages and White Pages advertisements for DIRECTV customers, AA 156 ¶ 5. Further, because marketers typically are required to buy advertising 12-15 months in advance, by

November 2008, Basic was already under contract to spend approximately $3.2 million for Yellow Pages advertising into 2009 and 2010. AA 11 ¶ 60; AA 156 ¶ 5; *see also* AA 53 ¶ 7 (acknowledging that Basic had purchased directory listings for the next two years); AA 125 *7 (directory listings placed by Basic for DIRECTV products and services "will remain in place long after the agreements have been terminated").

By late 2008, Basic's advertisements for DIRECTV services were generating between 60,000 and 85,000 sales leads per month, or nearly 800,000 calls that year. AA 11 ¶ 62; AA 156 1 5. In 2008, Basic generated between 3,000 and 5,000 new customers for DIRECTV per month, for which it earned on average over $300 for each new subscriber. AA 7 ¶ 29, AA 12 ¶ 63. By late 2008, Basic's multi-million dollar investment in Yellow Page listings was expected to generate over 1.2 million sales calls for DIRECTV in the next two years and another 300,000 calls in the following two years. AA 7 ¶ 32, 11 ¶ 61.

B. In 2008, Without Warning And Without Offering Any Reason, DIRECTV Terminated Basic As A Small Business Owner.

In late 2008, without any prior warning and without offering any reason, DIRECTV terminated Basic as a Small Business Owner on 30 days' notice. AA 12 ¶ 64 - 13 ¶ 71; AA 53 ¶ 5. During the meeting in which DIRECTV communicated that decision to Basic, DIRECTV's Senior Vice President of Sales asked that Basic sell its business to DIRECTV, including the Yellow Pages advertising platform and the sales leads that would surely continue to pour in as a result of that platform. AA 12 ¶ 66.

*8 The consequences for Basic of its abrupt termination as a DIRECTV dealer were dire. At DIRECTV's request, Basic continued to accept sales calls for DIRECTV customers and to complete new DIRECTV installations. AA 13 ¶ 72. However, DIRECTV immediately stopped paying Basic for new customer installations. AA 13 ¶ 71. Moreover, over the next two months, DIRECTV withheld more than $2 million in new customer commissions from Basic. *Id.* ¶ 72. Basic hemorrhaged cash at the rate of approximately $1 million per month while it fielded calls and completed installations for DIRECTV without compensation. *Id.* ¶ 73. At the time of its termination, it also remained responsible for over $3 million in already-purchased Yellow Pages advertisements, which Basic had purchased based on DIRECTV's past representations about Basic's secure role and which Basic could not cancel. *Id.* ¶ 74. Finally, as Basic's CEO told DIRECTV's senior executive, its decision would force Basic to fire approximately 175 people during the holiday season. *Id.* ¶ 76. This combination of facts had the direct and immediate effect of driving Basic to the brink of bankruptcy. *Id.* ¶ 75. To pay off its substantial debt, Basic would have to sell its assets, including incoming sales leads. *Id.* However, DIRECTV prevented Basic from doing so at their fair market value by preventing other authorized retailers from bidding on those assets.

*9 C. DIRECTV Eliminated Competition For Basic's Sales Leads.

Although Basic no longer was authorized to sign up new customers after its termination, its contract with DIRECTV did not address how it could recover its significant multi-million dollar investment in outstanding Yellow Pages listings. AA 7 ¶ 32. Nor did the contract impose any obligation on DIRECTV to purchase its remaining assets, including the tens of thousands of monthly sales leads in the form of incoming calls to toll-free numbers that its advertisements continued to generate. *Id.* ¶¶ 31, 32; AA 156 ¶ 6. Those sales calls had independent value in the marketing industry, where authorized sales partners for DIRECTV would pay around $24 per call for these sales leads. AA 18 ¶ 105; AA 155 ¶ 4; *see also AA* 151 ¶ 5 ("The sales calls or leads that were generated by these Sales Agents had real and independent commercial value because they could lead to new DirecTV subscriptions"). Thus, the value of Basic's sales calls, which were conservatively estimated to number 1.2 million over the first 24 months following its termination and an additional 300,000 over the next 24 months, would have easily exceeded $30 million in value to authorized DIRECTV sales partners. AA 18 ¶ 106; AA 155 ¶ 4, 158 ¶ 20.

After Basic was terminated, both DIRECTV itself and several of its authorized Small Business Owners expressed interest in acquiring these sales leads. As noted above, at the very meeting during which it terminated *10 Basic, DIRECTV offered to buy those sales leads from Basic. AA 13-14 ¶ 77. Basic was not prepared to negotiate the sale of its business at that first meeting, but agreed to continue the discussion. *Id.* Thereafter, however, DIRECTV ignored multiple proposals by Basic to sell its sales calls to DIRECTV on various alternative bases. AA 14-15 ¶¶ 81-84; AA 54 ¶ 8, 122-23. Instead, DIRECTV's only

BASIC YOUR BEST BUY, INC., Plaintiff and Respondent..., 2012 WL 1965929...

