EXHIBIT E



Basic Your Best Buy, Inc. v. Directv, Inc.   Copy Cite

   ···Read    Analyses 0    Briefs 0    Citing Cases 0

# Basic Your Best Buy, Inc. v. Directv, Inc.

COURT OF APPEAL OF THE STATE OF CALIFORNIA SECOND APPELLATE DISTRICT DIVISION THREE   Jan 29, 2016

B258061 (Cal. Ct. App. Jan. 29, 2016)

B258061

01-29-2016

BASIC YOUR BEST BUY, INC., Plaintiff and Appellant, v. DIRECTV, INC., Defendant and Respondent.

Kesselman Brantly Stockinger, David Wayne Kesselman; Crowell & Moring, Gregory D. Call, Michael Y. Kao, and Daniel A. Sasse for Plaintiff and Appellant. Quinn Emanuel Urquhart & Sullivan, Michael E. Williams and Justin C. Griffin for Defendant and Respondent.

EDMON, P. J.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, **rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.** (Los Angeles County Super. Ct. No. BC467034) APPEAL from a judgment of the Superior Court of Los Angeles County, Richard E. Rico, Judge. Affirmed. Kesselman Brantly Stockinger, David Wayne Kesselman; Crowell & Moring, Gregory D. Call, Michael Y. Kao, and Daniel A. Sasse for Plaintiff and Appellant. Quinn Emanuel Urquhart & Sullivan, Michael E. Williams and Justin C. Griffin for Defendant and Respondent.

---

2    *2

Plaintiff and appellant Basic Your Best Buy, Inc. (Basic) appeals a judgment following a grant of summary judgment in favor of defendant and respondent DirecTV, Inc. (DirecTV).

Basic was an authorized retailer for DirecTV. After DirecTV terminated Basic's contract, DirecTV allegedly precluded other retailers from bidding for Basic's sales leads, and then purchased Basic's sales leads at a depressed price.

The essential issue presented is whether there exists a triable issue of material fact with respect to Basic's cause of action against DirecTV for violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.).[1] We conclude that Basic failed to raise a triable issue of material fact as to either a horizontal or vertical restraint. Basic's horizontal restraint fails

## FACTUAL AND PROCEDURAL BACKGROUND [2]

> [2] This matter was the subject of a prior decision by this court, *Basic Your Best Buy*, *Inc. v. DirecTV*, *Inc.* (Oct. 5, 2012, B236383 [nonpub. opn.]), which affirmed an order denying DirecTV's special motion to strike Basic's complaint.

1. *The parties.*

DirecTV provides satellite entertainment programming to over 20 million customers throughout the United States, in competition with cable providers, other satellite providers, and telecommunications companies. DirecTV markets its programming directly to consumers. It also sells programming to consumers through a network of authorized retailers, including stores such as Best Buy and Costco, telecommunications companies and authorized independent retailers such as Basic. *3

Basic was a DirecTV authorized retailer from 1996 until December 2008. Basic specialized in signing up customers through advertisements in telephone directories. Because consumers often retain telephone directories for years, Basic's ads would continue to generate sales leads for DirecTV several years after they were placed.

2. *The agreements governing the relationship between DirecTV and Basic.*

The relationship between DirecTV and Basic was governed by DirecTV's standard Independent Retailer Agreement and Customer Referral Agreement.

Pursuant to the agreements, Basic was required to use marketing tactics, channels and methods designated by DirecTV, which retained "sole and absolute discretion" to withhold approval of the use by retailer of "any marketing tactic, channel or method that DIRECTV reasonably believes does not fit within its marketing strategy."

The agreements prohibited the sharing of compensation among retailers, stating: "Company shall not rebate or share any Compensation with another contractor/retailer of DIRECTV, or any other party (whether or not an authorized contractor/retailer of DIRECTV."

The agreements included a termination clause which provided "that due to the relatively unpredictable nature of the multi-channel video/entertainment service business, . . . either party may terminate this Agreement at any time for any or no cause, reason or justification, upon at least thirty (30) days' prior written notice to the other stating its intention to terminate. THE PARTIES ACKNOWLEDGE AND ACCEPT THE RISK INHERENT IN THE FOREGOING PROVISION."

Further, upon termination, a retailer must "immediately discontinue all advertising, marketing, solicitation of lease and promotion [of DIRECTV services] and shall cease to identify itself as an authorized [retailer] for DIRECTV or otherwise affiliated in any manner with DIRECTV."

The agreements also addressed what would occur after termination. Both parties were subject to a mutual "Waiver of Claims" provision that stated: "EACH PARTY WAIVES ANY RIGHT TO COMPENSATION AND DAMAGES IN CONNECTION WITH THE

DirecTV recognized that directory listings by numerous retailers resulted in multiple listings for DirecTV that were duplicative and caused customer confusion. As a result, in March 2007, DirecTV issued a policy prohibiting retailers from placing new ads in telephone directories without DirecTV's prior approval.

Basic was exempted from the limitation and was approved to continue placing new directory advertisements. One other retailer, Direct Sat TV, also was approved to place directory ads. In addition, DirecTV set up a central buying desk, through which other authorized retailers could place directory listings.

Basic continued as an authorized retailer for another year. Then, on November 4, 2008, DirecTV notified Basic that it was exercising its right to terminate Basic's sales agency agreement and customer referral agreement on 30 days written notice, and that the agreements would be terminated effective December 4, 2008.

Following termination, Basic allegedly spent an additional $2.7 million for ads to which it had already committed before its termination. Basic wanted to recoup that outlay. Basic also wanted to monetize the value of its directory ads, which would continue to generate consumer inquiries and new sales for a period of time.

DirecTV advised Basic that it was interested in purchasing Basic's sales leads. Other authorized retailers, such as Satex, Cannon Satellite, and Expert Satellite, also expressed an interest in buying Basic's sales leads, but did not bid, mindful that they were not authorized to sell in this channel without DirecTV's approval. At least two authorized retailers, Expert Satellite and Satex, requested DirecTV's approval to bid on Basic's assets, which DirecTV refused. However, the only company in the same distribution channel as Basic was Direct Sat TV, and it did not seek DirecTV's approval to bid on Basic's sales leads. *5

5

Without any other potential buyers, on December 3, 2008, Basic entered into an agreement to sell its sales leads to DirecTV, for compensation of $157.50 for each new DirecTV subscriber referred through Basic's toll free numbers between December 16, 2008 and September 30, 2010. DirecTV paid Basic more than $3 million pursuant to the post-termination agreement.

4. *Proceedings.*

a. *Pleadings.*

On August 5, 2011, Basic brought suit against DirecTV, alleging a single cause of action for conspiracy in restraint of trade in violation of the Cartwright Act (§ 16700 et seq.). Basic alleged that DirecTV conspired in restraint of trade to restrict competition in bidding for its sales leads. Basic pled that DirecTV "told its [authorized dealers] that they could not bid for another [authorized dealer's] assets without first receiving express permission from DirecTV." Basic alleged that DirecTV "strongly suggested" to its dealers that they would be terminated if they bid for such assets without DirecTV's approval. Basic further alleged that the authorized dealers "knew that they should not bid for other [dealers'] assets if DirecTV

Basic Your Best Buy, Inc. v. Directv, Inc.    Copy Cite

On March 26, 2014, DirecTV filed a motion for summary judgment, contending Basic could not establish that DirecTV's contractual restrictions on its retailer network were an unlawful restraint of trade, as vertical restraints on intrabrand competition are permissible under the Cartwright Act unless a plaintiff can prove they have an anticompetitive purpose and a harmful effect on interbrand competition, and Basic lacked evidence of either element. Further, Basic could not establish antitrust injury, which requires a showing of injury to competition, not just competitors. Basic could not establish that DirecTV's reminder to its retailers of their contractual restrictions constituted an unlawful conspiracy under the Cartwright Act. In addition, Basic failed to *6 meet its burden of establishing a relevant market because its expert admittedly did not conduct the necessary market analysis. Also, Basic's "monopsony" theory of liability that DirecTV paid a below market price to Basic only to sign up fewer customers was illogical and legally unsupported. Finally, DirecTV's conduct in protecting its trademarks is immune from antitrust liability.

In opposition, Basic argued the conduct at issue here was unlawful per se under the Cartwright Act because it was a horizontal conspiracy among competitors (DirecTV and other authorized retailers) that prevented other retailers from bidding on Basic's sales leads. However, even assuming this restraint was subject to the rule of reason, summary judgment was inappropriate because the anticompetitive harm resulting from DirecTV's coerced agreement greatly outweighed any alleged procompetitive effects.

c. *Basic's motion for summary adjudication.*

Basic concurrently filed a motion for summary adjudication directed at five of DirecTV's affirmative defenses, wherein DirecTV pled: its conduct was a lawful and justified means to accomplish legitimate business objectives (4th affirmative defense); constituted fair competition (21st affirmative defense); was a valid exercise of its trademark rights and obligations (22nd affirmative defense); was not taken for purpose of restraining trade (25th affirmative defense); and Basic had no right to engage in the unlawful conduct that DirecTV allegedly prevented it from engaging in (24th affirmative defense).

d. *Trial court's ruling.*

On May 16, 2014, after having heard the matter and having taken it under submission, the trial court issued a 13-page ruling granting DirecTV's motion for summary judgment and denying Basic's motion for summary adjudication.

The trial court ruled, inter alia: "A horizontal restraint is an agreement imposed by competitors at the same level of the market to minimize or eliminate competition. Here, defendant [DirecTV] was not in competition with independent retailers that defendant contracted with to market and promote defendant's products and services on *7 defendant's behalf. Simply because defendant also engaged in such activities on its own behalf does not transform the parties into competitors."