Case 2:21-cv-01546-JAM-KJN    Document 1-2    Filed 08/27/21    Page 7 of 16

response was to send a cease and desist letter to Basic threatening to sue the company for trademark infringement if it used the Yellow Pages sales calls to sell competitors' products and services, or sold them to any third party. AA 15 ¶¶ 85-86, 89; AA 43-44 ¶ 3, 46-47. In fact, Basic wanted to sell its assets to DIRECTV or to authorized DIRECTV sales partners for fair market value, not to DIRECTV's competitors. AA 158 ¶ 21. Basic never tried to sell the leads to a company providing cable or satellite services that competed with DIRECTV. *Id.*[2]

Numerous DIRECTV sales partners also were interested in purchasing Basic's assets, including the sales leads, but were prevented **\*11** from doing so by DIRECTV. AA 16-17 ¶¶ 91-99; AA 158 18. Upon learning that DIRECTV had terminated Basic as an authorized sales agent in October 2008, for example, a DIRECTV National Sales Partner, Expert Satellite, Inc. ("Expert"), became interested in purchasing Basic's assets. AA 152 ¶ 9. Expert believed that the sales leads generated by Basic's advertisements and its advertising program would have been valuable to it because they had the potential to attract a large number of new DIRECTV subscribers, and generate a significant stream of additional income from those new subscriptions. *Id.* However, Expert did not bid on Basic's assets, despite its desire to do so, because it was "common knowledge" that DIRECTV would terminate Expert if it did not obtain DIRECTV's approval before bidding on the assets of a terminated dealer, or if it disregarded DIRECTV's lack of approval. AA 152 ¶ 12. Expert approached DIRECTV to seek approval to bid on Basic's assets. AA 152 ¶ 13. However, DIRECTV told it that Basic's assets were "off limits"-which it understood to mean that Expert could not purchase or acquire those assets, and that if it did so, DIRECTV would terminate it as a sales agent. AA 17 ¶ 98; AA 153 ¶ 14. DIRECTV later reiterated its demand that Expert refrain from bidding on Basic's assets, instructing it to "stay away" from terminated dealers. AA 153 ¶ 15.[3]

**\*12** Significantly, when DIRECTV representatives gave Expert these warnings, they never mentioned anything to Expert about DIRECTV's trademarks. AA 153 ¶ 16. Nor could legitimate concerns about usage of those trademarks have factored into DIRECTV's warnings, since at the time Expert was an authorized DIRECTV sales agent and was authorized to use DIRECTV's trademarks in its own business. *Id.* Of course, the advertisements containing DIRECTV's trademarks had already been published or placed in future directories.

Basic asked DIRECTV several times for a list of authorized sales partners that it would allow to buy Basic's assets. AA 158 ¶ 17. Although DIRECTV responded that it would provide this list after the termination was effective, DIRECTV never provided any names of authorized sales partners that it would permit to purchase Basic's assets. AA 15 ¶ 90; AA 17 ¶ 99; AA 158 ¶ 17. Thus, all DIRECTV authorized sales partners who were interested in obtaining Basic's assets ultimately were unable to bid for them. AA 158 19.

**\*13** D. Basic Suffered Millions Of Dollars In Damages As A Result Of DIRECTV's Illegal Conspiracy.

Because DIRECTV did not allow other Small Business Owners to bid for Basic's assets, there was no meaningful competition for those assets. AA 17 ¶ 100. Meanwhile, DIRECTV had ceased paying Basic for the services Basic and its call center continued to provide for DIRECTV. Ultimately, Basic was forced to sell its assets to DIRECTV at a price far below their fair market value to mitigate its ongoing losses. AA 17 ¶ 101; AA 125-29. To date, Basic has received only approximately $3 million from DIRECTV on its investment of more than $30 million. AA 55 ¶ 11; AA 158 ¶ 22.

## PROCEDURAL HISTORY

Basic's complaint against DIRECTV states a single cause of action under the Cartwright Act. AA 1-21. It alleges that DIRECTV entered into an illegal conspiracy in restraint of trade with its authorized retailers to allocate customers and to restrict competition in bidding for and purchasing certain sales agency assets. AA 19 ¶ 113. Specifically, it alleges that DIRECTV coerced its

BASIC YOUR BEST BUY, INC., Plaintiff and Respondent,..., 2012 WL 1965929...

Case 2:21-cv-01546-JAM-KJN    Document 1-2    Filed 08/27/21    Page 8 of 16

retailers into an anticompetitive scheme by communicating to them (1) that they could not sell or purchase sales leads without explicit approval from DIRECTV and (2) they were not to compete against DIRECTV for the purchase of a terminated retailer's sales leads. AA 8 ¶ 37 - 9 ¶ 44; AA 19 ¶¶ 112-117. DIRECTV communicated this *14 coercive policy both through direct statements made by DIRECTV employees to retailers and through actions that DIRECTV took against retailers when they failed to abide by it. AA 9 ¶¶ 40, 44; AA 19 ¶¶ 113-17. This coercion and the agreement not to bid against DIRECTV resulted in the elimination of competition to purchase Basic's assets, which harmed Basic by forcing it to accept some $27.9 million less in payment for its marketing assets and sales calls than it would have but for DIRECTV's restraint of trade. AA 19-20 ¶¶ 118-20.

While a handful of the 120 charging allegations in the complaint referred to DIRECTV's demand letter to Basic threatening it with litigation if it engaged in trademark infringement (AA 15 ¶¶ 85-86, 89; AA 19 ¶ 117), nowhere in the complaint does Basic claim any right to sell its calls to competing cable or satellite television programming services or assert any claim relating to DIRECTV's trademarks. Nor does the complaint seek any relief against DIRECTV based on its having sent those letters. In its anti-SLAPP motion, DIRECTV nevertheless asserted that the action was "based on" its protected act of sending pre-litigation demand letters. AA 22-41. Basic opposed the motion on the ground that the complaint did not arise from any protected activity, but instead from an illegal anticompetitive *15 agreement that has nothing to do with DIRECTV's assertion of trademark rights. AA 130-158.[4]

The trial court denied DIRECTV's anti-SLAPP motion, finding that it failed to meet its burden of showing that the cause of action arises from protected activity. AA 189-93. The court held that "the Complaint's Cartwright Act claim does not arise from DirecTV's alleged petitioning activity and C.C.P. § 425.16 does not apply." AA 193. The court explained that "the Complaint is not based on DirecTV's threats to sue Basic if Basic used the 800 numbers to sell competing products or services, it is based on DirecTV's alleged conspiracy with other businesses that were authorized DirecTV retailers to restrict competition in bidding for Basic's 800 numbers." AA 192.