The trial court also rejected Basic's contention that even if DirecTV's conduct were considered to be vertical, it was nevertheless per se illegal under the Cartwright Act. "Plaintiff appears to be arguing that the 'rule of reason' does not apply here and that because 'naked price-fixing' is at issue here, the *per se* rule applies." The trial court found, "It is

Further, under the rule of reason, Basic had the burden to make a showing of a substantially adverse effect on competition in the relevant market. "In this case, plaintiff's expert failed to establish a relevant market. Plaintiff's expert did no analysis to determine what market definition should be applied in this case. (SSUF 45-47.) . . . . While it is true that there is generally a greater reluctance to uphold a grant of summary judgment when the rule of reason is the appropriate standard[,] . . . it is also true that where there exists no tenable *per se* boycott theory appellants must evince a substantially adverse effect on competition in the relevant market to support a viable legal theory . . . and consequently to survive a summary judgment motion." (Internal quotations omitted.)

Basic filed a timely notice of appeal from the judgment.

## CONTENTIONS

Basic contends: it suffered antitrust injury and thus has standing to pursue a claim under the Cartwright Act; the coerced agreement is a horizontal restraint in the market for sales leads that is per se unlawful; even if the rule of reason applies, summary judgment in favor of DirecTV was improper; and the trial court abused its discretion in excluding competent and relevant evidence. *8

## DISCUSSION

1. *No merit to Basic's contention the alleged coerced agreement to suppress competition to buy Basic's sales leads was a horizontal restraint in the market for sales leads that is per se unlawful; the alleged restraint was vertical, not horizontal.*

a. *General principles.*

"The Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), like the Sherman Antitrust Act (15 U.S.C. § 1 et seq.), was enacted to promote free market competition and to prevent conspiracies or agreements in restraint or monopolization of trade. Restraint of trade may be horizontal or vertical. ' Contracts, combinations and conspiracies in restraint of trade covered by Section 1 of the Sherman Act are of two types, horizontal or vertical. Horizontal combinations are cartels or agreements among competitors which restrain competition among enterprises at the same level of distribution. They are ordinarily illegal per se. [Citations.] Vertical restraints are imposed by persons or firms further up the chain of distribution of a specific product (or in rare cases, further down the chain) than the enterprise restrained. Vertical non-price restraints are tested under the rule of reason; that is, the plaintiff must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail. [Citations.]" (*Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1680-1681, fn. omitted (*Exxon*); see *State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988) 46 Cal.3d 1147, 1164 [judicial interpretation of Sherman Act helpful but not directly probative of Cartwright drafters' intent].)

b. *Basic's horizontal restraint theory.*

Basic's theory in this regard is that there existed a coerced agreement between DirecTV and authorized retailers not to bid on Basic's sales leads which was a horizontal agreement in restraint of trade, and therefore constituted a per se violation of the Cartwright Act.

in opposition, DirecTV argues that its restrictions on its retailers were clearly vertical, as they were imposed by DirecTV, an enterprise further up the chain of distribution. (*Exxon, supra,* 51 Cal.App.4th at p. 1680.)

The trial court rejected Basic's horizontal restraint theory, stating: "A horizontal restraint is an agreement imposed by competitors at the same level of the market to minimize or eliminate competition. Here, defendant was not in competition with independent retailers that defendant contracted with to market and promote defendant's products and services on defendant's behalf. Simply because defendant also engaged in such activities on its own behalf does not transform the parties into competitors."

c. *Standard of review.*

"Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment. [Citation.]" (*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.* (1st Cir. 2004) 373 F.3d 57, 61.)[3]

> [3] At oral argument, Basic acknowledged that this court can decide as a matter of law that the per se rule applies.

d. *Relevant case law supports trial court's characterization of the alleged restraint as vertical, not horizontal.*

In a horizontal group boycott, "entities *at the same level* combin[e] to deny a competitor at their level the benefits enjoyed by the members of the group," jointly disadvantaging the competitor. (*Freeman v. San Diego Assn. of Realtors* (1999) 77 Cal.App.4th 171, 195, fn. 26, italics added.) Here, DirecTV was not at the same level as the other authorized retailers who were potential bidders for Basic's sales leads. DirecTV is an entity at the *manufacturer level.* Therefore, this is not a case in which horizontal competitors combined to undermine a competitor. *10

Nonetheless, Basic contends the fact that pressure is applied vertically does not transform an otherwise horizontal restraint into a vertical one. Basic argues that irrespective of the fact that DirecTV used vertical leverage, the antitrust violation at issue is a horizontal restraint - a coerced agreement between DirecTV and DirecTV's competitors for Basic's sales leads that they would not bid for Basic's sales leads - which was achieved through vertical coercion.

Per se "violations have been found in several cases involving ostensibly 'vertical' restrictions that were determined to be 'primarily horizontal in nature.' Thus, in *Cernuto, Inc. v. United Cabinet Corp.* [(3d Cir. 1979)] 595 F.2d 164, where a manufacturer terminated a price cutting retailer at the behest of the retailer's competitor, allegedly because of price considerations, the Court of Appeals stated that '[i]*f the action of a manufacturer . . . is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition . . . .*' (*Id.,* at p. 168.) The [*Cernuto*] court ruled that sufficient facts had been alleged to support a per se violation. The *Cernuto* court emphasized that the motivating factor in the alleged conspiracy was price, i.e., the conspiracy sought to protect the existing retailer from price competition of a




because a combination *initiated by a competitor and involving the manufacturer of equipment* specified in the bid specifications prevented it from obtaining the necessary equipment. Although the coercive pressure was applied vertically, by the manufacturer, the court concluded 'that the stifling of competition in this instance was predominantly horizontal, warranting application of the per se rule of illegality as a group boycott.' (*Id.*, at p. 409.)" (*Gianelli*, *supra*, 172 Cal.App.3d at p. 1046, italics added.) *11

11

*Gianelli* explained, "In order to sustain a group boycott theory of per se illegality with respect to restraints that are vertically imposed, there must be a showing that the restraint imposed by the manufacturer *was not only conceived of and initiated by those in direct competition with the plaintiff, but that those competitors used their economic power or position to influence the manufacturer to act, not for its own advantage, but solely for the advantage of those competitors.*" (*Gianelli*, *supra*, 172 Cal.App.3d at p. 1047, italics added.)

*Gianelli* found no such showing on the facts presented. There, Beck's, a beer manufacturer, was sued by various local beer wholesalers who were terminated as distributors. (*Id.* at p. 1030.) Rejecting a group boycott theory, *Gianelli* explained, "[e]ven indulging the assumption that the restraint imposed by Beck's was prompted by complaints from plaintiffs' competitors, there is no evidence that Beck's was compelled to act on those complaints because of an exertion of economic power. *Nor is there evidence that Beck's acted solely or even primarily for the benefit of plaintiffs' competitors rather than for its own benefit.* Finally, and perhaps most significantly, there is no evidence that the challenged restraint had any "pernicious effect on competition and lacked any redeeming virtue." (*Gianelli*, *supra*, 172 Cal.App.3d at p. 1047, italics added.)

Other cases illustrate the nature of a group boycott. "In [*United States v. General Motors Corp.* (1966) 384 U.S. 127 (*General Motors*)] the Supreme Court found a group boycott where a group of automobile dealers had joined together to force their manufacturer, General Motors, to assist them in ending the practice of some dealers that were reselling their automobiles to discounters. See *id.* at 143-44, 147. Other cases fit this mold as well. See, e.g., *Big Apple BMW* [*Inc. v. BMW of N. Am. Inc.* (3rd Cir. 1992)] 974 F.2d [1358,] 1376 (analyzing an alleged agreement among supplier BMW North America and several of its dealers to prevent a potential price-cutting competitor from receiving a franchise as a horizontal group boycott); [*Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.* (3rd Cir. 1980)]

12    637 F.2d [105,] 114 (holding that when a manufacturer *12 terminates a distributor's supply pursuant to an agreement with several distributors, these actions make out a horizontal § 1 claim); cf. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-13 (1959) (applying a similar horizontal analysis under § 2 of the Sherman Act where manufacturers and distributors had conspired among themselves and with a major retailer to deprive another retailer access to product lines). [¶] The common principle we glean from these cases is that *a conspiracy is horizontal in nature when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers to eliminate their price-cutting competition by cutting his access to supplies.*" (*Rossi v. Standard Roofing, Inc.* (3rd Cir. 1998) 156 F.3d 452, 462, italics added.)

imposed, there must be a showing that the restraint imposed by the manufacturer [i.e. DirecTV] *was not only conceived of and initiated by those in direct competition with the plaintiff, but that those competitors used their economic power or position to influence the manufacturer to act, not for its own advantage, but solely for the advantage of those competitors.*" (*Gianelli, supra,* 172 Cal.App.3d at p. 1047, italics added.)

Here, the alleged restraint was not conceived of and initiated by those in direct competition with Basic; rather, the alleged restraint was vertical in nature in that it was conceived of and imposed by DirecTV, at the manufacturer level, for DirecTV's own benefit.

In reliance on *Guild Wineries & Distilleries v. J. Sosnick & Son* (1980) 102 Cal.App.3d 627 (*Guild*), Basic contends that a price fixing restraint imposed by a dual distributor such as
13  DirecTV, that advantages it against other distributors with whom *13 it competes, is regarded as horizontal, and thus a per se violation of the Cartwright Act. *Guild* is unavailing to Basic. In *Guild*, a wine cooperative terminated a wholesaler's distributorship contract after the wholesaler refused to turn over a lucrative account to it. (*Id.* at pp. 630-631.) Thus, in *Guild*, the impetus for the restraint came from a dual distributor that was in direct competition with the terminated distributor at the horizontal level. In contrast, in the instant case, DirecTV was not a competitor of Basic in the market for sales leads -- rather, DirecTV was an enterprise further up the chain of distribution imposing a restraint which was vertical in nature.

Further, although DirecTV was a dual distributor of satellite entertainment programming, there was no evidence of any agreement between DirecTV and any direct competitor of Basic with respect to Basic's sales leads. The evidence showed that Direct Sat TV was the sole company in the same distribution channel as Basic -- Direct Sat TV was the only other authorized retailer which had been approved by DirecTV to place directory ads. However, Basic did not present any evidence of an agreement between Direct Sat TV and DirecTV that Direct Sat TV would not bid on Basic's sales leads. Direct Sat TV was not even one of the retailers which approached DirecTV for approval to buy Basic's sales leads. Therefore, there is no evidence of a horizontal agreement conceived of by Direct Sat TV, Basic's sole direct competitor.