Because DIRECTV did not meet its burden as to the first prong of the anti-SLAPP test, the trial court made no determination whether Basic had demonstrated a probability of prevailing on its claim. DIRECTV filed this appeal. AA 194-98.

## *16 STANDARD OF REVIEW

"Review of an order granting or denying a motion to strike under section 425.16 is de novo." *Flatley v. Mauro,* 39 Cal. 4th 299, 325 (2006) (citations omitted); *Gallimore,* 102 Cal. App. 4th at 1397. The Court neither weighs credibility nor compares the weight of the evidence. Rather, the Court "accept [s] as true the evidence favorable to the plaintiff, and evaluate[s] the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." *Flatley,* 39 Cal. 4th at 326 (citations and quotations omitted); *accord, Freeman v. Schack,* 154 Cal. App. 4th 719, 727 (2007).

"If the trial court's decision denying an anti-SLAPP motion is correct on any theory applicable to the case, [the Court] may affirm the order regardless of the correctness of the grounds on which the lower court reached its conclusion." *City of Alhambra v. D'Ausilio,* 193 Cal. App. 4th 1301, 1307 (2011).

## ARGUMENT

In response to "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances," the Legislature enacted the anti-SLAPP statute to enable the quick resolution of meritless claims aimed at *17 chilling First Amendment rights. Civ. Proc. Code § 425.16(a); *see Gallimore,* 102 Cal. App. 4th at 1395.

Under the anti-SLAPP statute, a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a

BASIC YOUR BEST BUY, INC., Plaintiff and Respondent,..., 2012 WL 1965929...

Case 2:21-cv-01546-JAM-KJN   Document 1-2   Filed 08/27/21   Page 9 of 16

public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Civ. Proc. Code § 425.16(b)(1).

Resolution of an anti-SLAPP motion involves a two-prong test. First, the defendant must demonstrate that "the plaintiffs cause of action arose from acts by the defendant in furtherance of the defendant's right of petition or free speech in connection with a public issue." *Gallimore,* 102 Cal. App. 4th at 1396. If the defendant meets its burden on the first step, the second step requires plaintiff to "make a prima facie showing of facts, which, if proved at trial, would support a judgment in the plaintiffs favor." *Id.* "Only a cause of action that satisfies both prongs of the anti-SLAPP statute--i.e., that arises from protected speech or petitioning and lacks even minimal merit-is a SLAPP, subject to being stricken under the statute." *Navellier v. Sletten,* 29 Cal. 4th 82, 89 (2002). Here, the trial court correctly found that the first prong was not met because Basic's Cartwright Act cause of action did not arise from DIRECTV's protected speech.

## *18 I. THE TRIAL COURT CORRECTLY APPLIED THE TWO-PRONG TEST.

DIRECTV argues that the trial court failed properly to apply the two-step test. AOB 1, 22-23, 35. However, DIRECTV's attack on the trial court's application of the test is based entirely on brief excerpts taken out of context from the trial court's informal oral comments at the hearing on the motion.[5] As its detailed written order readily establishes, the trial court properly understood and applied the two-step test. Contrary to DIRECTV's contention that "the trial court did not look to the gravamen of the complaint at all" (AOB 22), its order addressed DIRECTV's contention that Basic's Cartwright Act claim was "based on" DIRECTV's written threats to sue Basic for trademark infringement, and squarely rejected that contention. *See* AA 192 (finding that complaint is "based on DirecTV's alleged conspiracy with other businesses") (citing Compl. ¶¶ 111-120); *see also id.* at 192-93 (same); *id.* at 193 (concluding that "the Complaint is not *19 based on DirecTV's threats to file trademark litigation for Basic's use of the 800 numbers to sell competing products"). The trial court therefore correctly applied the statute, since a "cause of action that *arises from a* defendant's protected actions is synonymous with a cause of action that is *based on* the defendant's protected actions." *Applied Bus. Software, Inc. v. Pacific Mortg. Exchange, Inc.,* 164 Cal. App. 4th 1108, 1116 (2008).

Because the trial court held that DIRECTV had not met its burden on the first prong, it properly denied the anti-SLAPP motion without addressing the second prong. "If the defendant does not demonstrate this initial prong, the court should deny the anti-SLAPP motion and need not address the second step." *Hylton v. Frank E. Rogozienski, Inc.,* 177 Cal. App. 4th 1264, 1271 (2009); *accord, Freeman,* 154 Cal. App. 4th at 733 (where plaintiffs' causes of action were not based on protected activity, "the burden never shifted to plaintiffs to demonstrate a probability of prevailing on the merits"); *Santa Monica Rent Control Bd. v. Pearl St., LLC,* 109 Cal. App. 4th 1308, 1317 (2003) ("If the court determines the cause of action did not arise from such protected activity, the motion to strike must be denied") (citations omitted). Thus, DIRECTV's contention that the trial court purportedly misunderstood the parties' burdens on the second prong (AOB 23) (it did not) is irrelevant to any issue on this appeal.

## *20 II. DIRECTV HAS NOT MET ITS BURDEN TO SHOW THAT BASIC'S CARTWRIGHT ACT CAUSE OF ACTION AROSE FROM PROTECTED ACTIVITY.

The anti-SLAPP statute applies only to "cause[s] of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech." Civ. Proc. Code § 425.16(b)(1). The threshold inquiry therefore is whether the challenged cause of action arises from, or is based upon, protected activity. *See, e.g., City of Cotati v. Cashman,* 29 Cal. 4th 69, 76 (2002); *Rusheen v. Cohen,* 37 Cal. 4th 1048, 1056 (2006).