Basic views the class of competitors for its sales leads more broadly. Basic recognizes that the agreements with DirecTV restricted retailers to specified marketing channels, but it contends the agreements did not place any limitation on the handling of sales leads *once they were generated*. According to Basic, the agreements did not restrict a retailer's right to sell or transfer its leads to other retailers, including after termination of the retailer's contract, and as a result, a market developed in which retailers bought and sold leads from each other, former retailers and affiliates. Thus, under Basic's theory, the potential bidders for its sales leads were not limited to a company in the same marketing channel as Basic.

14  *14

Basic's attempt to enlarge the class of horizontal competitors beyond Direct Sat TV is unpersuasive. As indicated, DirecTV's March 2007 notification of its policy reminded its authorized retailers that DirecTV "may withhold approval in its sole and absolute discretion of the use by a DIRECTV retailer of any marketing tactic, channel or method that

those other retailers from "*utilizing*" directory listings. The word "utilize" means "to put to use; turn to profitable account." (http://dictionary.reference.com/browse/utilize?s=t) Accordingly, this advisement by DirecTV negates Basic's argument that there was no restriction on other retailers *receiving* calls generated by directory ads. Moreover, Basic's argument disregards the express language in the agreements barring the sharing of compensation among retailers. Given the contractual prohibition on sharing of compensation among retailers, Basic's theory the agreements did not restrict its right to sell or transfer leads to other retailers is clearly without merit. Basic has not shown that DirecTV had any obligation to permit other retailers to enter the marketing channel of telephone directories so as to enable them to bid on Basic's sales leads.

The fact that retailers had bought and sold sales leads from each other in the past is insufficient to raise a triable issue in this regard. Further, although Basic asserts that terminated dealers routinely sold their leads to other retailers, Basic has not shown that other retailers were allowed to sell outside their authorized distribution channels following the March 2007 directory listings policy. Moreover, as for retailers who bought and sold sales leads among themselves, Basic has not shown the content of the agreements governing those retailers, or whether those retailers needed and obtained DirecTV's approval for those transactions. Basic's showing, without more, that sales *15 leads were transferred among retailers, is insufficient to raise a triable issue with respect to a horizontal conspiracy involving DirecTV and other retailers, such as Expert Satellite and Satex, entities which were outside the marketing channel of telephone directories.

Based on the uncontroverted evidence, the conduct in issue is properly characterized as a vertical, rather than a horizontal, restraint. Having determined the alleged restraint is vertical, we now address whether Basic raised a triable issue of material fact with respect to a vertical restraint of trade.

*2. Basic failed to present evidence of a relevant market and therefore failed to raise a triable issue of material fact under the rule of reason governing vertical restraints.*

A plaintiff alleging a vertical restraint of trade under the Cartwright Act has the initial burden " 'to delineate a relevant market and show that the defendant plays enough of a role in that market to impair competition significantly.' [Citation.]" (*Roth v. Rhodes* (1994) 25 Cal.App.4th 530, 542.)

*a. Basic's definition of the relevant market.*

Basic defines the relevant market as the market for DirecTV sales leads. The declaration of its economist, Ronald Schmidt, stated: "In this particular case, I consider the relevant market to be the market for DirecTV sales leads. Participants in this market on the seller side are people or entities who place advertisements and engage in marketing to produce sales leads (inquiries from potential DirecTV customers). Authorized DirecTV retailers, along with DirecTV itself, are the participants on the buyer side. DirecTV and its authorized retailers purchase such sales leads for the purpose of converting them into activations of DirecTV service."



The law in this area is well settled. "Plaintiffs have the burden of defining the relevant market. [Citations.] 'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.' [Citations.] Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted. See, e.g., *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir.1992) (affirming district court's dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined too narrowly); *Tower Air, Inc. v. Federal Exp. Corp.*, 956 F.Supp. 270 (E.D.N.Y.1996) ('Because a relevant market includes all products that are reasonably interchangeable, plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal.'); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162 (S.D.N.Y. 1995) (dismissal for failure to plead a valid relevant market; plaintiffs failed to define market in terms of reasonable interchangeability or explain rationale underlying narrow proposed market definition); *Re-Alco Industries, Inc. v. Nat'l Center for Health Educ., Inc.*, 812 F.Supp. 387 (S.D.N.Y.1993) (dismissal for failure to plead a valid relevant market; plaintiff failed to allege that specific health education product was unique or explain why product was not part of the larger market for health education materials); *E. & G. Gabriel v. Gabriel Bros., Inc.*, No. 93 Civ. 0894, 1994 WL 369147 (S.D.N.Y. 1994) (dismissal for failure to plead valid relevant market; proposed relevant market legally insufficient because it clearly contained varied items with no cross- *17 elasticity of demand)." (*Queen City Pizza, Inc. v. Domino's Pizza, Inc.* (3rd Cir. 1997) 124 F.3d 430, 436-437 (*Queen City*).)

17

Thus, for example, in *Exxon, supra*, 51 Cal.App.4th 1672, a suit brought by franchisee gasoline service station dealers against the franchisor, the relevant market was held to be *all* gasoline, not the wholesale market for Exxon brand gasoline. (*Id*. at p. 1682.) Although Exxon had a "*natural monopoly over its own product*," it lacked a dominating share of the petroleum market and was not in a position to monopolize or dominate that market. (*Id*. at p. 1677, italics added.)

That is not to say that "a single brand of a product can never be a relevant market." (*Exxon, supra*, 51 Cal.App.4th at p. 1685.) In *Eastman Kodak Co. v. Image Technical Services, Inc.* (1992) 504 U.S. 451 *265 (*Kodak*), the Supreme Court observed that a market is defined with reference to reasonable interchangeability. (*Id*. at p. 482.) The Court held that the market for repair parts and services for Kodak photo-copiers was a valid relevant market because repair parts and services for Kodak machines *are not interchangeable* with the service and parts used to repair other copiers. (*Ibid.*) "The *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies. When the copiers were first sold, Kodak relied on purchasers to obtain service from independent service providers. Later, it chose to use its power over the market in unique replacement parts to squeeze the independent service providers out of the repair market and to force copier purchasers to

265

Kodak is clearly distinguishable from the instant case. Here, by entering into the written agency agreements with DirecTV, Basic was duly advised that DirecTV had "sole and absolute discretion" with respect to Basic's use of any marketing tactic, channel or method,

18    that Basic could be terminated with or without cause on 30 days' notice, that it *18 waived any right to compensation or damages in connection with termination (such as recoupment of advertising costs), and that it was prohibited from sharing compensation with any other retailers. Given these disclosures, Basic had the ability to weigh the contractual restrictions at the time it made the decision to become a retailer for DirecTV. Accordingly, *Kodak*'s concern that consumers were not informed at the time of purchase that they would be locked into Kodak's repair service is not implicated here.

Guided by these authorities, we conclude Basic's proposed single brand relevant market, consisting of the "market for DirecTV sales leads," was legally insufficient. Basic failed to show that DirecTV sales leads are unique and not interchangeable with other sales leads. There is no analysis to show why DirecTV sales leads are not part of the larger market for cable and satellite sales leads, or entertainment sales leads, or sales leads generally. Without a proper definition of the relevant market, there is no triable issue of material fact with respect to Basic's claim of a vertical restraint.

*3. Remaining issues not reached.*

Having determined that the trial court properly granted summary judgment in favor of DirecTV because Basic failed to raise a triable issue with respect to either a horizontal or vertical restraint, it is unnecessary to address Basic's contention that it suffered antitrust injury and has standing to bring a Cartwright Act claim.

It is also unnecessary to address Basic's contentions that the trial court erred with respect to its evidentiary rulings, which sustained DirecTV's objections to portions of the declarations of Ronald Schmidt and Shane Cannon.

The excluded portion of the Cannon declaration stated that after DirecTV implemented a policy which prohibited Cannon Satellite from placing new directory ads, Cannon Satellite continued to generate new activations from the ads it had previously placed. However, the relevant issue for our purposes is not whether Cannon Satellite continued to make sales from old directory ads, but whether Cannon Satellite had the ability to sell its sales leads to other retailers. The excluded portion of the Cannon declaration has no bearing on that

19    question. *19

As for the excluded portion of the Schmidt declaration, it sought to address the economic conditions in the market for sales leads and the impact of the allegedly coerced agreement in suppressing competition in that market. Schmidt opined the depression of the price for sales leads created a disincentive for retailers to invest in marketing tactics to generate sales leads, and would lead to fewer activations and fewer new DirecTV customers in the long run. Although Schmidt opined regarding the impact of DirecTV's exercise of monopsony power in the relevant market, given Schmidt's failure to properly define a relevant market, as set forth above, this evidentiary ruling requires no discussion.

## DISPOSITION

EXHIBIT F

1
2
3

# FILED

San Francisco County Superior Court

APR 0 9 2019

CLERK OF THE COURT

BY: _____ ∽

Deputy Clerk

4
5
6
7
8

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN FRANCISCO

## UNLIMITED JURISDICTION

9
10
11
12

J. NILEY DORIT,

  Plaintiff,

  v.

JACK NOE,

  Defendant.

Case No. CGC-19-572638

**ORDER DENYING DEFENDANT
JACK NOE'S SPECIAL MOTION TO
STRIKE**

13
14
15
16
17
18
19

Defendant Jack Noe's special motion to strike came on regularly for hearing before the

Court on April 8, 2019.  Plaintiff J. Niley Dorit appeared in person and Aaron P. Morris appeared

telephonically for Defendant Jack Noe.

Having considered all the papers, briefs, and argument of counsel, and good cause

appearing, it is hereby ordered that Defendant's special motion to strike the complaint is DENIED.