"The anti-SLAPP's definitional focus is not the form of the plaintiffs cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability-and whether that activity constitutes protected speech or petitioning." *Navellier,* 29 Cal. 4th at 92. "But the mere fact an action was filed after protected activity took place does not mean it arose from that activity." *City of Cotati,* 29 Cal. 4th at 76-77; *accord, Applied Bus.,* 164 Cal. App. 4th at 1116 ("merely showing that the plaintiff filed

its complaint *after* the defendant engaged in protected activity is not sufficient"). Nor does the fact "[t]hat a cause of action arguably may have been triggered by protected activity" necessarily mean that it arises from such activity. *Id.* at 78.

Here, the trial court correctly found that DIRECTV did not meet its burden of showing that Basic's Cartwright Act cause of action arose from ***21** protected activity under the anti-SLAPP statute. The gravamen of that claim is that DIRECTV entered into an illegal antitrust conspiracy, not that it sent pre-litigation demand letters threatening litigation for trademark infringement. Indeed, Basic would have the same antitrust claims, even if DIRECTV had never sent the communications. While those communications may be *evidence* of the anticompetitive agreement, they do not comprise the wrongful conduct on which the complaint is based.

### A. The Gravamen Of Basic's Cartwright Act Claim Is That DIRECTV Entered Into An Illegal Antitrust Conspiracy, Not That It Sent Protected Communications.

To determine the conduct or actions that a cause of action arises from, or is based upon, courts look at the "gravamen" or "principal thrust" of the cause of action. *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App. 4th 181, 188 (2003). A cause of action "arises from" the acts or conduct which underlie the illegality or wrongdoing claimed of in the complaint. *Id.* at 181. Here, DIRECTV contends that Basic's Cartwright Act cause of action "arises out of the DIRECTV cease and desist letter itself," as well as out of its "communications with third party retailers inducing them not to purchase the leads." AOB 24, 25. It further contends that these communications are protected activity because they were made in anticipation of litigation that DIRECTV allegedly contemplated to protect its trademark rights if Basic were to sell the sales leads to its competitors. ***22** AOB 27-31. Finally, DIRECTV contends that the trial court misunderstood the scope of the trademark infringement lawsuit it threatened in its cease and desist letter. AOB 31-34.

DIRECTV has both misconceived the focus of the anti-SLAPP test and misidentified the gravamen of Basic's Cartwright Act claim. The inquiry under the first prong of the anti-SLAPP test focuses on whether *the plaintiffs* cause of action arises from protected activity, not on litigation the defendant may have threatened. The gravamen or principal thrust of Basic's cause of action under the Cartwright Act is that DIRECTV entered into an illegal antitrust conspiracy to eliminate competition for Basic's sales leads, not that it sent Basic or other retailers letters threatening litigation or setting forth its trademark infringement theories. Basic's cause of action does not arise from DIRECTV's cease and desist letter or any other protected communication.

"As courts applying the anti-SLAPP statute have recognized, the 'arising from' requirement is not always easily met." *World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.*, 172 Cal. App. 4th 1561, 1568 (2009) (citations and quotations omitted). "[A] defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant." *Martinez*, 113 Cal. App. 4th at 188. The statute does not apply if the speech is "distinct from the wrongful, injury-causing conduct" on ***23** which the plaintiff's claims are premised. *Id.*[6] That is precisely the case here.

If a cause of action is based on illegal conduct, that some of the conduct may have been communicated in writing does not convert it into protected First Amendment activity. For example, in *McConnell v. Innovative Artists Talent and Literary Agency, Inc.*, 175 Cal. App. 4th 169, 176 (2009), plaintiffs filed a lawsuit against their employer challenging the legality of certain provisions in their employment agreements and seeking a declaration that they had the right to terminate the agreements at will. The following day, the employer responded by having the plaintiffs escorted from the office and by delivering letters to them "modifying" their job duties by, among other things, instructing them not to come to the office, not to use company email, not to attend any client or industry functions, not to have telephone conversations or communications with clients or other employees, etc. Plaintiffs then added causes of action for retaliation and ***24** wrongful constructive discharge. The employer moved to strike the two new causes of action, asserting that they arose out of its protected communications. *Id.* at 174. The court affirmed the trial court's denial of the motion, holding the causes of action were based on a course of conduct that affected the plaintiffs employment, and the fact that the job "modifications" were reduced to writing did not convert them from conduct affecting employment decisions to protected First Amendment activity. *Id.* at 176-77, 181. While the lawsuits "undoubtedly precipitated" the employer's conduct in sending the letters, they were not protected communications within the meaning of the

anti-SLAPP statute. *Id.* at 177-78. The plaintiffs' claims were based on their exclusion from the workplace and the elimination of job duties, not on the letters themselves. *Id* at 179. As the court observed, "[n]o employer action has any effect unless it is communicated, but no one would suggest that a statement or writing firing an employee is protected First Amendment activity." *Id.* at 180. Likewise, here, while no antitrust conspiracy is formed unless the co-conspirators communicate among themselves regarding their illegal agreement, no one would suggest that a statement or writing reflecting such illegal conduct is protected First Amendment activity.

Moreover, this Court has recognized that where a suit is based on alleged illegal activity that preceded and is distinct from supposedly protected communications, it is not "based on" the communications. In **\*25** *Santa Monica Rent Control Bd. v. Pearl Street, LLC,* 109 Cal. App. 4th 1308 (2003), a city rent control board brought an action against rental property owners alleging that they had created sham tenancies to evade the rent control law. Defendants moved to strike the complaint, asserting that it was based on their protected activity of having filed notices of intention to re-rent the units at market prices. This Court disagreed, reasoning that while the suit may have been "triggered by" defendants' submission of such documents, "it is *not* true that this suit is *based on* the filing of such papers. Rather, the suit is based on activity that preceded the filing of the papers." *Id.* at 1318. The suit was based on the board's claim that defendants were charging an illegal rent, not on their filings with the board. *Id.*