Defendant meets prong one of the anti-SLAPP statute.  (Code Civ. Proc. § 425.16(b)(1),

(e).)  Dorit's claim for malicious prosecution is based on Noe's commencement of arbitration

proceedings pursuant to the Mandatory Fee Arbitration Act, Bus. & Prof. Code § 6200 et seq.

(MFAA).  That arbitration was an "official proceeding" within the meaning of Code of Civil

Case No. CGC-19-572638

ORDER DENYING SPECIAL MOTION TO STRIKE

1   Procedure § 425.16(e)(2).  The text of the award makes it clear that the non-binding arbitration was

2   initiated and conducted pursuant to the statutory scheme.  "[T]he initiation of a State Bar sponsored

3   fee arbitration proceeding . . . is an official proceeding established by statute to address a particular

4   type of dispute."  (*Philipson & Simon v. Gulsvig* (2007) 154 Cal.App.4th 347, 358.)  The fact that

5   the arbitration occurred before the Bar Association of San Francisco rather than the "State Bar"

6   makes no difference to the analysis.  The arbitration in *Philipson* arose from a fee arbitration before

7   the Orange County Bar Association (*Philipson*, 154 Cal.App.4th at 353), and the MFAA expressly

8   contemplates local bar association involvement.  (Bus. & Prof. Code § 6200(d) ["The board of

9   trustees shall adopt rules to allow arbitration and mediation of attorney fee and costs disputes under

10  this article to proceed under arbitration and mediation systems sponsored by local bar associations

11  in this state."]; *Schatz v. Allen Matkins Leck Gamble & Mallory LLP* (2009) 45 Cal.4th 557,  561

12  ["Under the mandatory fee arbitration act [citation], when there is a fee dispute between an attorney

13  and a client, the client may choose to submit the matter to arbitration by a local bar association."].)

14          Because Noe met prong one of the anti-SLAPP statute, Dorit must show a likelihood of

15  prevailing on his claim for malicious prosecution.  (See Code Civ. Proc. § 425.16(b)(1).)  "To

16  establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both

17  legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable

18  judgment if the evidence submitted by the evidence is credited.' [Citations.]  For purposes of this

19  inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff

20  and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or

21  comparative probative strength of competing evidence, it should grant the motion if, as a matter of

22  law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish

23  evidentiary support for the claim.' [Citations.]  In making this assessment it is 'the court's

24  responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .' [Citation.]  "The

25  plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being

26  stricken as a SLAPP." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.)  "To

27  prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was

28  commenced by or at the direction of the defendant and was pursued to a legal termination favorable

2

1 | to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice." (*Id.* at

2 | 292, citing *Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871.)

3      Here, the threshold question in determining whether Plaintiff has shown a likelihood of

4 | prevailing on his claim for malicious prosecution is whether the fee arbitration involved in this case

5 | is the type of "prior action" that can result in a favorable termination for purposes of such a claim.

6 | This appears to be an issue of first impression, and both parties cite authority to support their

7 | respective positions. Noe relies upon *Brennan v. Tremco Inc.* (2001) 25 Cal.4th 310 for the

8 | proposition that private contractual arbitration decisions cannot be the basis for a malicious

9 | prosecution action. Dorit, for his part, relies primarily on *Stanley v. Superior Court* (1982) 130

10 | Cal.App.3d 460, which held that a malicious prosecution action may be based on a judicial

11 | arbitration proceeding. The question before the Court is whether the parties' fee arbitration in this

12 | case is more like *Brennan* or *Stanley.*

13      In *Brennan,* our Supreme Court's most recent decision on the matter, the Court granted

14 | review to decide "whether a person may sue for the malicious prosecution of an action that the

15 | parties resolved through contractual arbitration." (25 Cal.4th at 312.) After initial litigation in

16 | court, the parties had stipulated to resolve their remaining claims by binding arbitration, waiving

17 | any right to trial de novo or appeal. (*Id.* at 313.) After the arbitrator ruled in Brennan's favor and

18 | the court confirmed the arbitration award and entered judgment in his favor, Brennan filed an

19 | action against Tremco and its attorneys for maliciously prosecuting the original action. The trial

20 | court sustained the demurrer without leave to amend on the ground that a malicious prosecution

21 | action cannot as a matter of law be based upon private arbitration.

22      The Supreme Court began its analysis by acknowledging that "[c]ourts have decided that

23 | various proceedings may or may not give rise to a future malicious prosecution action, largely

24 | depending on their nature." (*Id.* at 313.) It noted that in *Sagonowsky v. More* (1998) 64

25 | Cal.App.4th 122, 134, the court had affirmed dismissal of a malicious prosecution action, holding

26 | that a "private, contractual arbitration" is "not a 'prior action' of the sort which will support" a

27 | malicious prosecution action. Although the Supreme Court acknowledged that *Sagonowsky* was

28 | "not precisely on point," because the underlying action began and ended in arbitration, rather than

3

1  beginning first in court, the Court held the difference was immaterial: "Whether the underlying

2  action started in court or in arbitration, if it ends in contractual arbitration, that termination will not

3  support a malicious prosecution action." (*Id.* at 314.)  The Court based its holding on "[t]wo

4  converging legal trends": "(1) the trend against creating or expanding derivative tort remedies,

5  including malicious prosecution; and (2) the trend in favor of allowing the parties voluntarily to

6  choose binding, private arbitration to end the entire dispute." (*Id.*)  First, the Court "cautioned

7  against creating or expanding derivative tort remedies" in order to avoid giving rise to endless

8  rounds of litigation; for those reasons, the Court noted, the tort of malicious prosecution, which is

9  often described as disfavored, " 'should not be expanded.'" (*Id.*)  Second, the Court noted the

10  "increasing awareness that parties to litigation should be permitted to choose private arbitration as a

11  means of resolving their dispute once and for all." (*Id.* at 315.)  These factors, taken together,

12  convinced the Court that "private arbitration should not be the basis for future malicious

13  prosecution actions." (*Id.* at 315.)

14         Significantly, the *Brennan* Court did not disapprove or limit *Stanley v. Superior Court*

15  (1982) 130 Cal.App.3d 460, which permitted a malicious prosecution action based on *judicial*

16  arbitration.  Rather, the Court expressly agreed with *Sagonowsky,* which drew a clear distinction

17  between judicial arbitration and private contractual arbitration: "'Judicial arbitration is

18  fundamentally unlike private contractual arbitration. . . .  [T]he outcome of a judicial arbitration

19  proceeding is not a final resolution of the dispute to which the parties have agreed to bind

20  themselves; any party can request trial de novo.  (Code Civ. Proc., § 1141.20.)  The judicial

21  arbitration procedure has been likened to "a minitrial that is in effect a continuation of the

22  settlement negotiation process" which results in "a neutral view from an authoritative figure" of the

23  merits of the claim and thus gives impetus to settlement.  [Citation.]  The crucial difference

24  between the two types of arbitration is that a judicial arbitration does not arise from an agreement

25  to arbitrate entered into by the parties, but is mandated by the Legislature as to certain civil cases

26  filed in court.'"  [¶]  " 'Thus, like a voluntary dismissal, a judicial arbitration award in favor of

27  defendant reflects a decision on the lack of merit of a claim which was brought originally in court.

28  Permitting such terminations to support a claim of malicious prosecution furthers the public

4

1   purpose underlying the cause of action—namely to discourage abuse of the judicial system by the

2   bringing of maliciously motivated but baseless claims.'" (*Id.* at 316, quoting *Sagonowsky*, 64

3   Cal.App.4th at 131-132.)

4        In light of these considerations, mandatory fee arbitration is closer to judicial arbitration,

5   which may support a claim for malicious prosecution, than to contractual arbitration, which may

6   not. *First*, the outcome of a mandatory fee arbitration proceeding is not a final resolution of the

7   dispute to which the parties have agreed to bind themselves, since just as in judicial arbitration, any

8   party may request trial de novo. (Bus. & Prof. Code § 6204; see, e.g., *Rosenson v. Greenberg*

9   *Glusker Fields Claman & Machtinger LLP* (2012) 203 Cal.App.4th 688, 693 ["An award under the

10  MFAA is not binding, absent a written agreement to make it binding by the parties. In contrast, the

11  party's typical expectation under the [California Arbitration Act] is that the arbitration award will

12  be final."]; *Giorgianni v. Crowley* (2011) 197 Cal.App.4th 1462, 1472 ["It is presumed under the

13  MFAA that the arbitration award will be nonbinding."].) Unlike private contractual arbitration,

14  which "'is designed to serve a function analogous to—and typically to eliminate the need to resort

15  to—the court system,'" (*Brennan*, 25 Cal.4th at 317, quoting *Moore v. Conliffe* (1994) 7 Cal.4th

16  634, 643), that is, mandatory fee arbitration may result, at either party's option, in further litigation

17  in the court system.

18       *Second*, the "crucial difference" between judicial arbitration and contractual arbitration

19  identified in *Brennan* also distinguishes mandatory fee arbitration from contractual arbitration:

20  mandatory fee arbitration, as its name connotes, is also "mandated by the Legislature as to certain

21  civil cases filed in court." Under the MFAA, unless the client has agreed in writing to arbitration

22  of all disputes concerning fees, costs, or both, arbitration under the Act of such disputes "shall be

23  voluntary for a client and shall be mandatory for an attorney if commenced by a client." (Bus. &

24  Prof. Code § 6200(b).) Unlike contractual arbitration, that is, "the obligation to arbitrate under the

25  MFAA is based on a statutory directive and not the parties' agreement. Thus, a client may invoke

26  the MFAA and proceed to arbitration despite the absence of any prior agreement to do so."

27  (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 984; accord, *Rosenson*, 203 Cal.App.4th at 693 ["Unlike

28  arbitration based on an agreement under the [California Arbitration Act], arbitration under the

1  MFAA is based on statute and does not require a prior agreement."].) That the parties here agreed
2  in writing to arbitrate any fee disputes therefore is irrelevant, since the fee arbitration Noe initiated
3  would have been mandatory as to Dorit in any event.