Again, the same is true here: Basic's action is based on DIRECTV having formed and carried out an illegal antitrust conspiracy, not on its having sent communications to Basic threatening to file trademark infringement litigation or to other authorized dealers warning them not to purchase Basic's leads. *See also, e.g., Graffiti Protective Coatings, Inc.,* 181 Cal. App. 4th at 1211, 1218 (contractor's action arose from state and municipal laws requiring city to award contract through competitive bidding, not from any protected communications by the city relating to its selection of a new contractor). Numerous other cases draw the same **\*26** distinction between causes of action based on underlying wrongful or illegal conduct and those based on protected speech.[7]

### B. DIRECTV Confuses The Acts Of Alleged Misconduct With The Evidence Needed To Prove Them.

There is a second, dispositive distinction that DIRECTV ignores: the difference between the acts of alleged misconduct and the evidence needed to prove them. "In deciding whether an action is a SLAPP, the trial court should distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity. Prelitigation communications or prior litigation may **\*27** provide evidentiary support for the complaint without being a basis of liability." *Graffiti Protective Coatings, Inc.,* 181 Cal. App. 4th at 1214-15.

*In Graffiti Protective Coatings,* the plaintiff challenged the city's termination of its municipal contract to maintain the city's bus stops and award of a contract to one of its competitors without inviting competitive bids. The city contended that the claims against it were based on its communications with the plaintiff, its competitor, and the public regarding the maintenance of the city's bus stops. The court disagreed:

Here, the prelitigation communications between the City and others are helpful in establishing the events leading up to the termination of [the plaintiffs] contract. The communications assist in telling the story. But [the plaintiff's] claims against the City are not based on those communications. Rather, liability is premised on state and municipal laws requiring the City to award certain contracts through competitive bidding.

*Id.* at 1215.

This Court has reached the same conclusion. In *Gallimore,* this Court held that the plaintiffs claims that State Farm, the defendant insurer, had mishandled insurance claims arising out of the Northridge earthquake were not "based on" confidential written reports and related materials that State Farm had filed with the Department of Insurance, which later became public. *Gallimore,* 102 Cal. App. 4th at 1399-1400. The disclosure of those materials "may have served as a catalyst for the filing of the **\*28** complaint and, plaintiff hopes, will serve as a rich evidentiary source to help him prove his allegations." *Id.* at 1400. However,

plaintiffs claims were based on defendant's handling activities and violations of law, not upon its communications with the regulatory agency:

This contention confuses State Farm's allegedly *wrongful acts* with the *evidence* that plaintiff will need to prove such misconduct. Plaintiff seeks no relief from State Farm for its communicative acts, but rather for its alleged mistreatment of policyholders and its related violations and evasions of statutory and regulatory mandates.

*Id.* at 1399; *see also, e.g., Wang,* 153 Cal. App. 4th at 810 (defendant's commercial speech activities could be considered as "circumstantial evidence of the alleged conspiracy").

Precisely the same conclusion follows here. Basic does not allege that DIRECTV's cease and desist letters or its other communications to its retailers constituted antitrust violations, nor does it seek relief from DIRECTV for those communicative acts. Rather, Basic seeks damages for DIRECTV having entered into an alleged antitrust conspiracy to restrict competition for its sales leads. DIRECTV's communications may serve as evidence of the alleged conspiracy, and may "assist in telling the story." *Graffiti Protective Coatings,* 181 Cal. App. 4th at 1215. But Basic's claims *29 against DIRECTV are not based on those communications; rather, liability is premised on its alleged violations of the antitrust laws.[8]

### C. The Cases Relied Upon By DIRECTV Are Inapposite.

DIRECTV relies heavily on *Neville v. Chudacoff,* 160 Cal. App 4th 1255 (2008), which it contends is "on point." AOB 29-30. It is not. In that case, an employer fired one of its employees amid allegations that the employee had misappropriated customer lists and solicited his employer's customers to start a competing business. Several months before the employer commenced litigation against its former employee, its attorney drafted a letter to the employer's customers, which the employer sent, that accused the employee of breach of contract and misappropriation of trade secrets, and suggested that the customers should not do business with the former employee. The employee then brought a cross-complaint against the former employer and its attorney for defamation. The court held that the trial court had properly granted the attorney's motion to strike the cross-complaint because the letter was a writing made in connection with the *30 anticipated litigation between the employer and the former employee. 160 Cal. App. 4th at 1262-66.

DIRECTV ignores the key distinction between *Neville* and this case: there, the letter "directly related to the employer's claims against the employee" for misappropriation of trade secrets and breach of contract. *Id.* at 1259, 1267. Here, in contrast, DIRECTV's cease and desist letter related to its asserted trademark rights. Basic's Cartwright Act claim is unrelated to the substance of that letter because it involves a completely separate and distinct issue: an alleged antitrust conspiracy. If DIRECTV had filed a cross-complaint against Basic for trademark infringement, like the employer's trade secrets litigation in *Neville,* the letter undoubtedly would be directly related to that cross-complaint, but it is not directly related to Basic's antitrust claim.

Moreover, the employee's defamation cause of action in *Neville* was explicitly and exclusively based on the employer's letter to its customers. *McConnell,* 175 Cal. App. 4th at 179 ("In *Neville,* it was undisputed-and indisputable-that Neville's claims against the lawyer arose *entirely* from the letter, without which there could have been no defamation claim") (citation omitted; emphasis added). Here, in contrast, Basic's claims do *not* arise entirely from the cease and desist letter; indeed, they do not arise from the cease and desist letter at all. Basic would have, and would assert, the same cause of action if the letter had never been sent. As discussed above, *31 the letter may be *evidence* of the anticompetitive conspiracy, but is not itself the basis for Basic's claims.[9]

Finally, DIRECTV's position sweeps far too broadly. DIRECTV contends that it should be entitled to complete immunity from the antitrust laws on the sole ground that it sent Basic a letter threatening trademark litigation. If accepted, that position would permit defendants to shield themselves from liability for illegal activity merely by writing a pre-litigation demand letter-even if no litigation on the threatened ground ensues, and even if the illegal activity was not directly related to it. The Legislature could not have intended the anti-SLAPP statute to produce such a perverse result. *Cf. Santa Monica Rent Control Bd.,* 109 Cal.