4      *Third*, a mandatory fee arbitration award in favor of a defendant attorney reflects a decision
5  on the lack of merit of a claim which was or could have been brought originally in court. Under
6  the MFAA, if the attorney commences an action in any court and the client is entitled to fee
7  arbitration, the client may stay the action by serving and filing a request for arbitration before filing
8  an answer in the action. (Bus. & Prof. Code § 6201(b).) Upon filing and service of the request for
9  arbitration, the action filed by the attorney shall be automatically stayed until the arbitrator's award
10  is issued or the arbitration is otherwise terminated. (*Id.* § 6201(c)). Further, before an attorney
11  files an action against the client, the attorney must forward a written notice to the client regarding
12  the client's right to arbitration under the MFAA. (*Id.* § 6201(a).) Thus, permitting the favorable
13  terminations of mandatory fee arbitrations to support a claim of malicious prosecution furthers the
14  public purpose underlying the cause of action—to discourage abuse of the judicial system by the
15  bringing of maliciously motivated but baseless claims.

16      For these reasons, the Court concludes that like judicial arbitration but unlike private
17  contractual arbitration, mandatory fee arbitration under the MFAA may give rise to a malicious
18  prosecution action in an appropriate case. Because there is no question that the underlying
19  arbitration was terminated in Dorit's favor, it remains to determine whether he has shown a
20  probability of prevailing on the other two elements of his cause of action for malicious prosecution,
21  lack of probable cause and malice. The Court concludes that he has.

22      "The question of probable cause is 'whether as an objective matter, the prior action was
23  legally tenable or not.'" [Citation.] 'A litigant will lack probable cause for his action either if he
24  relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery
25  upon a legal theory which is untenable under the facts known to him.'" (*Soukup v. Law Offices of*
26  *Herbert Hafif*, 39 Cal.4th at 292.)

27      Here, Dorit's evidentiary showing is ample to demonstrate a probability of prevailing on
28  this element for purposes of the anti-SLAPP statute. Noe entered into a fee contract with Dorit in

1  which he agreed to pay Dorit "a non-refundable retainer fee of $10,000.00" in exchange for Dorit's

2  investigation of potential medical malpractice claims against Kaiser arising out of his mother's

3  death. (Dorit Decl. ¶ 7 & Ex. C at 1.) Although Dorit discouraged him from spending money on

4  such a review, Noe insisted on proceeding with the engagement, but then prevented Dorit from

5  orally presenting the results of his analysis. (Dorit Decl. ¶¶ 7, 10; Ex. B at 5, 6.) Noe thereafter

6  falsely claimed that Dorit had not reviewed the files and instead had a paralegal do the work, even

7  though Dorit did not then employ a paralegal. (Dorit Decl. ¶¶ 11, 22.) Noe then asked for a refund

8  of the fee, first a partial refund and then a complete refund, although he had expressly agreed in

9  writing that it would be non-refundable. (*Id.* ¶ 11.)

10         Noe asserted in his arbitration brief that Dorit had "demonstrated a total lack of attention, to

11  the file." (Dorit Decl., Ex. D at 4; see also *id.* at 6 [seeking award "which recognizes the failure of

12  Mr. Dorit to provide the services that he was paid to provide."].) Following the hearing, however,

13  the arbitrator specifically found that Dorit performed the contracted-for services, and that Noe did

14  not present any evidence to suggest that he did not. (Ex. B at 5; see also *id.* ["When asked why he

15  believed Attorney did not do the work, Client had no real answer."]; id. at 6 [finding "unsupported"

16  Noe's belief that Dorit had not done the work and had purposefully delayed"].) This finding, in

17  and of itself, is sufficient to establish Noe's lack of probable cause for his claims. (See *Sycamore*

18  *Ridge Apartments, LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1404 [absent evidence that

19  would demonstrate any factual support for her claim, plaintiff's "subjective feelings" were

20  insufficient to support her claim.] Further, although Noe asserted that Dorit had delayed unduly in

21  rendering his opinion, the arbitrator found any brief delay to be "inconsequential." (Ex. B at 5.)

22  Further, the arbitrator rejected Noe's claim that Dorit was obligated to provide a written report,

23  finding that the fee contract did not require such a report, and that Noe had taken inconsistent

24  positions on that issue. (Ex. B at 6.) At the conclusion of the hearing, the arbitrator expressly

25  found that Dorit was entitled to the $10,000 fee he received, and that Noe was not entitled to any

26  refund of that fee. (Ex. B at 7.) Noe's failure to present any evidence in the arbitration hearing to

27  support his claims, and the inconsistent positions he took in the arbitration, which contradicted the

28

7

1  plain language of his written agreement, constitute prima facie evidence there was no probable

2  cause to support his claims against Dorit.

3       " 'The "malice" element . . . relates to the subjective intent or purpose with which the

4  defendant acted in initiating the prior action. [Citation.] The motive of the defendant must have

5  been something other than that of bringing a perceived guilty person to justice or the satisfaction in

6  a civil action of some personal or financial purpose. [Citation.] The plaintiff must plead and prove

7  actual ill will or some improper ulterior motive.' " (*Soukup*, 39 Cal.4th at 292.) Here, the record

8  shows that Noe ignored Dorit's communications explaining that his claim was baseless and

9  warning Noe that pursuing baseless legal claims could lead to legal claims against him, and instead

10 insisted on proceeding with the arbitration. (Dorit Decl. ¶ 12; Compl., Ex. A.) "Moreover, malice

11 can also be inferred from the evidence that [Noe] lacked probable cause to initiate and maintain the

12 underlying action against [Dorit]." (*Soukup*, 39 Cal.4th at 296.) Finally, Noe made a personal

13 threat to Dorit at the end of the hearing, which the arbitrator found to be "completely inappropriate

14 and unwarranted." (Dorit Decl. ¶ 15 & Ex. B at 6.) That threat provides further compelling

15 evidence of ill will or personal malice on Noe's part. Dorit's showing therefore is sufficient to

16 establish malice for the limited purpose of defeating Noe's motion to strike.

17       For the foregoing reasons, Noe's special motion to strike Dorit's complaint is denied.

18       **IT IS SO ORDERED.**

19

20

21   Dated:  April 9, 2019

                                HON. ETHAN P. SCHULMAN

22

23

24

25

26

27

28

                                    8

CGC-19-572638              J NILEY DORIT VS. JACK NOE ET AL

I, the undersigned, certify that I am an employee of the Superior Court of California, County Of San Francisco and not a party to the above-entitled cause and that on April 10, 2019 I served the foregoing  ORDER DENYING DEFENDANT JACK NOE'S SPECIAL MOTION TO STRIKE on each counsel of record or party appearing in propria persona by causing a copy thereof to be enclosed in a postage paid sealed envelope and deposited in the United States Postal Service mail box located at 400 McAllister Street, San Francisco CA  94102-4514 pursuant to standard court practice.

Date: April 10, 2019

By: M. GOODMAN

AARON P. MORRIS
MORRIS & STONE, LLLP
17852 E 17TH ST, STE 201
TUSTIN, CA  92780

DORIT, J NILEY
220 MONTGOMERY ST.
SAN FRANCISCO, CA  94104

EXHIBIT G

A145599

COURT OF APPEAL OF THE STATE OF CALIFORNIA FIRST APPELLATE DISTRICT DIVISION FOUR

# Singer v. Alice Tse

Decided Apr 10, 2018

A145599

04-10-2018

RICHARD SINGER et al., Cross-complainants and Respondents, v. ALICE TSE, Defendant and Appellant.

Schulman, J.

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115. (San Francisco County Super. Ct. No. CGC14537549)

Cross-defendant Alice Tse (Tse) appeals from an order denying her special motion to strike. Cross-complainants Patricia Singer and Richard Singer (Singer)[1] alleged, in their third cause of action, that Tse falsely represented to others that Singer owned and controlled property alleged to be in "abhorrent" condition, when in fact, Tse was the sole owner and manager of the property. Tse filed a special motion to strike that cause of action, arguing her statements were "protected activity" under Code of Civil Procedure section 425.16.[2] The trial court concluded Tse did not carry her burden of proving that the statements were "act[s] in furtherance of [Tse's] right of . . . free speech" as defined in section 425.16, subdivision (e). We conclude the motion was properly denied. *2

2

[1] We shall refer to Richard Singer individually as "Singer" and Patricia Singer and Richard Singer collectively as "the Singers."

[2] All references to statutes are to the Code of Civil Procedure.

### A. Legal Principles Governing a Special Motion to Strike

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)[3]

[3] A special motion to strike is also referred to as an "anti-SLAPP" motion, which means a motion against a "strategic lawsuit against public participation." The acronym was coined by Penelope Canan and George W. Pring, professors at the University of Denver (Canan & Pring, *Strategic Lawsuits Against Public Participation* (1988) 35 Soc. Probs. 506). (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57, fn. 1 (*Equilon Enterprises*).)

Our Supreme Court has outlined the two steps involved in applying the anti-SLAPP statute: " 'First, the court decides whether the [cross-]defendant has made a threshold showing that the challenged cause of action is one "arising from" protected activity. (§ 425.16, subd. (b)(1).)

If the court finds such a showing has been made, it then must consider whether the [cross-complainant] has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820 (*Oasis West*).) Only a cause of action that arises from protected speech and lacks even minimal merit is subject to being stricken under the anti-SLAPP statute. (*Id.* at p. 820.)

"We review an order granting or denying a motion to strike under section 425.16 de novo." (*Oasis West, supra,* 51 Cal.4th at p. 820.) *3

3

### B. Protected Activity or Speech

A claim is subject to the anti-SLAPP statute under section 425.16 if it is an " 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue.' " These acts are enumerated as follows: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).) It is the moving party's burden to show that the alleged activities or statements supporting the challenged cause of action arose out of any of these forms of protected activity. (*PrediWave Corp. v. Simpson Thacher & Bartlett LLP* (2009) 179 Cal.App.4th 1204, 1218-1219.)