App. 4th at 1318 ("If we were to accept defendants' argument, then they could preclude any judicial review of their violation of the rent control law, no matter how egregious, by simply filing a SLAPP motion in response to any Board complaint. We are confident that the Legislature intended no such application of this statute").

## *32 III. BASIC ALSO ESTABLISHED A REASONABLE PROBABILITY OF PREVAILING ON THE MERITS OF ITS CLAIM.

A. This Court Need Not Reach The Second Prong.

If this Court agrees that the trial court properly denied DIRECTV's motion because Basic's claim did not arise from protected activity, it need not address the second step of the test. *See Applied Bus. Software,* 164 Cal. App. 4th at 1115 ("because we have determined that plaintiffs causes of action are not based on any section 425.16 protected activity, we have no need to discuss defendant's analysis of the claimed defects in plaintiffs case").

In the event this Court agrees with DIRECTV's contention that Basic's Cartwright Act cause of action arises from protected activity, it should remand the case to the trial court. Where, as here, a trial court denies an anti-SLAPP motion after analyzing the first step and accordingly did not consider whether the plaintiff met its burden of demonstrating a reasonable probability of prevailing on its claims, an appellate court generally should remand the matter so the trial court can make that determination in the first instance. *See, e.g., Tusynska v. Cunningham,* 199 Cal. App. 4th 257, 267 (2011), citing *Navellier,* 29 Cal. 4th at 95; *Hall v. Time Warner, Inc.,* 153 Cal. App. 4th 1337, 1341 (2007) ("Because the court did not reach or decide the question whether Hall had established a probability of prevailing on the counts alleged in her complaint or rule on *33 objections to evidence presented by the parties with respect to that question, we will reverse the order and remand the matter with directions to decide those matters in the first instance").

### B. Alternatively, This Court May Affirm On The Ground That Basic Met Its Burden On The Second Prong.

In the interest of judicial economy, the Court may address the second step of the analysis because the parties have briefed the merits inquiry in the trial court and on appeal. *See, e.g., Silverado Modjeska Rec. & Park Dist. v. County of Orange,* 197 Cal. App. 4th 282, 312 (2011). If it does so, it should affirm on the ground that Basic met its burden to establish a reasonable probability of prevailing on its claim.

"[I]n order to establish the requisite probability of prevailing, the plaintiff need only have stated and substantiated a legally sufficient claim." *Navellier,* 29 Cal. 4th at 88 (quotations and citations omitted). This requires a demonstration "that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Id.* (citations and quotations omitted). In considering whether plaintiffs cause of action meets this requirement, the Court does not weigh the evidence but "accept[s] as true evidence favorable to the plaintiff." *Neville,* 160 Cal. App. 4th at 1262; *see also Blanchard,* 123 Cal. App. 4th at 921. A cause of *34 action may be stricken only when it "lacks even minimal merit." *Navellier,* 29 Cal. 4th at 89.

### C. Basic's Cartwright Act Claim Is Legally Sufficient And Supported By A Prima Facie Factual Showing Of A Conspiracy Among DIRECTV and Its Authorized Retailers.

The Cartwright Act prohibits any combination for the purpose of creating or carrying out restrictions in trade or commerce, preventing competition, or controlling prices. Cal. Bus. & Prof. Code § 16720. A cause of action for conspiracy in restraint of trade under the Cartwright Act requires: (1) the formation and operation of a conspiracy, (2) wrongful acts done pursuant thereto, and (3) damage resulting from such acts. *Kunert v. Mission Fin. Servs. Corp.,* 110 Cal. App. 4th 242, 262 n. 15 (2003); *see also Quelimane Co. v. Stewart Title Guar. Co.,* 19 Cal. 4th 26, 47 (1998).

DIRECTV does not dispute that Basic pled a legally sufficient cause of action for a Cartwright Act violation. Basic also provided a prima facie showing of evidence to support each element.

### 1. Basic Made A Prima Facie Showing That An Illegal Conspiracy Was Formed.

"In 1907, the California Legislature enacted the Cartwright Act, which generally outlaws any combinations or agreements which restrain trade or competition or which fix or control prices." *Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 7 (2012) (citations and **\*35** internal quotations omitted). Under the Cartwright Act, a conspiracy "is formed where a [defendant] uses coercive tactics to impose restraints upon otherwise uncooperative businesses." *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 268 (1983). Direct evidence of such tactics is not essential. "It is well established that evidence of a conspiracy to commit wrongful acts may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." *Novartis Vaccines and Diagnostics, Inc. v. Stop Huntingdon Animal Cruelty USA*, 143 Cal App. 4th 1284, 1296 (2006).

Here, Basic alleged that "DirecTV entered into an illegal conspiracy in restraint of trade with its Small Business Owners [] to allocate customers and to restrict competition in bidding for and purchasing certain Sales Agency assets." AA 19 ¶ 112. This illegal agreement was implemented through DIRECTV's agreement with Small Business Owners not to bid on Basic's sales leads, lest their contracts be terminated. AA 8 ¶ 37 - 9 ¶ 44; AA 19 ¶¶ 113-17. These allegations were supported by declarations which demonstrated, among other things, that:

• DIRECTV had superior bargaining power because it was many Small Business Owners' major or exclusive source of business. AA 153 ¶17.

\* DIRECTV made it clear to its Small Business Owners that bidding on Sales Assets without approval, or otherwise **\*36** competing with DIRECTV, would result in termination of their contracts with DirecTV. AA 151 ¶ 6, 152 ¶¶7, 11-12, 153 ¶ 14.

\* Small Business Owners rightfully feared termination because DIRECTV had terminated others for not seeking approval to purchase Sales Assets or for competing with DIRECTV. AA 151 ¶ 6, 152 ¶¶7, 12, 153 ¶ 14.