### C. Factual Background

The factual history underlying this appeal is somewhat complex, but we need not review it in its entirety. Only the following facts are relevant to the dispute before us.

According to Singer: A building located at 1300 Webster Street in Oakland (the Property) was owned by Prize Group, LLC, which in turn was owned by a trust of which Singer was the trustee. In early 2011 Singer pled guilty to criminal charges of solicitation to commit arson related to the Property. Singer was incarcerated from June 2011 to December 2012, was released to a halfway house until May of 2013, and thereafter was on probation. While living at the halfway house Singer worked for Innovistech Realty, Tse's real estate company. *4

4

In March 2011, before Singer was sentenced, all of the membership interest in Prize Group, LLC was sold to another trust, of which Tse was a trustee. From and after March of 2011, Singer had no ownership interest in, or managerial control over, the Property. Since the date that Tse's trust purchased the Property, the owners have failed to pay property taxes or maintain insurance, and the Property has fallen into "abhorrent" "slum-like" conditions.

Singer financed a portion of the Prize Group, LLC purchase price, taking two promissory notes. One of the promissory notes was secured by another property (the Julian property). The note was not timely repaid and Singer commenced foreclosure proceedings against the Julian property.

Before issuing a notice of default Singer spoke with Tse's attorney to determine whether a resolution regarding the overdue note could be reached. During that call, the attorney threatened to create problems with Singer's probation by claiming that Singer's employment with Innovistech was a "sham" unless Singer agreed to accept a lesser amount than was due on the note. When Singer objected, the attorney stated he would characterize the objection as a threat

against him and his client, and asked rhetorically whether the probation officer would believe Singer or " 'an attorney and officer of the court.' "

Thereafter, according to Singer, continuing in the attempt to coerce Singer to accept a discounted sum, Tse told a reporter and a blogger multiple times that "*she was buying properties for [Singer].*" Singer claims that Tse and others have "spread falsehoods" to the effect that Singer maintains an interest in the Property and "is responsible for the abhorrent, criminal and unsafe conditions" at the Property.

**D. Procedural History**

Tse sued Singer and others to stop the foreclosure on the Julian property, alleging various causes of action, including fraud. The court issued an injunction halting the foreclosure proceedings. *5

The Singers filed a cross-complaint, alleging, among other claims, a cause of action for libel and slander. They alleged that Tse and related persons knowingly falsely stated to news reporters and bloggers that Singer remains the owner and exercises control over the Property, and that he is responsible for the abhorrent conditions which have existed since the sale of the Property to Tse. The Singers further alleged that the statements were made for purpose of securing leverage against Singer and to deflect attention by governmental agencies for the uninhabitable conditions on the Property. Singer alleged damage to his reputation; the Singers also alleged malice and sought punitive damages.

Tse then filed a special motion to strike that cause of action, pursuant to section 425.16. In support of the motion, Tse filed a declaration denying that she stated Singer owned the Property or was responsible for the conditions on the premises. Rather, "[t]he only thing [she has] told a news reporter about Richard Singer was that [she] had a new fraud case against [him]," referring to the above-described lawsuit. Tse further averred that she never spoke with the reporter, but only left a

voicemail message, and believes that the quote in the news article "reflects the basic substance of the information [she] provided...in [her] message."

Attached to Tse's declaration was a news article from SF BayView, entitled "Mass evictions at Oakland's Empyrean Towers."[4] The article described Singer's history with the Property, his conviction, and earlier litigation regarding habitability issues at the Property. The article then reported the following: "[A]ccording to public records with 'corporation wiki,' Richard Singer has partnered with real estate broker Alice Tse to own and manage the building through Empyrean Towers LLC and Innovistech Realty Co. [¶] As a real estate broker, Alice Tse has been buying properties for Singer for a number *6 of years and she called me a few times around the beginning of 2014. [¶] Over the phone Alice Tse stated a few times that she was buying properties for Singer, and that she was very concerned about Singer's activities. Then on Feb. 21, 2014, I received a strange email from Alice Tse [] that said: 'I have a new fraud case committed by Richard Singer who attempted to burn down [the Property]. Please call me....' [¶] I tried calling a few times but Alice did not respond to my call, and I wondered what happened. Only lately did I learn that she is partners at the Empyrean Towers with Richard Singer." The article then went to describe the plight of various tenants who were facing eviction at the Property and concluded with a statement from the "[e]viction attorney" who said she had "no comment regarding [the] many questions about 20 tenants or more allegedly facing eviction by Richard Singer and Alice Tse."

[4] Empyrean Towers is the Property.

In her memorandum in support of the motion to strike Tse argued, in essence, that she did not make the statements alleged in the cross-complaint, but only told the reporter she had a new fraud claim against Singer; that statement, she asserted, was protected as one made in connection with an official judicial proceeding. Tse argued,

additionally, that Singer could not show a probability of prevailing on his claim. According to Tse, she "never stated that [Singer] still had ownership or control of [the Property] or was responsible for the conditions of the property since it was transferred, [and therefore Singer] cannot produce competent, admissible evidence to support this allegation." Finally, Tse contended that her statement about having a fraud claim against Singer was true and therefore Singer could not prevail.

Tse's motion to strike was denied. The court ruled that statements made by Tse regarding the litigation (the fraud claim) were not the basis of the claim alleged in the third cause of action, and so, Singer's defamation cause of action was not shown to arise out of protected activity. *7

**E. Argument on Appeal**

On appeal, Tse makes a slightly different argument. She contends the trial court erred in focusing on what was alleged in the complaint as the basis for the libel and slander claim instead of what she claims she actually said. From that premise, she argues (1) that she "never actually made the statements Richard Singer alleges in his Cross-Complaint" and (2) *if* she stated she was "buying properties for Mr. Singer" and "was very concerned about his activities," those statements were made only "in specific reference to her recently filed fraud action...." Whether or not it can be proved that she made the alleged statements, Tse's analysis is without merit.

The contention that the trial court must focus on *Tse's* version of the facts rather than on the allegations of the complaint is feckless. As its plain language makes clear, the anti-SLAPP statute applies to "[a] cause of action against a person" that arises out of protected speech activity (§ 425.16, subd. (b)(1)); that is, it applies to "*allegations* of activity protected by the statute." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 381 (emphasis added); see also *id.* at pp. 381-382 ("Typically, a pleaded cause of action states a legal

ground for recovery supported by specific allegations of conduct by the defendant on which the plaintiff relies to establish a right to relief.") Tse "cannot meet [her] threshold showing in step one by pointing to the lack of evidence that the statements were made . . . ." (*City of Costa Mesa v. D'Alessio Investments, LLC* (2013) 214 Cal.App.4th 358, 372.) "The question is what is pled—not what is proven." (*Comstock v. Aber* (2012) 212 Cal.App.4th 931, 942.)

Tse argues that language in *Navellier v. Sletten* (2002) 29 Cal.4th 82 (*Navellier*) supports her theory because it states that the anti-SLAPP statute focuses "not on the form of the plaintiff's cause of action but, rather, the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Id.* at p. 92.) But the court in *Navellier* was not distinguishing between the allegations of a complaint and the defendant's own version of the facts. Rather, the court *8 was addressing the question of whether a breach of contract cause of action could be the subject of an anti-SLAPP motion. To decide that issue, the court in *Navellier* looked at the allegations of the complaint to determine whether the acts alleged were or were not protected, stating, "Plaintiffs' cause of action for breach of contract is grounded in allegations that [defendant] filed counterclaims in the federal action and that his 'filing of said . . . counterclaims and assertion that the Release was invalid directly and proximately damaged [plaintiffs]. . . .' " (*Navellier, supra*, 29 Cal.4th at p. 89.)

Additionally, Tse's claim that her statement (if made) about buying properties for Singer was made only in connection with her fraud claim, is specious on its face. Singer alleged in his cross-complaint that Tse (or persons acting under her direction) falsely stated to news reporters and bloggers that Singer still owns and has control over the Property, and that he is responsible for the abhorrent conditions there. Tse's complaint against Singer, in contrast, relates entirely to Singer's

attempts to collect on promissory notes and to foreclose on property securing one of the promissory notes. There are allegations of fraud (misrepresentation of the amounts due on the loans), wrongful foreclosure (violation of Civ. Code, §§ 2924, 2924f), breach of contract and violation of the Unfair Competition Law. There are *no* allegations pertaining to ownership or control of the Property or to Tse buying properties for Singer.

As Singer correctly argues, the first step in the analysis of an anti-SLAPP motion looks only at the conduct alleged as the basis for plaintiff's cause of action, viz., "the act or acts of which the plaintiff complains" to determine whether it is protected activity. (*Equilon Enterprises*, *supra*, 29 Cal.4th at p. 67; and see *Martinez v. Metabolife Internat.*, *Inc.* (2003) 113 Cal.App.4th 181, 188, citing *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 79 [whether anti-SLAPP statute applies is determined by the "principal thrust or gravamen of the plaintiff's cause of action"]; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062 ["A claim arises from protected activity when that activity underlies or forms the basis for the claim"].) The question of

9  whether *9 the plaintiff—here, the cross-complainant—can produce evidence supporting the allegations comes into play only at the second step of the anti-SLAPP analysis. "In its motion, the defendant *must make a threshold showing* that the plaintiff's cause of action arises from the defendant's free speech or petition activity, as specified in the statute. (§ 425.16, subds. (b), (e).) The burden then shifts to the plaintiff to establish a probability of prevailing on the claim. [Citation.]" (*Haight Ashbury Free Clinics*, *Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1547, italics added.) Tse has not made that threshold showing here because the challenged statements do not fall within any of the categories of protected speech defined in section 425.16, subdivision (e). (See *Navellier*, *supra*, 29 Cal.4th at p. 88 [moving party meets its burden to

show that the challenged cause of action is one arising from protected activity by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.16, subd. (e)].)