\* DIRECTV told Small Business Owners that Basic's calls were "off limits" and could not be purchased. AA 153 ¶¶ 14, 15.

\* As a result, Small Business Owners were coerced into an agreement not to bid for Basic's calls. AA 151 ¶ 6, 152 ¶¶ 7, 12, 153 ¶¶ 14, 15, 156 ¶ 10, 157 ¶ 13 - 158 ¶ 19.

Those allegations and evidence were sufficient to establish the formation of an anticompetitive conspiracy. In *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709 (1982), for example, the court affirmed judgment on a jury verdict in an antitrust action by a terminated newspaper distributor against a newspaper publisher, finding that the evidence supported a finding that the defendant coerced its distributors in a manner constituting a restraint on trade. *Id.* at 722. The court observed that in view of the defendant's "vastly superior bargaining strength," its "suggestions" that distributors roll back prices "were in fact thinly **\*37** disguised and threatening commands." *Id.*; see also *R.E. Spriggs Co. v. Adolph Coors Co.*, 94 Cal. App. 3d 419, 425 (1979) (affirming judgment on jury verdict finding that Coors created a price-fixing conspiracy with its distributors by making price suggestions and terminating distributors for non-compliance because a Coors distributorship was a valuable asset and terminable without cause).

### 2. Basic Made A Prima Facie Showing That DIRECTV's Conspiracy Unlawfully Restrained Trade.

Basic also adequately alleged and provided evidence of DIRECTV's restraint of trade, specifically DIRECTV's actions and agreement that prevented competition for Basic's assets.

DIRECTV's illegal agreement restricted the market for Basic's calls by eliminating competition by potential purchasers of those calls. For example, Patrick J. Hudgin, the President of Expert Satellite, a DIRECTV Small Business Owner, was interested in purchasing Basic's Assets. AA 152 ¶ 9, 158 ¶ 18. But he refrained from bidding on the assets because DirecTV told him they were "off limits" and he feared termination of his relationship with DirecTV if he pursued Basic's assets. AA 152 ¶¶ 11 - 153 ¶15. Other Small Business Owners were similarly dissuaded from purchasing Basic's calls. AA 158 ¶¶ 18, 19. DirecTV's actions interfered with Small Business Owners' ability to use their own judgment, and pursue *38 their own interests, in determining whether to bid for Basic's assets. Again, that evidence is sufficient for a prima facie showing. See *Kolling*, 137 Cal. App. 3d at 722 ("[T]he test ... is whether the agreement, or conduct, interferes with the freedom of sellers or traders in such a manner as to prohibit or restrain their ability to sell in accordance with their own judgment").

### 3. Basic Made A Prima Facie Showing That It Suffered Damages from DIRECTV's Conspiracy.

The last element of a Cartwright Act violation is whether the plaintiff suffered cognizable damages. *Kolling*, 137 Cal. App. 3d at 723. Here, Basic's evidence established that DIRECTV's conspiracy eliminated competition for Basic's assets, effectively permitting DIRECTV to dictate its purchase price and purchase Basic's sales leads at a non-competitive price. Basic's sales leads were worth at least 30 million dollars. AA 155 ¶ 4, 158 ¶ 20. Without any competition, DIRECTV was able to purchase those leads for only $3 million, or approximately ten percent of their fair market value, resulting in a loss of at least $27 million. AA 158 ¶ 22. Those damages "resulted directly" from DIRECTV's illegal agreement, and constitute "an injury caused by reason of conduct which the antitrust laws seek to prevent." *Kolling*, 137 Cal. App. 3d at 724.

### *39 D. The Litigation Privilege Does Not Bar Basic's Cartwright Act Claim.

DIRECTV contends that the litigation privilege provides it with an absolute defense to Basic's Cartwright Act claim. AOB 36-38; see *Digerati Holdings, LLC v. Young Money Ent., LLC*, 194 Cal. App. 4th 873, 888 (2011) ("A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes the defendant's liability on the claim"). However, the litigation privilege applies only to communicative acts, not to tortious or illegal courses of conduct. *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1238 (2007); see, e.g., *Kimmel v. Goland*, 51 Cal. 3d 202, 211-12 (1990) (privilege did not bar action for violation of privacy rights by illegal recording of confidential telephone conversations, even though done in anticipation of litigation). "The distinction between communicative and noncommunicative conduct hinges on the *gravamen of the action*. That is, the key in determining whether the privilege applies is whether the injury allegedly resulted from an *act that was communicative in its essential nature.*" *Id.*, quoting *Rusheen*, 37 Cal. 4th at 1058 (citations omitted; emphasis in original).

Here, as shown above, the gravamen of Basic's claim is not based on DIRECTV's prelitigation communications, but rather on its unlawful conduct in violation of the antitrust laws. Accordingly, the litigation privilege cannot provide DIRECTV with a defense to that claim. Further, *40 the gravamen of Basic's Cartwright Act complaint does not relate to the trademark infringement litigation threatened by DIRECTV in the cease and desist letter. Indeed, a third-party former authorized dealer declared that during the conversations in which DIRECTV told him to "stay away" from Basic's assets, DIRECTV never mentioned any trademark concerns or contemplated litigation. AA 153 ¶ 16. The litigation privilege does not shield DIRECTV from scrutiny under the antitrust laws.[10]

### *41 CONCLUSION

For the foregoing reasons, the Superior Court's order denying DIRECTV's anti-SLAPP motion should be affirmed.

Footnotes

BASIC YOUR BEST BUY, INC., Plaintiff and Respondent..., 2012 WL 1965929...

Case 2:21-cv-01546-JAM-KJN    Document 1-2    Filed 08/27/21    Page 16 of 16

1   This statement of facts is based on the pleadings and the papers filed in the trial court on the anti-SLAPP motion. *Graffiti Protective Coatings, Inc.*, 181 Cal. App. 4th at 1211.