Tse contends that her statements about her fraud claim against Singer and "comments to the press regarding  .  .  .  Singer's real estate malfeasances/real estate fraud should be considered protected speech on a matter of public interest." As a theoretical matter we do not disagree, but Singer did not allege that Tse made any false statements about his real estate malfeasances or fraud; he alleged that Tse represented that Singer maintained ownership and control over the Property, and was responsible for its deplorable condition. Tse categorically denies making such statements, and asserts these are only "false assumptions" or "misconception[s]" Singer had about what Tse said to the reporter. Again, this is a question of proof, which is considered under the second prong of the anti-SLAPP analysis, only if there is an initial determination that the acts alleged are protected activity.

Tse's next arguments are equally unavailing. First, she contends that her "statements/comments to [the] news reporter .   . that she had a new fraud case against Richard Singer" are protected under section 425.16, subdivision (e)(4) as statements

10  *10 made in connection with a public issue because of "Singer's history and notoriety in the Bay Area." Next, she argues that her statements "that she had a real estate transaction history with Mr. Singer and that she was 'very concerned about his activities' serve the purpose of informing and warning the public about Mr. Singer's potential untrustworthiness." Even assuming these contentions are viable, they are irrelevant because (again) these are not the representations that form the basis of Singer's libel claim, which are that, in conjunction with Tse, he still owned and controlled the Property.

In the final section of her brief, Tse actually addresses the alleged defamatory statements that Singer still had ownership and control over the property. First, she argues the statements are protected because they are "substantially connected to an official judicial proceeding," i.e., the action filed by Tse. Tse contends that her complaint involves fraud and contract claims on liens Singer holds against the Property and other properties, and therefore "Mr. Singer's ownership interest in [the Property] is directly at issue in the litigation. . . ." This mischaracterizes both the law and the subject matter of Tse's litigation.

To begin with, it is not clear from the complaint that there is any lien against the Property. The complaint alleges, as background, that Tse purchased the Property from Singer, that Tse executed a promissory note in favor of Singer and a title company, and that the note was "secured by a deed of trust with Singer as beneficiary." The allegation does not identify what property secured the deed of trust, but states only that that deed of trust was recorded in San Francisco.[5] Tse further alleged that the deed of trust for the Property was also secured by two other properties. The charging allegations all pertain to Singer's alleged fraud, breach of contract and wrongful foreclosure on property in San Francisco, in an attempt to collect on the promissory note, which was in default. No issue is raised or implicated as to Singer's

11    ownership or control of the Property. *11

      [5] The Property is located in Oakland, not San Francisco.

As to the law, a deed of trust conveys only a security interest in property; it conveys no ownership or control over the property. "Despite the existence and validity of the secured interest created by a deed of trust, the trustor-debtor retains all incidents of ownership with regard to the real property, including the rights of possession and sale. [Citation.]" (*Jenkins v. JP Morgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 508, disapproved on other grounds by

*Yvanova v. New Century Mortg. Corp.* (2016) 62 Cal.4th 919, 939, fn. 13; see also *Shuster v. BAC Home Loans Servicing, LP* (2012) 211 Cal.App.4th 505, 510.) The lien allegedly held by Singer on the Property thus does not implicate any ownership interest.

Tse also argues that her statements were "in connection with an official judicial proceeding" because they were made three days after she filed the complaint. Tse cites no authority for the proposition that a statement made *after* the filing of a complaint is made "in connection with" that judicial proceeding, and we have found none. It is not the timing but the content of the statement that controls. A statement is protected if it involves "the subject of the dispute." (Cf. *Rohde v. Wolf* (2007) 154 Cal.App.4th 28, 36.)

Finally, despite having repeatedly denied she ever stated or insinuated that Singer still owned or controlled the property or was responsible for its condition, and despite having affirmatively asserted that she is and has been the owner of the Property—and that Singer has relinquished ownership and control—since March 2011, Tse argues that the alleged statements are protected because *if* they were true, they would be a subject of public interest. This argument was forfeited because it was not adequately raised or developed below. It was merely referenced in a single phrase in a paragraph describing Singer's sordid history with the Property, the press coverage of that story since 2011, and unspecified claims of other incidents of fraud, malfeasance and landlord tenant disputes. Tse argued in that context that "comments [made] to the press [about] Richard Singer's previous *and/or continued involvement* [with the Property] and/or any other real estate malfeasances/fraud or landlord/tenant disputes

12    should be considered protected speech on *12 a matter of public interest (italics added)" because "they serve to inform the community and other bay area property owners about the potential risks of doing business with Richard Singer—the owner of multiple properties in the region."

In any event, even if the argument had been properly preserved, we would reject it. Tse contends that the alleged defamatory statements fall within two additional categories of protected activity set forth in section 425.16, subdivision (e). The first of these applies to "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (§ 425.16, subd. (e)(3).) The second applies to "any other conduct in furtherance of . . . the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)[6] Thus, we must determine whether the statements alleged here were "in connection with an issue of public interest," the element common to both categories.

> [6] Tse properly conceded at oral argument that the allegations in this case do not implicate the constitutional right to petition.

Tse asserts that her alleged statements fall within the first of these categories because they were made in a public forum and "provide[] the public . . . information regarding a powerful organization that impacts their lives."[7] Alternatively, she contends *13 that regardless of whether they were made in a public forum, they fall within the second category because, in light of Singer's prior conviction of solicitation to commit arson, "the public would certainly have an interest in his current involvement with the property, and the risk this would potentially pose to the public." While Tse's position is not obviously untenable, we are ultimately unpersuaded.

> [7] We cannot determine whether the statements, which were allegedly made to "news reporters and bloggers," were made "in a place open to the public or a public forum." (§ 425.16, subd. (e)(3).) Tse argues that "comments that appear in Internet news sites and/or local newspapers are made in a 'public forum.' " We agree. (See *Cross v. Facebook, Inc.* (2017) 14

Cal.App.5th 190, 199 [websites accessible to the public are public forums for purposes of the anti-SLAPP statute]; *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1252 [postings on Facebook page and Instagram account and comments during radio broadcast were all made in a place open to the public or a public forum].) But as Tse conceded below, the cross-complaint does not allege that the statements were actually reported or reprinted in newspapers or on blogs or other online sites. Statements "made in a private setting" to a newspaper reporter during an interview, but that are not actually published, may not qualify. (*Zhao v. Wong* (1996) 48 Cal.App.4th 1114, 1131, overruled on other grounds in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10.) Because the public interest component is determinative, however, we need not decide this issue.

As Tse acknowledges, section 425.16 "does not provide a definition for 'an issue of public interest,' and it is doubtful an all-encompassing definition could be provided." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132.) The numerous reported decisions on the subject are intensely fact-dependent and arguably difficult to reconcile. Nonetheless, we are able to distill the following governing principles from the cases.

First, the definition of "public interest" within the meaning of the anti-SLAPP statute "has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479.) Examples include situations in which the subject of the statement or activity was in either "a person or entity in the public eye [citations], conduct that could directly affect a large number of people beyond the direct participants [citations] or a topic

of widespread, public interest." (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 (*Rivero*).) "Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest." (*Weinberg v. Feisel, supra*, 110 Cal.App.4th at p. 1132.)

Second, "simply because a general topic is an issue of public interest, not every statement somewhat related to that subject is also a matter of 14 public interest within the *14 meaning of section 425.16, subdivision (e)(3) or (4)." (*Jackson v. Mayweather, supra*, 10 Cal.App.5th at p. 1253.) " [T]here should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]." (*Weinberg v. Feisel, supra*, 110 Cal.App.4th at p. 1132.) "One cannot focus on society's general interest in the subject matter of the dispute instead of the specific speech or conduct upon which the complaint is based." (*Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 481.) For example, in *Dual Diagnosis Treatment Center, Inc. v. Buschel* (2016) 6 Cal.App.5th 1098, the court held that while discussion of drug and alcohol rehabilitation services may well be an issue of public interest, the licensing status of a single rehabilitation facility—the subject of a newspaper article that defendant republished in a newsletter that was distributed to approximately 22,000 readers—was not. (*Id.* at pp. 1103-1104.) Similarly, in *Olaes v. Nationwide Mutual Ins. Co.* (2006) 135 Cal.App.4th 1501, the court held that while "the public interest in the fair resolution of claims of sexual harassment is undeniable," that general public interest "does not bring a complaint alleging defamation during a sexual harassment investigation into section 425.16's ambit." (*Id.* at p. 1510; see also *Jackson v. Mayweather, supra*, 10 Cal.App.5th at p. 1253 [collecting authorities].)

Third, "in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119, fn. omitted.) There, plaintiff alleged that he was terminated from his employment as assistant business manager of a union, and that a defamatory statement about his termination was posted on the union website 15 falsely *15 stating that he had been removed from office for financial mismanagement. The court observed that while the statement presumably was of interest to the union membership, it was "unconnected to any discussion, debate or controversy." (*Id.* at p. 118.) Members of the local were not being urged to take any position on the matter, or indeed to take any action whatever. (*Ibid.*) Because the allegedly defamatory statement was not made in the context of any ongoing controversy, dispute or discussion, the court concluded, it was not entitled to the statute's protection. (*Id.* at p. 119.)

Here, these principles compel the conclusion that the alleged statements regarding Singer's ownership and control of the Property were not in connection with "a public issue" or "an issue of public importance." (§ 425.16, subds. (e)(3) & (e) (4).) First, the statements directly concerned a relatively small, specific audience—the tenants of the Property—rather than a large number of people. While the record does not reveal the precise number of tenants at the Property, there appears to be no dispute that it is a seven story multi-unit, low income residential building that was occupied by at most a few dozen tenants. The alleged statements concerning Singer's alleged responsibility for conditions at the Property

directly concerned that relatively small group of tenants, which undermines Tse's position that they implicated a larger public interest. (See, e.g., *Olaes v. Nationwide Mutual Ins. Co.*, *supra*, 135 Cal.App.4th at p. 1511 ["a dispute among a small number of people in a workplace does not implicate a broader public interest"]; *Rivero*, *supra*, 105 Cal.App.4th at p. 924 [union's statements concerning supervision of a staff of eight custodians by plaintiff, an individual who had previously received no public attention or media coverage, was "hardly a matter of public interest"]; compare *Damon v. Ocean Hills Journalism Club*, *supra*, 85 Cal.App.4th at p. 479 [statements regarding management of homeowners association of more than 3,000 individuals concerned public interest].)