2   In the third of its alternative proposals, Basic raised the possibility of allowing callers to choose among DIRECTV, cable related products and Dish Network. AA 123. However, Basic never implemented that approach. Contrary to DIRECTV's mischaracterization, Basic did not "threaten[] to sell the listings ... if DIRECTV did not accede to Basic's demands" (AOB 30); rather, its proposal stated that if DIRECTV was not interested in purchasing the leads, "we will be more than happy to work with any *approve[d]* DirecTV dealer or dealers." *Id.* (emphasis added). As noted below, DIRECTV never responded to Basic's request for the names of any authorized dealers to whom it could sell its leads.

3   Basic had a similar experience with another DIRECTV National Sales Partner, Satex Corp. ("Satex"), which was interested in purchasing Basic's assets, but knew that it could not bid for them without DIRECTV's permission. AA 16 ¶¶ 92, 94. As a result of DIRECTV's restrictive policy, Satex ceased negotiations with Basic out of fear for its own business. AA 16 ¶ 95.

4   DIRECTV filed evidentiary objections to certain of the declarations that Basic filed in response to its motion in order to meet the second prong of the anti-SLAPP test. AA 177-188. Because the trial court did not reach the second prong, it did not rule on those objections.

5   DIRECTV's reliance on the trial court's informal oral remarks is misplaced. "[T]he trial court's less formal comments on the record or in the minutes are insufficient to form the basis of reversible error." *Shaw v. County of Santa Cruz*, 170 Cal. App. 4th 229, 268 (2008) (citations and internal quotations omitted). A court's oral comments "may never be used to impeach the order or judgment on appeal." *Id.*; *accord, In re Marriage of Ditto*, 206 Cal. App. 3d 643, 646 (1988); *see generally* 7 B. Witkin, *California Procedure* (5th ed. 2008) Judgment § 10 at 554 ("An oral or written opinion by a trial judge, discussing and purporting to decide the issues, is merely an informal statement of the judge's views," and is not itself the decision of the court or a judgment). In any event, a reviewing court will affirm a judgment or order correct on any legal basis, even if that basis was not invoked by the trial court. *Shaw*, 170 Cal. App. 4th at 269. "There can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct." *Id.* (citation omitted).

6   A complaint may be based on illegal conduct rather than protected speech even if it contains extensive references to the defendant's communications. For example, in *Martinez*, the court observed that the complaint was "laced with allegations" referring to the defendant's advertisements regarding the product's safety, including at least one express or implied reference to that commercial speech in every cause of action. *Martinez*, 113 Cal. App. 4th at 181. The court nevertheless found that plaintiffs causes of action for product liability, breach of warranty and fraud were not subject to the anti-SLAPP statute because the product, not the speech, was the alleged cause of the injuries for which plaintiff sought to recover. *Id.* at 193. The same is true here: Basic seeks to recover for damages caused by an anticompetitive conspiracy, not by DIRECTV's letters to Basic and other retailers.

7   *See also, e.g., In re Episcopal Church Cases*, 45 Cal. 4th 467, 477-78 (2009) (gravamen of action between national and local church was dispute regarding ownership of property, not protected activity that led to disaffiliation of local church; "that protected activity may lurk in the background ... does not transform a property dispute into a SLAPP suit"); *Donovan v. Dan Murphy Found.*, 204 Cal. App 4th 1500 (2012) (nonprofit board member's action for wrongful removal was not based on protected activity simply because director was removed by the protected activity of voting); *World Fin. Gp., Inc.*, 172 Cal. App. 4th at 1569 (complaint alleging that defendants misappropriated plaintiffs trade secrets and utilized confidential information to solicit its associates and customers arose from conduct and speech committed in a business capacity, not from protected speech); *Clark v. Mazgani*, 170 Cal. App. 4th 1281, 1286-88 (2009) (tenant's action for fraud and unlawful eviction arose from landlord's alleged violation of rent control laws, not from protected activities of serving eviction notices or initiating unlawful detainer action); *Wang v. Wal-Mart Real Estate Business Trust*, 153 Cal. App. 4th 790, 808 (2007) (action for breach of contract and fraud claims arose out of purchaser's business-related activities, not out of petitioning activities in seeking permits); *Blackburn v. Brady*, 116 Cal. App. 4th 670, 676-77 (2004) (alleged fraud committed in bidding at sheriffs auction was "a purely business type event or transaction," not protected activity).

8   DIRECTV's arguments about the merits of its trademark claims (AOB 31-34) are misplaced. "Arguments about the merits of the claims are irrelevant to the first step of the anti-SLAPP analysis." *Coretronic Corp. v. Cozen O'Connor*, 192 Cal. App. 4th 1381, 188-89 (2011). DIRECTV cannot rely on those arguments to meet its burden as to the first step of the analysis. *Id.* (under the first prong, the court "determine[s] what conduct is actually being challenged, not ... whether the conduct is actionable").

9   *Blanchard v. DIRECTV*, 123 Cal. App. 4th 903 (2003), is inapposite for the same reason. There, DIRECTV sent a cease and desist letter to thousands of people who had purchased a device capable of pirating DIRECTV'S television programming. *Id.* at 909. The recipients brought a cause of action against DIRECTV for sending the letter, alleging that it was an unfair business practice, a violation of their civil rights, and extortion. *Id.* The cease and desist letter was the only illegal activity alleged, and it formed the entire basis for plaintiffs' claims. In this circumstance, the court granted an anti-SLAPP motion because "[t]he entire lawsuit is premised on DIRECTV's demand letter." *Id.* at 918.

10  For similar reasons, DIRECTV is mistaken in contending that the Noerr-Pennington doctrine also would bar Basic's claim. AOB 38 n.5. The Noerr-Pennington doctrine holds that those who petition the government for redress generally are immune from antitrust