16   Second, and relatedly, the ownership and management of the Property is not a subject of "*widespread*, public interest." (*Rivero*, *supra*, 105 Cal.App.4th at p. 924, *16 italics added.) "There is no showing that [the Property] impacts, or has the potential to impact, a broad segment of society." (*Dual Diagnosis Treatment Center, Inc. v. Buschel*, *supra*, 6 Cal.App.5th at p. 1105.) Nor is there a sufficient "degree of closeness" between the challenged statements, which essentially accused Singer with being a slumlord responsible for substandard conditions at a single, small residential hotel, and the "broad and amorphous" topic of safe, habitable housing in Oakland, the topic of public interest articulated by Tse's counsel at oral argument. (See *Price v. Operating Engineers Local Union No. 3* (2011) 195 Cal.App.4th 962, 972-973 [flyers which union and striking employees distributed in general manager's neighborhood were not made in connection with an issue of public interest where they did not mention the labor dispute and manager was not involved in collective bargaining process].)

Tse attempts to link the alleged statements to Singer's prior arson conviction, but the statements themselves made no mention of that conviction.

Nor did they warn prospective tenants of the Property or the public at large of any risk that might be posed in that regard by his alleged continued ownership and management of the Property.[8] For this reason, Tse misplaces her reliance on cases involving Internet postings on consumer-oriented websites. Courts have reasoned that such postings are directly connected to an issue of public concern because they provide information " 'in the nature of consumer protection information,' " such as a warning not to use the plaintiff's services. (*Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1144; see also *Piping Rock Partners v. David Lerner Associates* (N.D. Cal. 2013) 946 F.Supp.2d 957, 969 [statement was "a warning to consumers not to do business with plaintiffs because of their allegedly faulty business practices"]; *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898 ["Consumer information,

17   *17 . . . at least when it affects a large number of persons, also generally is viewed as information concerning a matter of public interest"].) In *Grenier v. Taylor*, *supra*, 234 Cal.App.4th 471, similarly, the court held that allegedly defamatory statements that accused the plaintiff pastor of molesting a child and misappropriating church funds were connected to an issue of public concern because, among other reasons, the speakers were "attempting to warn people away from attending the Church with [plaintiff] as the pastor," a situation "analogous to consumer protection information." (*Id.* at p. 483.) But the statements alleged here contained no such warning or other consumer protection information; rather, they asserted only that Singer had an ownership interest in the Property and was responsible for its current substandard conditions.

[8] Tse's emphasis on the issue seems disingenuous, since she admitted on reply that she agreed to employ Singer in her real estate business following his release from prison (although she characterized that employment relationship as a "sham").

Third, there is no evidence in the record that would support the conclusion that there was any "ongoing controversy, dispute or discussion" regarding Singer's ownership or control of real property, in Oakland or elsewhere, to which the statements could have contributed. In *Dual Diagnosis Treatment Center, Inc. v. Buschel*, *supra*, for example, the subject newsletter republished an article stating that a rehabilitation facility for mentally ill persons was unlicensed. While the city had filed a lawsuit against the facility's owner about one week before the newsletter was disseminated alleging the facility was a public nuisance, there were no allegations concerning the licensing status of the facility, and no other evidence of an ongoing discussion, dispute or controversy on that topic. (6 Cal.App.5th at p. 1106.) Under the circumstances, the court concluded that while the statement "might be of interest to a limited group, such as potential clients, neighboring residents and businesses, and/or certain industry professionals," it did not address an issue of public interest under the statute. (*Id*. at pp. 1105-1107.) "To grant protection to mere informational statements, in

this context, would in no way further the statute's purpose of encouraging *participation* in matters of public significance (§ 425.16, subd. (a))." (*Du Charme v. International Brotherhood of Electrical Workers*, *supra*, 110 Cal.App.4th at p. 118.) *18

Thus, under the circumstances presented here, the alleged statements regarding Singer's ownership and control of the Property and purported responsibility for its current conditions were not "in connection with an issue of public interest."

## DISPOSITION

The order denying Tse's special motion to strike is affirmed. *19

/s/

Schulman, J.* We concur: /s/

Reardon, J. /s/

Streeter, Acting P.J.

> * Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution. --------



EXHIBIT H

PHILIP A. SEGAL
Email phil@kernlaw.com

KERN SEGAL & MURRAY
15 SOUTHGATE AVENUE, SUITE 200
DALY CITY, CA 94105

TELEPHONE  (415) 474-1900
FACSIMILE   (415) 474-0302

* Also admitted in FL & TX



LONG BEACH OFFICE

301 E. OCEAN BLVD., SUITE 660
LONG BEACH, CA 90802

TELEPHONE:   (562) 451-6200
FACSIMILE:   (415) 474-0302

REPLY TO DALY CITY OFFICE

December 23, 2020

SENT VIA EMAIL (james@jisonlaw.com)

James Ison
333 University Ave Suite 200
Sacramento, CA 95825
T: (916)563-7677
F: (916)929-0488

> Re:    TALENS v. JAPANESE FEAST INC.ET AL
>         D/A:                        3/21/2018
>         Our File No.:               MERCU 1128

Dear Mr. Ison:

Early on in the case when **Mr. Segal** was still speaking to you on the phone, both sides agreed that we would pay for the mediation in exchange for you dismissing Mr. Kawashima. Whether it is with prejudice or without, we do not care either way. There were no other conditions. That agreement has not changed. We have now participated in good faith in the mediation and offered your client $250,000.00 when your initial demand was $85,000.00. We have now fulfilled our end of the bargain. We now demand that you dismiss Mr. Kawashima without prejudice if that is what you desire. Please find enclosed the dismissal for your signature. Please file it within 7 days.

It is our position that you attended the mediation in bad faith. I arrived at the mediation in San Rafael by 9:35am and Ms. Strong arrived at 9:50am. She was in the room with me the whole time. However, you did not arrive until 10:25am and came without your client despite our agreement that your client would be attending in person. We will file a motion for bad faith participation in mediation and request sanctions as you showed up late and without your client. However, if you agree to fulfill your end of the bargain and dismiss Mr. Kawashima we will forego filing the motion. Please provide the filed dismissal by email by December 30, 2020 at 5pm.

Please contact me if you have any questions or concerns

Thank you for your courtesy and cooperation.

James Ison
TALENS v. JAPANESE FEAST INC.ET AL
December 23, 2020
Page 2 of 2.

Best regards.

Very truly yours,

BRYANA S. MCGUIRK

PAS/BSM
*Enclosure: Request for Dismissal*

EXHIBIT I

James Ison

| | |
|---|---|
| **From:** | Bryana McGuirk <bmcguirk@kernlaw.com> |
| **Sent:** | Monday, February 15, 2021 12:46 PM |
| **To:** | James Ison |
| **Cc:** | Phil Segal; Sara Yun |
| **Subject:** | Re: Talens v. Japanese Feast Inc., et al. - 19-CIV-05403 |
| **Attachments:** | STRONG_PARKING.pdf |

Mr Ison,

This issue should have been put to rest months ago when you spoke to Mr. Diamond. She drove her own vehicle. See attached Ms. Strong's debit card line item for the parking garage. Now that you have your proof we both PERSONALLY attended, though your client failed to attend, please sign and return the dismissal as agreed. Thank you.

On Mon, Feb 15, 2021 at 11:56 AM James Ison <james@jisonlaw.com> wrote:

> Mr. Segal:
>
>
> If Ms. Strong was there, why you are so reluctant to provide information and are willing only to provide highly redacted credit card statement that could be helpful, but in and of itself proves nothing.  Just give me the information and records necessary and we can put this particular issue to rest for good.
>
>
> How did Ms. Strong get to San Rafael?  Did she fly and if so on what airline?  Did she come by bus?  Rental car?  Please advise – answering those simple questions in a straightforward manner will move us a long way toward resolving this issue.
>
>
> Thanks, Jim
>
> ---
> **From:** Bryana McGuirk <bmcguirk@kernlaw.com>
> **Sent:** Monday, February 15, 2021 8:51 AM
> **To:** James Ison <james@jisonlaw.com>
> **Cc:** Phil Segal <phil@kernlaw.com>; Sara Yun <syun@kernlaw.com>
> **Subject:** Re: Talens v. Japanese Feast Inc., et al. - 19-CIV-05403
>
>
> Mr. Ison:

Tara was in attendance as well. She has a debit card line item that was cleared the following day that she was in the parking garage as well. We are not be producing her entire debit card statement. If you will give up on this whole thing as she was actually there we will consider producing her redacted debit card statement. Please let me know.

Thank you.

On Feb 11, 2021, at 11:07 AM, James Ison <james@jisonlaw.com> wrote:

Mr. Segal:

We are in receipt of your responses to plaintiff's request for production of documents set one to Kenichi Kawashima and request for production of documents set two to The Japanese Feast, Inc.  Neither Mr. Kawashima nor his company provided documents providing that Ms. Tara Strong was in San Rafael for the so called "mediation".  Are you going to produce documents that prove that Ms. Strong was physically present?  And that Ms. McGuirk was present?  And remove the meritless objections.  If I don't hear from you by noon on Monday, we will request an IDC on the presumption that you will not change your position.  If you wish to confer further, please let me know by then.

Thanks, Jim

James J. Ison, Esq.

The Ison Law Firm, PC

333 University Avenue, Suite 200

Sacramento, CA 95825

Ph: (916) 565-7677

Cell: (415) 290-4223

Account Activity

| 12/17/2020 | Withdrawal | Withdrawal at PARKING SVC/SAN RAF 0 PARKING SVC/SAN SAN RAFAEL CA US | Not Categorized | -$0.50 |